EXHIBIT B

## IN THE SUPERIOR COURT FOR FULTON COUNTY
## STATE OF GEORGIA

BPCP INVESTMENT HOLDINGS, LP,

        Plaintiff,

v.

SILVERPEAK HOLDINGS, LLC, CHAPMAN DUCOTE, WAR CHEST REAL ESTATE, LLC, AND SPOILS OF WAR, LLC,

        Defendants.

CIVIL ACTION FILE NO.

26CV005216

### VERIFIED COMPLAINT FOR BREACH OF CONTRACT, DECLARATORY JUDGMENT, ACCOUNTING, TEMPORARY RESTRAINING ORDER AND INTERLOCUTORY INJUNCTION

Plaintiff BPCP INVESTMENT HOLDINGS, LP, as assignee and successor to BAY POINT CAPITAL PARTNERS II LP ("**Lender**" or "**Plaintiff**"), files this Complaint against SILVERPEAK HOLDINGS, LLC ("**Parent**"), CHAPMAN DUCOTE ("**Ducote**"), WAR CHEST REAL ESTATE, LLC ("**War Chest**"), and SPOILS OF WAR, LLC ("**Spoils**", and collectively with Parent, Ducote, and War Chest, "**Defendants**"), respectfully showing this Court as follows:

### PARTIES

1.     Plaintiff is a limited partnership with its primary offices located in Atlanta, Georgia.

2.     Parent is a Colorado limited liability company that has consented to jurisdiction before this Court.

3.     Ducote is a natural person domiciled in Florida that has consented to jurisdiction before this Court.

4.     War Chest is a Florida limited liability company that has consented to jurisdiction before this Court.

EXHIBIT B

5.    Spoils is a Florida limited liability company that has consented to jurisdiction before this Court.

## PRELIMINARY STATEMENT

6.    Plaintiff commences this action to remedy the Defendants' flagrant violations of Loan Documents (defined below) and intentional dissipation of assets, which continues at an alarming pace.

7.    Specifically, Defendants' principal, Chapman Ducote, sold valuable real property interests that were pledged to Defendants and failed to distribute those proceeds to the Lender. Further, Ducote liquidated a certificate of deposit in the amount of $10,000,000 required to be maintained under the Loan Documents and allegedly transferred the proceeds to his ex-wife, along with certain membership interests pledged to the Lender.  Lender has also learned that a sale of valuable real property owned by a pledging party is imminent—in yet another attempt by Ducote or his agents to willfully harm Plaintiff.  Now, one of the borrower entities is in a Colorado receivership, Ducote is allegedly nowhere to be found, and the Lender's only point of contact, the Defendants' alleged financial advisor, has ceased communications.  Against this backdrop, Plaintiff seeks emergency relief to maintain the status quo and prevent further irreparable harm to its interests.

8.    These facts herein show the Defendants' flagrant disregard for their obligations under the Loan Documents and their willingness to dissipate assets pledged to the Lender as collateral.  There is a clear and substantial threat that the Lender will suffer irreparable injury if the continued dissipation of assets by the Defendants is not enjoined.  Accordingly, the Plaintiff is seeking, among other relief, entry of a temporary restraining order and interlocutory injunction

2

EXHIBIT B

preventing the further dissipation of collateral and preserving the status quo while the Lender seeks to vindicate its rights under the Loan Documents and applicable law in this Court.

## JURISDICTION AND VENUE

9. Plaintiff brings this action in the Superior Court of Fulton County, pursuant to the parties' express forum-selection and consent-to-jurisdiction provisions in the operative Loan Documents.

10. Section 11.6(b) of the *Loan and Security Agreement* dated October 18, 2022 (the "**Loan Agreement**") provides that the Obligors[1] irrevocably and unconditionally submit to the jurisdiction of this Court. *See* **Exhibit A**, Loan Agreement § 11.6(b).

11. Obligors also waived any objection to this Court having proper venue over any such suit, action or proceeding relating to the Loan Documents, among other things. *See* **Exhibit A**, Loan Agreement, § 11.6(c).

12. Each Guarantor[2] likewise has irrevocably submitted to jurisdiction in Georgia and waived any objection to venue in Georgia courts. *See* **Exhibits G–I**, Guaranty Agreements, §§ 14.

13. Accordingly, venue is proper in, and the parties have consented to the exclusive jurisdiction of this Court.

## BACKGROUND FACTS

### Loan and Loan Documents

14. On October 18, 2022, Parent (the "**Borrower**")[3], entered into the Loan Agreement with (i) Lender, and (ii) Ducote, War Chest, and Spoils collectively as guarantor

---

[1] "Obligors" is defined in the Loan Agreement as "Parent, Silverpeak, each Guarantor, and any other Person who has granted a security interest or Lien in favor of Lender to secure all or any portion of the Obligations under the Loan Documents."

[2] "Guarantor" is defined in the Loan Agreement as Ducote, War Chest, and Spoils.

[3] The other Borrower entity under the Loan Agreement, Silverpeak Corp. ("**Silverpeak**"), is subject to a receivership proceeding pending in the District Court of Denver County, Colorado. Plaintiff reserves the right to amend this Verified Complaint to add Silverpeak Corp. as a defendant as may be permitted by the terms of the receivership order.

3

EXHIBIT B

(the "**Guarantor**"), pursuant to which Lender made a term loan in the principal amount of $13,000,000 to the Borrower (the "**Loan**"). *See* **Exhibit A**.

15.     The Loan is further evidenced by that certain *Note* issued by the Borrower in favor of Lender on October 18, 2022 in the principal sum of $13,000,000 (the "**Note**"). *See* **Exhibit B**.

16.     The Loan is secured by all assets of the Borrower, *see* **Exhibit A**, Loan Agreement, § 4.1, which security interest was perfected by UCC-1 financing statement filed with the Secretary of State in the State of Colorado on October 20, 2022. *See* **Exhibit C**. The Loan Agreement and the Note are both governed by Colorado law, and the parties have consented to venue in this Court. *See* **Exhibit A**, Loan Agreement, § 11.6.

17.     As further security for the Loan, Ducote pledged 100% of his membership interests in War Chest to Lender pursuant to that certain *Pledge Agreement* dated as of October 18, 2022 in favor of Lender (the "**War Chest Pledge Agreement**"), attached hereto as **Exhibit D**.[4]

18.     Lender's security interests under the War Chest Pledge Agreement were perfected by filing a UCC-1 financing statement with the Secretary of State in the State of Florida on October 20, 2022. *See* **Exhibit E**.

19.     The War Chest Pledge Agreement is governed by Colorado law, and the parties have consented to venue in this Court. *See* **Exhibit D**, War Chest Pledge Agreement, § 6.6.

20.     War Chest previously owned the following valuable real property and improvements:

(i)     50% of Eastbay Shopping Center (971-1221 S. University Avenue, Provo, Utah ("**Provo TIC**"); and

---

[4] Certain other pledges were also made to secure the Loan but are not material to this Complaint.

4

(ii)    38.7% of Silver Lake Village (2311 SE Adams Blvd., Bartlesville, Oklahoma ("**OK TIC**").

21.    War Chest currently owns, through a tenancy in common (90% of Muncie Marketplace), valuable real property located at 600 E. McGalliard Rd, Muncie, Indiana ("**Muncie TIC**"). At the time the Loan was extended, War Chest owned only 40.5% of the Muncie TIC. Without Lender's consent, War Chest apparently transferred its interest in the OK TIC in exchange for a 90% interest in the Muncie TIC. The transfer was recorded in Delaware County, Indiana on March 27, 2026 through that certain *Memorandum of Tenancy in Common Agreement*, dated as of March 20, 2026, with War Chest Jr, LLC, a Utah limited liability company ("**War Chest Jr.**", and together with War Chest, the "**Co-Owners**") (the "**TIC Memorandum**"), attached hereto as **Exhibit F**. The TIC Memorandum was only provided to Lender on April 7, 2026.

22.    The TIC Memorandum describes a Tenancy-in-Common Agreement dated as of March 20, 2026 governing the rights and obligations of the Co-Owners with respect to War Chest's 90% undivided interest and War Chest Jr.'s 10% undivided interest in the Muncie TIC. A copy of the Tenancy-in-Common Agreement was not provided to the Lender.

23.    The Provo TIC was also sold without Lender's consent.

24.    On October 18, 2022, each Guarantor executed a substantially identical *Guaranty Agreement* in favor of Lender (together, the "**Guaranty Agreements**", and collectively with the Loan Agreement, War Chest Pledge Agreement, the Loan Documents (as defined in the Loan Agreement), and all other related documents, instruments, letters, notes, and agreements, including, without limitation, security agreements, deposit account control agreements, pledge agreements, guaranties, promissory notes, deeds of trust, and financing statements, the "**Loan Documents**"). *See* **Exhibits G–I**. The Guaranty Agreements are governed by Colorado law, and

the parties have consented to venue in this Court. *See* **Exhibits G–I**, Guaranty Agreements, §§ 13, 14.

25.     The following amounts are due under the Loan Documents as April 3, 2026, excluding certain accruing legal costs and expenses:

| | |
|---|---|
| Principal | $ 11,501,267.11 |
| Interest | $ 4,096,160.68 |
| Deferred Interest | $ 2,029,485.56 |
| Late Fee | $ 1,503,458.33 |
| Exit Fee | $ 500,000.00 |
| Legal Fees | $ 52,629.18 |
| Total | $ 19,683,000.87 |

**Default and Acceleration**

26.     On December 12, 2025, Lender properly notified (such notice, the "**Default Letter**") the Borrower and each other Obligor that an event of default had occurred for failure to pay Lender principal and interest pursuant to Section 2.3 of the Loan Agreement (the "**Initial Event of Default**"). Pursuant to the Default Letter, the Lender accelerated all amounts due under the Loan Agreement and Note. *See* **Exhibit J**. The Defendants, through counsel, responded to the Demand Letter on December 22, 2025, making inaccurate claims about negotiations that were allegedly ongoing among the parties. *See* **Exhibit K**.

27.     Under each Guaranty Agreement, each Guarantor unconditionally and jointly and severally guaranteed all obligations owing under the Loan Documents.

28.     Guarantors failed to satisfy the obligations of the Borrower under the Loan Documents following delivery of the Default Letter and at all times thereafter, in violation of the Guaranty Agreements.

29.     The War Chest Pledge Agreement provides that, upon the occurrence and continuation of any Event of Default under the Loan Agreement or Note, Lender has all rights and remedies of a secured party upon default under the War Chest Pledge Agreement, the UCC or

6

other applicable law. *See* **Exhibit D**, War Chest Pledge Agreement, § 5.2. The War Chest Pledge Agreement provides that the Pledgor shall not sell, assign, transfer, pledge, or encumber in any other manner the applicable Collateral. *See* **Exhibit D**, War Chest Pledge Agreement, § 4.1.

**Dispositions of Assets in Violation of Loan Documents**

30.     As detailed below, Defendants have intentionally violated the Loan Documents by selling off and transferring assets to scuttle Lender's ability to realize any meaningful recovery on the substantial sums loaned to Borrower.

31.     First, unbeknownst to Lender and without Lender's consent, War Chest and Ducote sold War Chest's interest in the Provo TIC. Despite the War Chest Pledge Agreement, which pledged all dividends, distributions, cash, and similar property to secure repayment of the amounts due and owing under the Loan Documents, Ducote and War Chest did not pay the proceeds of the sale to Lender, all in violation of the Loan Documents.

32.     Second, without Lender's consent, War Chest also transferred its interest in the OK TIC in exchange for a 90% interest in the Muncie TIC. The transfer is purportedly memorialized, in part, by the TIC Memorandum, which was provided to Lender on April 7, 2026, although the underlying Tenancy-in-Common Agreement was allegedly executed on March 20, 2026.

33.     Third, Ducote liquidated a certificate of deposit (the "**CD**") in the amount of $10,000,000.00, which was issued by Hancock Whitney Bank, and apparently paid the proceeds to his wife (or ex-wife, as the case may be ("**Ducote's Ex-Wife**"), or otherwise transferred the CD to her, in violation of the Loan Agreement. Lender was not paid proceeds from the CD. Pursuant to the Loan Agreement, Ducote was required to maintain the CD. *See* **Exhibit A**, Loan Agreement, § 6.10.

EXHIBIT B

34.     Fourth, the Lender was also informed that Ducote allegedly transferred an interest in War Chest to Ducote's Ex-Wife, in violation of the War Chest Pledge Agreement and the Loan Agreement, for what appears to be little or no consideration.

35.     Fifth, the Lender has been informed that Ducote's alleged divorce case resulted in the transfer of effectively all of Ducote's property, leaving him with little to no assets.[5]

**Communications with Loan Parties**

36.     Jim Martin, the Managing Partner of ACM Capital Partners, LLC ("**Martin**") has allegedly been hired by Ducote and/or War Chest for the purpose of restructuring their financial affairs.

37.     Martin has recently informed Lender that there are offers to purchase the Muncie TIC.  However, despite repeated requests, Martin has not provided information requested by Lender with respect thereto, including without limitation purchase offers, contracts, broker information, terms and timing of sale, etc.

38.     Despite repeated requests, Martin has not provided information regarding the Receivership Case, including the case, location, draft pleadings, receivership order, etc.

39.     Martin has recently stopped communicating with Lender concerning Ducote, the Muncie TIC, the sale of the Muncie TIC, the Loan Documents, and related items, instead referring Lender to his "corporate counsel".

40.     Additionally, Martin has made conflicting statements to the Lender concerning the location of cash being generated by the Muncie TIC.

---

[5] The Lender has been led to believe that the other remaining assets are the businesses subject to a receivership case filed on April 7, 2026 in Colorado ("**Receivership Case**") and the Muncie TIC.

EXHIBIT B

41.    When questioned about the discrepancies, Martin replied "game on"—thus further indicating his intent not to cooperate with Lender concerning its collateral and the repayment of amounts due under the Loan Documents.

42.    Given the repeated and documented pattern of the Obligors and their agents to intentionally violate the Loan Documents, fraudulently transfer and abscond with Lender's collateral, and otherwise engage in bad faith behavior, Lender was left with no choice but to seek emergency relief from this Court to maintain the status quo in an attempt to preserve what little collateral may remain.

## COUNT I: BREACH OF LOAN AGREEMENT AND NOTE AGAINST BORROWER

43.    Lender incorporates and realleges the foregoing paragraphs as if fully set forth herein.

44.    On October 18, 2022, the Borrower and the Lender entered into the Loan Agreement.

45.    Lender has performed and fulfilled all obligations as set forth in the Loan Agreement.

46.    The Borrower has materially breached the Loan Agreement, including, but not limited to, the Initial Event of Default.  Further, the transfer of assets by Ducote and War Chest violates section 7 of the Loan Agreement, and Ducote has materially breached the Loan Agreement through failure to maintain a CD in the amount of $10,000,000.00 (collectively with the Initial Event of Default, the "**Events of Default**").

47.    Despite written demand, the Borrower has failed to pay the lender the amounts they are obligated to pay under the Loan Agreement and Note.

48.    As supported by the facts alleged above, Lender is entitled to judgment against the Borrower in the amount of not less than $19,683,000.87, plus costs and expenses and accrued but

9

EXHIBIT B

unpaid interest as of the date of judgment.

## COUNT II: BREACH OF GUARANTY AGREEMENTS AGAINST GUARANTORS

49.    Lender incorporates and realleges the foregoing paragraphs as if fully set forth herein.

50.    On October 18, 2022, each Guarantor entered into a Guaranty Agreement.

51.    Each Guarantor has materially breached its respective Guaranty Agreement by the failure to make payment to the Lender for amounts due under the Loan Agreement following the occurrence and during the continuation of an event of default under the Loan Agreement. Guarantors failed to satisfy the obligations of the Borrower under the Loan Documents following delivery of the Default Letter and at all times thereafter, in violation of the Guaranty Agreements.

52.    As a result of each Guarantor's failure and refusal to pay the amounts due under the Loan Agreement, each Guarantor is in default under its respective Guaranty Agreement.

53.    As supported by the facts alleged above, Lender is entitled to a judgment against each Guarantor in the amount of not less than $19,683,000.87, plus costs and expenses and accrued but unpaid interest as of the date of judgment.

## COUNT III: BREACH OF WAR CHEST PLEDGE AGREEMENT

54.    Lender incorporates and realleges the foregoing paragraphs as if fully set forth herein.

55.    On October 18, 2022, Ducote entered into the War Chest Pledge Agreement.

56.    Ducote has materially breached the War Chest Pledge Agreement by transferring an interest in War Chest to Ducote's Ex-Wife, in violation of section 4.1 of the War Chest Pledge Agreement.

57.    As supported by the facts alleged above, Ducote should be held liable for the value of the War Chest membership interest transferred to Ducote's Ex-Wife and other damages incurred

10

by Lender as a result thereof in an amount to be determined at trial.

## COUNT IV: DECLARATORY JUDGMENT
## WITH RESPECT TO ASSET DISPOSITIONS AGAINST WAR CHEST AND DUCOTE

58.    Lender incorporates and realleges the foregoing paragraphs as if fully set forth herein.

59.    This Court has authority to issue declaratory relief pursuant to the Georgia Declaratory Judgment Act, O.C.G.A. § 9-4-1 *et seq.*, to settle and afford relief from uncertainty and insecurity with respect to the parties' rights, status, and legal relations.

60.    An actual and justiciable controversy exists between Lender and War Chest concerning Lender's rights to the proceeds from the sale of the Muncie TIC, including the calculation of the sale proceeds.

61.    By virtue of the failure to pay Lender the proceeds from the sale of the Provo TIC and the comments by Martin, it appears that Ducote and War Chest dispute Lender's entitled to the proceeds from the sale of the Muncie TIC.

62.    Lender is presently suffering uncertainty and insecurity regarding the disposition of the sale of the proceeds of the Muncie TIC.

63.    Lender has also exercised its rights to conduct a foreclosure sale of Ducote's interest in War Chest.

64.    Lender is presently suffering uncertainty and insecurity regarding its collateral, as Martin alleges that Ducote has transferred a portion of his ownership interest in War Chest to Ducote's Ex-Wife.

65.    Declaratory relief will terminate the controversy and clarify the parties' respective rights and obligations.

EXHIBIT B

66.    Lender requests that the Court declare that Lender is entitled to all proceeds arising from the Muncie TIC.

## COUNT V: ACCOUNTING AGAINST ALL DEFENDANTS

67.    Lender incorporates and realleges the foregoing paragraphs as if fully set forth herein.

68.    The Court should require a full and complete accounting from each Defendant of any and all collateral transferred in violation of any of the Loan Documents, including without limitation the Muncie TIC and transfers in violation of the War Chest Pledge Agreement.

## COUNT VI: TEMPORARY RESTRAINING ORDER AND INTERLOCUTORY INJUNCTION AGAINST ALL DEFENDANTS

69.    Lender incorporates and realleges the foregoing paragraphs as if fully stated herein.

70.    O.C.G.A. § 9-11-65(b) provides that a "temporary restraining order may be granted without written or oral notice to the adverse party or his attorney only if:

(1)    It clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition; and

(2)    The applicant's attorney certifies to the court, in writing, the efforts, if any, which have been made to give the notice and the reasons supporting the party's claim that notice should not be required."

71.    An interlocutory injunction may issue upon a showing that (1) there is a substantial threat that the moving party will suffer irreparable injury if the injunction is not granted; (2) the threatened injury to the moving party outweighs the threatened harm that the injunction may do to the party being enjoined; (3) there is a substantial likelihood that the moving party will prevail on the merits of her claims at trial; and (4) granting the interlocutory injunction will not disserve the

12

EXHIBIT B

public interest. The test for the issuance of an interlocutory injunction is a balancing test, and all four factors need not be proven to obtain the interlocutory injunction.

72.    Lender will suffer immediate and irreparable injury if an injunction is not granted. Ducote is insolvent according to the admissions of his retained financial advisor, Martin. Ducote and War Chest have clearly been engaged in a campaign to dissipate assets in violation of the Loan Documents. If Ducote, War Chest and the other Defendants are permitted to continue dissipating assets, Lender will suffer immediate and irreparable injury because Lender will be prevented from recovering on its claims under the Loan Agreement, Note, Guaranty Agreements and other Loan Documents.

73.    In addition, the transfers of the War Chest equity and CD (or its proceeds) to Ducote's Ex-Wife exhibit several badges of fraud within the definition of O.C.G.A. § 18-2-74(a)(1). The transfer was concealed from the Lender, and the value received does not appear to be reasonably equivalent to the interests transferred. On information and belief, Ducote was insolvent or became insolvent shortly after the transfers, and they were made after the Default Letter was sent, when Ducote was in apprehension of potential litigation with respect to the Loan. All of these badges provide a strong basis to conclude that the transfers were made with actual intend to place assets out of reach of the Lender.

74.    There is no harm to the Defendants in entering a temporary injunction. The scope of the injunction merely preserves Lender's right to the proceeds of the Muncie TIC and its other collateral while the litigation remains pending.

75.    Lender is likely to succeed on the merits of its breach of contract claims. The Borrower and the Guarantors have breached the Loan Agreement and Note and the Guaranty Agreements, respectively, and have failed to satisfy their obligations thereunder despite the

13

EXHIBIT B

Lender's demands. The Defendants have not cured the Events of Default despite Plaintiff's demand they do so.

76. Lender is also likely to succeed on the merits of its claim of right to entitlement of the proceeds from the sale of the Muncie TIC. Lender has a perfected security interest in Ducote's ownership of War Chest pursuant to the War Chest Pledge Agreement, and War Chest in turn owns the Muncie TIC. Further, Lender has a guaranty by War Chest, pursuant to which War Chest is obligated for all amounts due and owing under the Loan Documents.

77. The public interest will be served by the entry of a preliminary injunction. Indeed, the public has an interest in seeing that contractual obligations are observed and enforced and that obligors are not able to abscond with assets that may be used to satisfy valid debts and obligations.

## COUNT VII: ATTORNEYS' FEES

78. Lender incorporates and realleges the foregoing paragraphs as if fully set forth herein.

79. Pursuant to section 11.4 of the Loan Agreement, Borrower agreed to reimburse Lender for all reasonable and documented out-of-pocket costs and expenses incurred by Lender after an Event of Default in connection with the collection of the Obligations or the enforcement of the Loan Agreement, the other Loan Documents, or any other such documents. *See* **Exhibit A**, Loan Agreement, § 11.4.

80. Pursuant to section 6 of the Guaranty Agreements, the Guarantors agreed to reimburse Lender for all expenses incurred in connection with any action or proceeding for the enforcement of the Guaranty Agreements, including, without limitation, reasonable attorneys' fees. *See* **Exhibits F–H**, Guaranty Agreements, § 6.

81. The Plaintiff has initiated this lawsuit to enforce the Loan Agreement, Loan Documents, and Guaranty Agreements.

EXHIBIT B

82.    Consequently, the Borrower and the Guarantors are liable for all costs and expenses, including attorneys' fees, incurred in connection with this suit.

83.    Notice is hereby given in accordance with O.C.G.A. § 13-1-11 of Plaintiff's intent to enforce the attorneys' fees provisions in the Loan Agreement and Guaranty Agreements. Borrowers and Guarantors are hereby notified that they have ten (10) days following services of this Verified Complaint and summons with which to pay the accrued principal and interest stated above to avoid liability for payment of statutory attorneys' fees. Notice was previously given pursuant to the Default Letter.

**WHEREFORE**, Plaintiff respectfully prays for relief as follows:

A.    As to Count I, entry of judgment against the Borrower for breach of the Loan Agreement and Note in the amount of not less than $19,683,000.87, plus costs and expenses and accrued but unpaid interest as of the date of judgment.

B.    As to Count II, entry of judgment against each Guarantor for breach of the Guaranty Agreements in the amount of not less than $19,683,000.87, plus costs and expenses and accrued but unpaid interest as of the date of judgment.

C.    As to Count III, entry of judgment against Ducote for the value of the War Chest membership interest transferred to Ducote's Ex-Wife and other damages incurred by Lender as a result thereof in an amount to be determined at trial.

D.    As to Count IV, entry of a declaratory judgment that Lender is entitled to all proceeds arising from the Muncie TIC.

E.    As to Count V, entry of an order requiring a full and complete accounting from each Defendant of any and all collateral transferred in violation of any of the Loan Documents, including without limitation the Muncie TIC and transfers in violation of the War Chest Pledge Agreement.

F.    As to Count VI, entry of a temporary restraining order and interlocutory injunction against Defendants preserving Lender's right to the proceeds of the Muncie TIC and its other collateral while the litigation remains pending.

G.    As to Count VII, entry of an order requiring Borrower and Guarantors to pay Lender's attorneys' fees.

EXHIBIT B

Dated: April 10, 2026

/s/ J.A. Schneider
John C. Allerding
Georgia Bar No. 952436
J.A. Schneider
Georgia Bar No. 141437
**THOMPSON HINE LLP**
Two Alliance Center, Suite 1600
3560 Lenox Road
Atlanta, Georgia 30326
T: 404-541-2900 / F: 404-541-2905
*John.Allerding@ThompsonHine.com*
*JA.Schneider@ThompsonHine.com*

*Counsel for Plaintiff*

16

EXHIBIT B

## IN THE SUPERIOR COURT FOR FULTON COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| BPCP INVESTMENT HOLDINGS, LP,<br><br>Plaintiff,<br><br>v.<br><br>SILVERPEAK HOLDINGS, LLC, CHAPMAN DUCOTE, WAR CHEST REAL ESTATE, LLC, AND SPOILS OF WAR, LLC,<br><br>Defendants. | CIVIL ACTION FILE NO.<br><br>_____ |

## VERIFICATION

PERSONALLY APPEARED BEFORE ME, the undersigned authority, Greg Jacobs, the Chief Operating Officer at Bay Point Advisors, LLC, the general partner of Bay Point Capital Partners II, LP and BPCP Investment Holdings, LP, the Plaintiff in this action, that he is authorized to verify the above and foregoing *Verified Complaint for Breach of Contract, Declaratory Judgment, Accounting and Temporary Restraining Order* as to all Loan Documents and exhibits attached thereto and incorporated therein, and all sums outstanding and owing under thereunder, and that such documents are true and correct copies of the originals and all statements as to amounts owing thereunder are true and correct.

Dated: April 10, 2026

EXHIBIT B

**FURTHER AFFIANT SAYETH NOT**

This 10th day of April 2026.

_____
Greg Jacobs

Sworn to and subscribed before me in the State of
GEORGIA, FULTON _____ County, this
___ day of April 2026.

_____ [SEAL]
Notary Public

My Commission Expires: March 18, 2030

AMANDA SCOTT
NOTARY
EXPIRES
GEORGIA
MARCH 18, 2030
PUBLIC
COBB COUNTY

*Signature Page – Verification*

EXHIBIT B

# IN THE SUPERIOR COURT FOR FULTON COUNTY
## STATE OF GEORGIA

BPCP INVESTMENT HOLDINGS, LP,

      Plaintiff,

v.

SILVERPEAK HOLDINGS, LLC,
CHAPMAN DUCOTE, WAR CHEST REAL
ESTATE, LLC, AND SPOILS OF WAR,
LLC,

      Defendants.

CIVIL ACTION FILE NO.

_____

## VERIFICATION

PERSONALLY APPEARED BEFORE ME, the undersigned authority, Mitchell Dagley, a Managing Director at Bay Point Advisors, LLC, the general partner of Bay Point Capital Partners II, LP and BPCP Investment Holdings, LP, the Plaintiff in this action, that he is authorized to verify the above and foregoing *Verified Complaint for Breach of Contract, Declaratory Judgment, Accounting and Temporary Restraining Order* as to all factual allegations regarding communications related to Defendants' respective assets and the dissipation thereof, the lack of Plaintiff's notice with respect to Defendants' dissipation of assets, communications related to offers received by Defendant War Chest Real Estate, LLC's for the Muncie TIC, and Plaintiff's request for information regarding the same, and that that the matters stated therein are true and correct.

Dated: April 10, 2026

EXHIBIT B

**FURTHER AFFIANT SAYETH NOT**

This 10th day of April 2026.

_Mitchell Dagley_

Sworn to and subscribed before me in the State of
GEORGIA, FULTON _____ County, this
_10_ day of April 2026.

_____ [SEAL]

Notary Public

My Commission Expires: March 18, 2030

AMANDA SCOTT
NOTARY
EXPIRES
GEORGIA
MARCH 18, 2030
PUBLIC
COBB COUNTY

*Signature Page – Verification*

EXHIBIT B

## EXHIBIT A

EXHIBIT B

## LOAN AND SECURITY AGREEMENT

This LOAN AND SECURITY AGREEMENT (this "Agreement") is entered into as of October 18, 2022, by and between SILVERPEAK HOLDINGS, LLC, a Colorado limited liability company ("Parent"), SILVERPEAK CORP., a Colorado corporation ("Silverpeak" and together with Parent, collectively, the "Borrower"), as borrower, CHAPMAN DUCOTE, a resident of the State of Florida ("Ducote"); WAR CHEST REAL ESTATE, LLC, a Florida limited liability company ("War Chest"), SPOILS OF WAR LLC, a Florida limited liability company ("Spoils" together with Ducote and War Chest, "Guarantor"), as guarantors, and BAY POINT CAPITAL PARTNERS II, LP, a Delaware limited partnership ("Lender"), as lender.

Lender has agreed to make available to Borrower a term loan upon the terms and subject to the conditions set forth herein. In consideration of the mutual agreements herein, the parties agree as follows:

## 1.    DEFINITIONS AND CONSTRUCTION.

**1.1    Definitions.** As used in this Agreement, the following terms shall have the following definitions:

"Account Debtor" means "account debtor" as such term is defined in the UCC.

"Accounts" means all presently existing and hereafter arising accounts, contract rights, payment intangibles, and all other forms of obligations owing to Borrower arising out of the sale or lease of goods or the rendering of services by Borrower, whether or not earned by performance, and any and all credit insurance, guaranties, and other security therefor, as well as all merchandise returned to or reclaimed by Borrower and Borrower's books and records relating to any of the foregoing.

"Administrative Account" has the meaning provided in Section 11.5(a) of this Agreement.

"Affiliate" of any Person means (a) any other Person which, directly or indirectly, controls or is controlled by or is under common control with such Person, (b) any partner, manager, trustee, officer, or director of such Person and (c) with respect to Lender, any entity administered or managed by Lender or an Affiliate or investment advisor thereof and which is engaged in making, purchasing, holding, or otherwise investing in commercial loans. A Person shall be deemed to be "controlled by" any other Person if such Person possesses, directly or indirectly, power to vote twenty percent (20%) or more of the securities (on a fully diluted basis) having ordinary voting power for the election of directors or managers or power to direct or cause the direction of the management and policies of such Person whether by contract or otherwise. Unless expressly stated otherwise herein, Lender shall not be deemed an Affiliate of any Obligor.

"Agreement" shall have the meaning provided in the introductory paragraph of this Agreement.

"Amortization Date" shall have the meaning provided in Section 2.3(a) of this Agreement.

"Anti-Corruption Laws" shall mean all laws, rules, and regulations of any jurisdiction applicable to Obligors and their Subsidiaries concerning or relating to bribery or corruption.

"Bankruptcy Code" means Title 11 of the United States Code, §§ 101, *et seq.*

"Borrower" shall have the meaning provided in the introductory paragraph of this Agreement.

"Business Day" means any day other than a Saturday, Sunday, or legal holiday in Denver, Colorado.

4874-5262-8788.6

EXHIBIT B

"Cannabis Code" means, collectively, Sections 14 and 16 of Article XVIII of the Colorado Constitution, the Colorado Regulated Marijuana Code, §§ 44-10-101, et seq., C.R.S., as the same may be supplemented or amended from time to time, together with the regulations promulgated thereunder, and all applicable local laws and regulations thereto promulgated by a Governmental Authority.

"Certificate of Deposit" mean that certain certificate of deposit account established and maintained with by Hancock Whitney Bank in the name of Ducote in an amount not less than $10,000,000.

"Change of Control" means any of the following (or any combination of the following) whether arising from any single transaction event or series of related transactions or events that, individually or in the aggregate, result in: (a) an alteration of the identity of the Persons associated with any of Borrowers requiring approval by the Licensing Division; (b) Ducote ceasing to own, directly or indirectly, at least 51.00% of the Equity Interests of Parent or failing to have the power to direct or cause the direction of the management and policies of Parent; (c) any "person" or "group" (within the meaning of Section 13(d) and 14(d)(2) of the Securities Exchange Act of 1934) becoming the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934), directly or indirectly, of a sufficient number of Equity Interests of Parent ordinarily entitled to vote in the election of directors, empowering such "person" or "group" to elect a majority of the members of the Board of Parent, who did not have such power before such transaction; (d) the sale, transfer or other disposition of all or substantially all assets of any Obligor or of a material business line of any Obligor; (e) Parent ceasing to own and control, free and clear of any Liens (other than the Lien of Lender hereunder), directly or indirectly, at least 100% of the Equity Interests in Silverpeak or failing to have the power to direct or cause the direction of the management and policies of Silverpeak; (f) except as otherwise provided in clauses (e) above, any Obligor ceasing to own and control, free and clear of any Liens (other than Permitted Liens), directly or indirectly, all of the Equity Interests in each of its Subsidiaries or failing to have the power to direct or cause the direction of the management and policies of each such Subsidiary..

"Change in Law" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law including US Federal Cannabis Law, US State Cannabis Law, Controlled Substances Act or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided, that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Closing Date" means the date of this Agreement.

"Collateral" means, collectively, all tangible and intangible property, real and personal of any Person that is or purports to be the subject of a Lien in favor of Lender to secure the whole or any part of the Obligations, including, without limitation, the Mortgaged Property.

"Collateral Assignment of Marijuana Licenses" means, collectively, a Collateral Assignment of Marijuana Licenses for each Marijuana Licenses held by Borrower, as listed on Schedule 5.10 attached hereto, in each case, in form and substance satisfactory to Lender.

2

4874-5262-8788.6

EXHIBIT B

"Collateral Assignment of Lease" means, collectively, a Collateral Assignment of Lease for each location by Borrower, as tenant, as listed on Schedule 5.10 attached hereto in each case, in form and substance satisfactory to Lender.

"Collateral Documents" means, collectively, the Security Instrument, each Mortgage Document, the Parent Pledge Agreement, each Collateral Assignment of Marijuana Licenses, each Collateral Assignment of Lease, each Landlord Agreement and Lien Waiver, each collateral report, each account control agreement and any other agreement or instrument pursuant to which Borrower or any other Person grants or purports to grant collateral to Lender or otherwise relates to such Collateral.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise taxes or branch profits taxes.

"Controlled Substances Act" means Title 21, Chapter 13 of the United States Code, §§ 801, et seq

"Copyrights" means any and all copyright rights, copyright applications, copyright registrations, and like protections in each work or authorship and derivative work thereof.

"Debtor Relief Laws" means the United States Bankruptcy Code, as amended, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States, or other applicable jurisdictions from time to time in effect.

"Default" means any circumstance that, with the passage of time or giving of notice, would constitute an Event of Default.

"Environmental Report" means that certain Environmental Site Assessment Phase I, dated as of April 19, 2021, prepared by AEI Consultants with respect to the Mortgaged Property.

"Equipment" means all present and future machinery, equipment, tenant improvements, furniture, fixtures, vehicles, tools, parts, and attachments in which Borrower has any interest.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options, or other rights entitling the holder thereof to purchase or acquire any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

"Event of Default" has the meaning provided in Section 8 of this Agreement.

"Excluded Taxes" means any of the following taxes imposed on or with respect to Lender or required to be withheld or deducted from a payment to Lender, (a) taxes imposed on or measured by net income (however denominated), franchise taxes, and branch profits taxes, in each case, (i) imposed as a result of Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding taxes imposed on amounts payable to or for the account of Lender with respect to an applicable interest in a Loan pursuant to a law in effect on the date hereof, and (c) any U.S. federal withholding taxes imposed under FATCA.

3

EXHIBIT B

"Exit Fee Date" has the meaning provided in Section 2.8(c) of this Agreement.

"Expense Deposit" has the meaning provided in Section 11.5(b) of this Agreement.

"Facility Termination Date" means the date all Obligations arising under the Loan Documents have been indefeasibly paid in full.

"FATCA" means Sections 1471 through 1474 of the IRC, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the IRC.

"FRB" means the Board of Governors of the Federal Reserve System or any successor thereto.

"GAAP" means U.S. generally accepted accounting principles as in effect from time to time.

"Governmental Authority" is any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"Gross Operating Income" means the sum of any and all amounts, payments, fees, rentals, additional rentals, expense reimbursements (including, without limitation, all reimbursements by tenants, lessees, licensees, and other users of all real property owned by Borrower), discounts or credits to Borrower, income, interest, and other monies directly or indirectly received by or on behalf of or credited to Borrower in the Borrower's Ordinary Course of Business from any person with respect to Borrower's ownership, use, development, operation, leasing, franchising, marketing, licensing, or sale of any property, including, without limitation the sale of Inventory at the fair market value thereof and for cash in the Borrower's Ordinary Course of Business. Gross Operating Income shall be computed on a cash basis and shall include for each monthly statement required to be delivered to Lender hereunder all amounts actually received in such month whether or not such amounts are attributable to a charge arising in such month.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly and including any obligation, direct or indirect, of the guarantor (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities, or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital, or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (d) as an account party in respect of any letter of credit or letter of guaranty issued in support of such Indebtedness or obligation; provided that the term "Guarantee" shall not include endorsements for collection or deposit in the Ordinary Course of Business. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made or, if not so stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith. The term "Guarantee" used as a verb has a corresponding meaning.

4

EXHIBIT B

"Guarantor" means each Person who may from time to time provide a guarantee of the Obligations in favor of Lender, including, as of the Closing Date, mean jointly and severally, Ducote, War Chest and Spoils.

"Indebtedness" means, as to any Person, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations of such Person as a lessee under capital leases, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all obligations of such Person to pay the deferred purchase price of assets (other than (i) trade payables repayable in accordance with customary trade practices and (ii) obligations to pay for services provided by employees and independent contractors, in each case with respect to clauses (i) and (ii) incurred in the Ordinary Course of Business which are not past due by more than 30 days), (f) net obligations of such Person under any hedging transactions, (g) all obligations of such Person to purchase, redeem, retire, defease, or otherwise make any payment prior to the date that is 91 days after the Maturity Date in respect of any Equity Interest in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, and (h) any obligation of such Person guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (g) above. For purposes of this definition, (A) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (B) the amount of any Indebtedness described in clause (d) above shall be the lower of the amount of the obligation and the fair market value of the assets of such Person securing such obligation.

"Indemnified Liabilities" has the meaning provided in Section 11.14 of this Agreement.

"Indemnified Taxes" means (a) taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower or any other Obligor under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Insolvency Proceeding" means any proceeding commenced by or against any Person or entity under any provision of any Debtor Relief Law.

"Intellectual Property" means all of Borrower's right, title, and interest in and to the following: Copyrights, Trademarks, and Patents; all trade secrets, all design rights, claims for damages by way of past, present, and future infringement of any of the rights included above, all licenses or other rights to use any of the Copyrights, Patents, or Trademarks, and all license fees and royalties arising from such use to the extent permitted by such license or rights; all amendments, renewals, and extensions of any of the Copyrights, Trademarks, or Patents; and all proceeds and products of the foregoing, including without limitation all payments under insurance or any indemnity or warranty payable in respect of any of the foregoing.

"Intercreditor Agreements" means those certain Intercreditor and Subordination Agreements by and among Hancock Whitney Bank (formerly known as Whitney Bank) (the "Hancock Whitney Bank") and War Chest and Spoils of War, respectively, in form and substance reasonable satisfactory to Lender, with regard to the first-in priority Liens of the Hancock Whitney Bank encumbering the Mortgaged Property.

5

4874-5262-8788.6

EXHIBIT B

"Inventory" means all inventory in which Borrower has or acquires any interest, including work in process and finished products intended for sale or lease or to be furnished under a contract of service, of every kind and description now or at any time hereafter owned by or in the custody or possession, actual or constructive, of Borrower, including (i) cannabis plants at any stage of their lifecycle, including immature, vegetative, flowering, and harvested cannabis and cannabis plant material, whether or not packaged, (ii) cannabis-infused products, including topicals, edibles, tinctures, and concentrates, (iii) such inventory as is temporarily out of its custody or possession or in transit, (iv) including any returns upon any accounts or other proceeds, including insurance proceeds, resulting from the sale or disposition of any of the foregoing and any documents of title representing any of the above, and (vi) Borrower's books and records relating to any of the foregoing.

"Investment" means any beneficial ownership of (including stock, partnership interest, or other securities) any Person, or any loan, advance, or capital contribution to, or other investment in, any Person.

"IRC" means the Internal Revenue Code of 1986, as amended, and the regulations thereunder.

"Leases" means all leases, contracts, rental agreements, franchise agreements, license agreements, or other occupancy or use agreements, whether oral or written, now existing or hereafter entered into, for the use or occupancy of all or any part of any property leased or owned by Borrower, including, without limitation, the Mortgaged Property, together with all modifications or renewals thereof.

"Landlord Agreement and Lien Waiver" means, collectively, a Landlord Agreement and Lien Waiver for each leased location of Borrower, in each case, in form and substance satisfactory to Lender.

"Lender" shall have the meaning provided in the introductory paragraph of this Agreement.

"Lender Party" has the meaning provided in Section 11.15 of this Agreement.

"Licensing Division" means the Colorado Department of Revenue, Marijuana Enforcement Division.

"Lien" means any mortgage, lien, deed of trust, charge, pledge, security interest, or other encumbrance.

"Lien Waiver" means the waiver or subordination of Liens satisfactory to Lender from a lessor, mortgagee, warehouse operator, bailee, processor, or other third party that may have a Lien upon any Collateral that is in such third party's possession or is located or leased by such party to a Obligor, by which such Person shall waive or subordinate its Liens and claims with respect to any Collateral in favor of Lender and shall assure Lender's access to any Collateral for the purpose of allowing Lender to enforce its rights and Liens with respect thereto.

"Loan" means the term loan made by Lender to Borrower, on the Closing Date pursuant to Section 2.1 in the original principal amount of Thirteen Million and No/100 Dollars ($13,000,000.00).

"Loan Documents" means, collectively, this Agreement, the Note and any note or notes executed by Obligors, the Collateral Documents, each Compliance Certificate, and any other agreement entered into in connection with this Agreement, all as amended or modified from time to time.

"Marijuana Licenses" means each Permit issued by the Licensing Division or any other state or municipal Governmental Authority regarding or related to cannabis.

6

4874-5262-8788.6

EXHIBIT B

"Material Adverse Effect" means a material adverse effect on (a) the business operations, assets, liabilities, properties, condition (financial or otherwise), or results of operations, of Borrower, or (b) the ability of Borrower to repay the Obligations or to perform its obligations under the Loan Documents or (c) the validity or enforceability of Lender's security interests in the Collateral.

"Material Agreement" means (i) each contract, agreement, instrument, permit, lease, or license involving the payment of money in an aggregate amount of One Hundred Thousand Dollars ($100,000) or more, and (ii) each other contract, agreement, instrument, permit, lease, or license, which the failure to comply with could reasonably be expected to result in a Material Adverse Effect.

"Maturity Date" means the earlier of (i) the Stated Maturity Date, and (ii) the date all or any of the Obligations are accelerated pursuant to Section 9 of this Agreement.

"Mortgage Documents" means, collectively, each Security Instrument, duly executed by War Chest and Spoils, respectively, together with, to the extent requested or required by Lender in its sole discretion, each of the following (a) title insurance policies, current as-built ALTA/ACSM Land Title surveys certified to Lender, zoning letters, building permits, and certificates of occupancy, in each case relating to the Mortgaged Property and satisfactory in form and substance to Lender, (b)(i) "Life of Loan" Federal Emergency Management Agency Standard Flood Hazard determinations, (ii) notices, in the form required under the Flood Insurance Laws, about special flood hazard area status and flood disaster assistance duly executed by the applicable Borrower, and (iii) if the improved real property encumbered by the Security Instrument is located in a special flood hazard area, a policy of flood insurance that is on terms satisfactory to Lender, (c) evidence that counterparts of the Security Instrument have been recorded in all places to the extent necessary or desirable, in the judgment of Lender, to create a valid and enforceable Lien (subject to Permitted Liens) on the Mortgaged Property in favor of Lender (or in favor or such other trustee as may be required or desired under local law), (d) an opinion of counsel in the state in which the Mortgaged Property is located in form and substance and from counsel satisfactory to Lender, (e) a duly executed Environmental Indemnity with respect thereto, (f) upon Lender's request, a Phase I Environmental Site Assessment Reports, consistent with American Society of Testing and Materials (ASTM) Standard E 1527-05, and applicable state requirements, on the Mortgaged Property, dated no more than six (6) months prior to the Closing Date, prepared by environmental engineers satisfactory to Lender, all in form, scope, substance, and depth satisfactory to Lender, and such environmental review and audit reports, including Phase II reports, with respect to the Mortgaged Property as Lender shall have requested, in each case together with letters executed by the environmental firms preparing such environmental reports, in form and substance satisfactory to Lender, authorizing Lender to rely on such reports, and Lender shall be satisfied with the contents of all such environmental reports, and (g) such other reports, documents, instruments, and agreements as Lender shall request, each in form and substance satisfactory to Lender.

"Mortgaged Property" means the real property described on Exhibit B attached hereto and incorporated herein by reference, and any improvements thereon.

"Note" means a promissory note made by Borrower in favor of Lender evidencing the Loan made by Lender, substantially in the form of Exhibit A attached hereto.

"Obligations" means (a) all advances to, and debts, liabilities, obligations, covenants, and duties of, Borrower arising under any Loan Document or otherwise with respect to the Loan, (b) all fees and expenses of Lender payable by Borrower hereunder or under any of the other Loan Documents, and (c) all other obligations of the Obligors arising hereunder or under any of the other Loan Documents, in each case identified in clauses (a) through (c) whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against Borrower or any Affiliate thereof of any Insolvency

7

EXHIBIT B

Proceeding naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"Obligor" means Parent, Silverpeak, each Guarantor, and any other Person who has granted a security interest or Lien in favor of Lender to secure all or any portion of the Obligations under the Loan Documents.

"Option to Purchase 1%" shall mean that certain Option to Purchase Membership Interests executed by Ducote to Lender for the purchase of the Option Interests, in form and substance satisfactory to Lender.

"Option to Purchase 5%" shall mean that certain Option to Purchase Membership Interests executed by Ducote to Lender for the purchase of the Option Interests, in form and substance satisfactory to Lender.

"Option to Purchase" shall mean, collectively, that certain Option to Purchase 1% and Option to Purchase 5%.

"Option Percentage" shall have the meaning set forth in the Option to Purchase.

"Ordinary Course of Business" means, with respect to any Person, the ordinary course of such Person's business, as conducted by such Person in accordance with past practices and undertaken by such Person in good faith and not for the purpose of evading any covenant or restriction in any Loan Document.

"Other Connection Taxes" means, with respect to Lender, taxes imposed as a result of a present or former connection between Lender and the jurisdiction (or political subdivision thereof) imposing such tax (other than connections arising from Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced any Loan Document, or sold or assigned an interest in the Loan or any Loan Document).

"Other Taxes" means all present or future stamp, court, or documentary, intangible, recording, filing, or similar taxes that arise from any payment made under, from the execution, delivery, performance, enforcement, or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such taxes that are Other Connection Taxes imposed with respect to an assignment.

"Parent Pledge Agreement" means collectively, that certain Parent Stock Pledge Agreement and that certain Pledge Agreement.

"Parent Stock Pledge Agreement" means that certain Pledge Agreement dated as of the Closing Date, by Parent with respect to the pledge to Lender of 100% (99,750 shares) of the stock the held by Parent in Company.

"Pledge Agreement" means that certain Pledge Agreement dated as of the Closing Date, by Ducote with respect to the pledge to Lender of one-hundred percent (100%) the Equity Interests held by Ducote in Parent.

"Participant" has the meaning provided in Section 11.3(d) of this Agreement.

"Participant Register" has the meaning provided in Section 11.3(d) of this Agreement.

8

4874-5262-8788.6

EXHIBIT B

"Patents" means all patents, patent applications, and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions, and continuations-in-part of the same.

"Patriot Act" has the meaning provided in Section 11.13 of this Agreement.

"Permit(s)" means, with respect to any Person, any authorizations, consents, permits, approvals, authorizations, licenses, registrations, certificates, concessions, grants, variances, permissions, and exemptions from, and all filings, contractual obligations and registrations with, and all reports to, any Governmental Authority, in each case whether or not having the force of law and applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject, which are required for (a) the execution, delivery and performance of the Loan Documents, (b) the transactions contemplated by the Loan Documents, (c) the conduct of the business of each Obligor, and (d) the ownership (or lease) of the properties of each Obligor.

"Permitted Indebtedness" means: (a) Indebtedness of Borrower in favor of Lender arising under this Agreement or any other Loan Document; (b) Indebtedness existing on the Closing Date and described on Schedule 7.3; (c) Indebtedness secured by a lien described in clause (c) of the defined term "Permitted Liens," provided (i) such Indebtedness does not exceed the lesser of the cost or fair market value of the equipment financed with such Indebtedness and (ii) such Indebtedness does not exceed One Hundred Thousand Dollars ($100,000) in the aggregate at any given time; (d) Indebtedness consisting of the endorsement of negotiable instruments for deposit or collection of similar transaction in the Ordinary Course of Business; (e) Indebtedness subordinate to the Indebtedness of Borrower in favor of Lender in an aggregate principal amount of up to One Hundred Thousand Dollars ($100,000) at any time outstanding; and (f) other Indebtedness in an aggregate principal amount of up to One Hundred Thousand Dollars ($100,000) at any time outstanding or incurred in the Ordinary Course of the Business of Borrower.

"Permitted Investments" means: (a) Investments existing on the Closing Date and described on Schedule 7.6; (b) Investments in cash and cash equivalents; (c) Investments in an aggregate amount not in excess of One Hundred Thousand Dollars ($100,000) at any time outstanding consisting of (i) travel advances and employee relocation loans and other employee loans and advances in the Ordinary Course of Business and (ii) loans to employees, officers or directors relating to the purchase of equity securities of Borrower pursuant to employee stock purchase plan agreements approved by Borrower's board of directors (or the equivalent); and (d) other Investments in an aggregate principal amount of up to One Hundred Thousand Dollars ($100,000) at any time outstanding.

"Permitted Liens" means the following: (a) Liens existing on the Closing Date and described on Schedule 7.4 or arising under this Agreement or the other Loan Documents; (b) Liens for taxes, fees, assessments, or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings, provided the same have no priority over any of Lender's security interests; (c) Liens (i) upon or in any equipment which was not financed by Lender acquired or held by Mortgagor to secure the purchase price of such equipment or indebtedness incurred solely for the purpose of financing the acquisition of such equipment, or (ii) existing on such equipment at the time of its acquisition, provided that the Lien is confined solely to the property so acquired, and the proceeds of such equipment; (d) Liens incurred in connection with the extension, renewal or refinancing of the indebtedness secured by Liens of the type described in clauses (a) through (c) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the indebtedness being extended, renewed or refinanced does not increase; (e) normal and customary rights of setoff upon deposits of cash in favor of banks or other depository institutions and Liens of a collection bank arising under Section 4-210 of the UCC on items in the course of collection; (f) Liens of carriers, warehousemen, mechanics, materialmen and repairmen or other like Liens arising in the Ordinary Course

9

EXHIBIT B

of Business which are not overdue for a period of more than thirty (30) days or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person; (g) deposits or Liens in the Ordinary Course of Business under worker's compensation, unemployment insurance, social security and other similar laws, or to secure the performance of bids, trade contracts (other than for repayment of borrowed money), or to secure indemnity, performance or similar bonds for the performance of bids, tender or contracts (other than for the repayment of borrowed money), or to secure contracts for the purchase of property, leases, statutory obligations, surety and appeals bonds, performance bonds and other obligations of a like nature, in each case, either incurred in the Ordinary Course of Business or in connection with transactions permitted hereunder, and not representing Indebtedness for borrowed money; and (h) other Liens securing obligations in an aggregate principal amount of up to Fifty Thousand Dollars ($50,000) at any time outstanding.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity, or governmental agency.

"Post-Closing Agreement" means that certain the Post-Closing Agreement made by Borrower in favor of Lender in connection with the Loan regarding certain obligations to be permed by Borrower after the Closing Date.

"Receivables" means Accounts, chattel paper, documents, investment property, instruments and any other rights or claims to receive money which are general intangibles or which are otherwise included as Collateral.

"Responsible Officer" means each of the President, the Chief Executive Officer, the Chief Operating Officer, the Chief Financial Officer or other principal accounting and financial officer of Borrower (or any other officer or member having similar responsibilities).

"Restricted Cannabis Activities" means, in connection with the cultivation, distribution, sale, and possession of cannabis and related products: (a) any activity that is not permitted under applicable US State Cannabis Laws; (b) notwithstanding compliance with applicable US State Cannabis Laws, any activity which a Governmental Authority proactively asserts is unlawful under US Federal Cannabis Law; (c) distribution and sale of cannabis and related products to minors; (d) payments to criminal enterprises, gangs, cartels, and Persons subject to Sanctions; (e) non-compliance with anti-terrorism laws and other applicable law relating to money-laundering; (f) diversion of cannabis and related products from states where it is legal under US State Cannabis Law to other states; (g) use of activities permitted under US State Cannabis Law as a cover or pretext for the trafficking of other controlled substances or illegal drugs or other illegal activity; (h) the commission, or making threats, of violence and the use of firearms; (i) growing cannabis and related products on public lands in violation of applicable law; and (k) directly or indirectly, aiding, abetting, or otherwise participating in a common enterprise with any Person or Persons in such activities.

"Sanctioned Country" shall mean, at any time, a country, region, or territory that is, or whose government is, the subject or target of any Sanctions.

"Sanctioned Person" shall mean, at any time, any Person that is (a) the subject or target of any Sanctions, (b)(x) located, organized, operating, or resident in a Sanctioned Country, (y) an agency of the government of a Sanctioned Country, or (z) an organization controlled by a Sanctioned Country, or (c) owned or controlled by any such Person.

"Sanctions" shall mean economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control or the U.S. Department of State, (b) the United Nations Security Council, the

10

4874-5262-8788.6

European Union, or His Majesty's Treasury of the United Kingdom, or (c) any other relevant sanctions authority.

"Security Instrument" means, collectively, (i) that certain Deed of Trust, Assignment of Leases and Rents and Security Agreement, dated of even date herewith, by War Chest in favor of Trustee (as defined therein) and for the benefit of Lender, and (ii) that certain Preferred Ship Mortgage, dated of even date herewith, by Spoils in favor of Lender.

"Specified Deposit Account Agreement" has the meaning provided in Section 2.11 of this Agreement.

"Specified Deposit Account" means that certain deposit account of Silverpeak ending in 9588, which deposit account is maintained with Partners Colorado Credit Union, and which deposit account shall at all times name Lender, or an individual designated by Lender, as an authorized signatory and shall be subject to the provisions of Section 2.11 hereof and the Specified Deposit Account Agreement.

"Stated Maturity Date" means October 18, 2029.

"Subsidiary" means, with respect to any Person, a corporation, partnership, limited liability company, or other entity of which such Person owns, directly or indirectly, such number of outstanding Equity Interests as have more than fifty percent (50%) of the ordinary voting power for the election of directors or managers (as applicable) of such corporation, partnership, limited liability company, or other entity. Unless the context otherwise requires, each reference to Subsidiaries herein shall be a reference to Subsidiaries of Borrower.

"Trademarks" means any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of any Obligor connected with and symbolized by such trademarks.

"US Federal Cannabis Law" means any federal laws of the United States treating cannabis and related products as illegal or as controlled substances.

"US State Cannabis Law" means any Cannabis Code and any law enacted by any other state of the United States which legalizes cannabis and related products in some form, and which implements strong and effective regulatory and enforcement systems to control the cultivation, distribution, sale, and possession of cannabis and related products.

"UCC" means the Uniform Commercial Code as in effect on the date hereof and from time to time in the State of Colorado, provided that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the security interests in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect on or after the date hereof in any other jurisdiction, "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy.

### 1.2    Other Interpretive Provisions.

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

11

4874-5262-8788.6

EXHIBIT B

(b)    Section, Annex, Schedule, and Exhibit references are to this Agreement unless otherwise specified. The term "including" is not limiting and means "including without limitation."

(c)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including." Unless otherwise expressly provided herein, (i) references to agreements (including this Agreement and the other Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, supplements and other modifications thereto, but only to the extent such amendments, restatements, supplements and other modifications are not prohibited by the terms of any Loan Document, and (ii) references to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing, or interpreting such statute or regulation.

(d)    This Agreement and the other Loan Documents are the result of negotiations among and have been reviewed by counsel to Lender, Borrower and the other parties thereto and are the products of all parties. Accordingly, they shall not be construed against Lender merely because of Lender's involvement in their preparation.

(e)    Terms used herein that are defined in the UCC, unless otherwise defined herein, shall have the meanings specified in the UCC.

## 2.    LOAN AND TERMS OF PAYMENT.

2.1    **Loan.** Subject to and upon the terms and conditions of this Agreement, Lender agrees to make a single term loan to Borrower on the Closing Date in a principal amount equal to Thirteen Million and No/100 Dollars ($13,000,000.00). The execution and delivery of this Agreement by Borrower and the satisfaction of all conditions precedent pursuant to Section 3 shall be deemed to constitute Borrower's request to borrow the Loan on the Closing Date. Amounts repaid in respect of the Loan may not be reborrowed. Borrower shall use the proceeds of the Loan as provided in Section 6.10 of this Agreement.

2.2    **Promise to Pay.** Borrower promises to pay to the order of Lender, in lawful money of the United States of America, the aggregate unpaid principal amount of the Loan. Borrower shall also pay interest on the unpaid principal amount of the Loan at rates in accordance with the terms hereof. Lender may, at its option, charge any Obligations which are then due against any operating, investment or other account of Borrower maintained with or under the control of Lender or any of its Affiliates, including, without limitation, the Administrative Account and the Specified Deposit Account.

2.3    **Repayment and Prepayment of the Loan.**

(a)    **Principal and Interest Repayment.** Commencing on October 31, 2022, and continuing on the last day of each month thereafter until April 18, 2024 (the "Amortization Date"), Borrower shall pay Lender monthly installments of accrued and unpaid interest at the rate of interest set forth in Section 2.4(a) and subject to Section 2.4(c). Commencing on the last day of the month following the Amortization Date and continuing until the Maturity Date, Borrower shall pay Lender monthly payments of principal and interest based upon a seven (7) year straight line amortization schedule at the rate of interest set forth in Section 2.4(a) and subject to Section 2.4(c). The outstanding principal balance of the Loan and all unpaid interest thereon shall be paid in full on the Maturity Date.

(b)    **Voluntary Prepayments.** Borrower may prepay the Loan in whole or in part at any time, without premium or penalty.

12

4874-5262-8788.6

EXHIBIT B

    (c)    **Mandatory Prepayments.**

        (i)    **Proceeds of Issuances of Indebtedness or Equity.**  Immediately upon receipt by Borrower or any Subsidiary of any proceeds from any (A) issuance of Indebtedness (other than Indebtedness permitted by Section 7.3) by Borrower or any Subsidiary, or (B) issuance, sale, transfer, exchange, conversion or other disposition of any Equity Interests by Borrower or any Subsidiary after the Closing Date, Borrower shall prepay the then outstanding principal amount of the Loan and the other Obligations in an amount equal to ten percent (10%) all of such proceeds (whether or not such proceeds are received by Borrower), net of reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by Borrower in connection therewith (in each case, paid to non-Affiliates).  Any such prepayment shall be applied in accordance with Section 2.3(d).

        (ii)    **Asset Dispositions and Extraordinary Receipts.**  Immediately upon receipt by Borrower or any Subsidiary of any proceeds of any sale or disposition by Borrower or any Subsidiary of any Collateral or any of its respective assets (other than asset sales or dispositions permitted under Section 7.1), or any proceeds from any casualty insurance policies (in excess of the cost of repairing or replacing such loss to the extent such repair and replacement is approved by Lender) or eminent domain, condemnation, or similar proceedings, Borrower shall prepay the Obligations in an amount equal to all such proceeds (whether or not such proceeds are actually received by Borrower), net of commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by Borrower in connection therewith (in each case, paid to non-Affiliates). Any such prepayment shall be applied in accordance with Section 2.3(d).

    (d)    **Application of Prepayments**. Any prepayments made by Borrower pursuant to Section 2.3(b) or (c) shall be applied as follows: first, to Lender's fees and reimbursable expenses then due and payable pursuant to any of the Loan Documents; second, to interest then due and payable hereunder; and third, to the principal installments due on the Loan (in the inverse order of maturity), until the same shall have been paid in full.

    **2.4**    **Interest Rates, Payments, and Calculations.**

    (a)    **Interest Rates.** The outstanding principal amount of the Loan shall bear interest at a fixed rate of fifteen percent (15%) per annum.

    (b)    **Default Rate.** Unless Lender otherwise consents in writing, all Obligations shall bear interest, from and after the occurrence and during the continuance of an Event of Default, at a rate equal to thirty percent (30.00%) percent per annum or the maximum rate permitted by law, whichever is less.

    (c)    **Accrual of Interest Payments.** The interest accruing on the Loan at the fixed rate of fifteen percent (15%) per annum in accordance with Section 2.4(a) shall be due and payable in the following manner:

        (i) Borrower shall pay to Lender the monthly installments due under Section 2.3(a) the amount of interest determined by Lender equal to the monthly amount of interest accruing on the Loan at a rate of ten percent (10%) per annum.

        (ii) The balance of the unpaid interest accruing on the Loan shall be payable on the Maturity Date.

    (d)    **Computation.** All interest chargeable under the Loan Documents shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed.

13

**2.5**     **Crediting Payments**. Notwithstanding anything to the contrary contained herein, any wire transfer or payment received by Lender after 2:00 p.m. Atlanta time shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day. Whenever any payment to Lender under the Loan Documents would otherwise be due (except by reason of acceleration) on a date that is not a Business Day, such payment shall instead be due on the next Business Day, and additional fees or interest, as the case may be, shall accrue and be payable for the period of such extension.

**2.6**     **Withholding**. Payments received by Lender from Borrower under this Agreement will be made free and clear of and without deduction for any taxes, except as required by any Governmental Authority, applicable law, regulation, or international agreement. Specifically, however, if at any time any Governmental Authority, applicable law, regulation, or international agreement requires Borrower to make any withholding or deduction from any such payment or other sum payable hereunder to Lender, Borrower hereby covenants and agrees that, if such tax is an Indemnified Tax, the amount due from Borrower with respect to such payment or other sum payable hereunder will be increased to the extent necessary to ensure that, after the making of such required withholding or deduction, Lender receives a net sum equal to the sum which it would have received had no withholding or deduction been required, and Borrower shall pay the full amount withheld or deducted to the relevant Governmental Authority. Borrower will, upon request, furnish Lender with proof reasonably satisfactory to Lender indicating that Borrower has made such withholding payment; provided, however, that Borrower need not make any withholding payment if the amount or validity of such withholding payment is contested in good faith by appropriate and timely proceedings and as to which payment in full is bonded or reserved against by Borrower. The agreements and obligations of Borrower contained in this Section 2.6 shall survive the termination of this Agreement.

**2.7**     **Additional Costs**. If any Change in Law shall: (a) subject Lender to any taxes (other than (i) Indemnified Taxes, (ii) taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (iii) Connection Income Taxes) on the Loan, loan principal, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; (b) impose, modify, or deem applicable any reserve (including, without limitation, any imposed by the FRB), special deposit, compulsory loan, insurance charge, or similar requirement against assets of, deposits with or for the account of, or credit extended by Lender; or (c) impose on Lender or the foreign exchange and interbank markets any other condition affecting this Agreement; and the result of any of the foregoing is to increase the cost to Lender of making, continuing, or maintaining any part of the Obligations or to reduce the amount of any sum received or receivable by Lender under this Agreement by an amount deemed by Lender to be material, then Borrower shall pay to Lender, within fifteen (15) days of Borrower's receipt of a written notice (coupled with the certificate referenced in the next sentence) from Lender requesting such additional amount or amounts as will compensate Lender for such increased cost or reduction. A certificate of Lender, prepared in good faith and in reasonable detail by Lender and submitted by Lender to Borrower, setting forth the basis for determining such additional amount or amounts necessary to compensate Lender shall be conclusive and binding for all purposes, absent manifest error. In the event that any Change in Law affects or would affect the amount of capital required or expected to be maintained by Lender (or any corporation or entity controlling Lender), and Lender determines that the amount of such capital is increased by or based upon the existence of any obligations of Lender hereunder or the maintaining of any Obligations, and such increase has the effect of reducing the rate of return on Lender's (or such controlling corporation's or entity's) capital as a consequence of such obligations or the maintaining of such Obligations to a level below that which Lender (or such controlling corporation or entity) could have achieved but for such circumstances (taking into consideration its policies with respect to capital adequacy), then Borrower shall pay to Lender, within fifteen (15) days of Borrower's receipt of written notice (coupled with the certificate referenced in the next sentence) from Lender requesting such compensation, additional amounts as are sufficient to compensate Lender (or such controlling corporation or entity) for any increase in the amount of capital and reduced rate of return which Lender reasonably determines to be allocable to the existence

14

EXHIBIT B

of any obligations of Lender hereunder or to maintaining any Obligations. A certificate of Lender as to the amount of such compensation, prepared in good faith and in reasonable detail by Lender and submitted by Lender to Borrower, shall be conclusive and binding for all purposes absent manifest error. Borrower shall not be required to compensate Lender pursuant to this Section 2.7 for any increased costs incurred or reductions suffered more than two hundred seventy (270) days prior to the date that Lender notifies Borrower of the Change in Law giving rise to such increased costs or reductions, and of Lender's intention to claim compensation therefor (except that if the Change in Law giving rise to such increase costs or reductions is retroactive, then the two hundred seventy (270)-day period referred to above shall be extended to include the period of retroactive effect).

    **2.8**    <u>Fees</u>. Borrower shall pay the following:

    (a)    **Origination Fee**. On the Closing Date, an origination fee to Lender equal to Six Hundred Fifty Thousand and No/100 Dollars ($650,000.00), which origination fee shall be fully-earned on the Closing Date and shall be nonrefundable.

    (b)    **Diligence Fee**. On the Closing Date, a due diligence fee to Clifton Property Trust equal to Thirty Thousand and No/100 Dollars ($30,000.00), which due diligence fee shall be fully-earned on the Closing Date and shall be nonrefundable.

    (c)    **Exit Fee.** On the first to occur of (i) the Maturity Date or (ii) the Facility Termination Date (the "Exit Fee Date"), an exit fee to Lender, which shall be fully-earned as of such Exit Fee Date and shall be nonrefundable, in an amount to be determined as follows:

    (i)    $3,000,000 in the event the Exit Fee Date occurs at any time from and including the Closing Date to and including the last day of the 6th month of the Loan;

    (ii)    $2,000,000 in the event the Exit Fee Date occurs at any time from and including first day of the 7th month of the Loan to and including the last day of the 12th month of the Loan;

    (iii)    $1,000,000 in the event the Exit Fee Date occurs at any time from and including first day of the 13th month of the Loan to and including the last day of the 30th month of the Loan; or

    (iv)    $500,000 in the event the Exit Fee Date occurs at any time from and including first day of the 31st month of the Loan to and including the Stated Maturity Date.

    (d)    **Late Payment Fee.** If Lender has not received the full amount of Borrower's regularly scheduled monthly payments, or any payment due on the Maturity Date, within five (5) days after the due date thereof, then Borrower shall pay a late fee equal to ten percent (10%) of the amount of such late payment (including, without limitation, the outstanding principal balance of the Loan owed on the Maturity Date or following an acceleration of the Obligations by Lender); provided, that payments due on the Maturity Date shall not have a five (5) day grace period and any such payments are deemed late as of the date immediately after the Maturity Date. Borrower agrees that such late charge is not a charge for the use of the money, but is imposed to compensate Lender for some administrative services, costs, and losses associated with any default (including a payment default upon maturity) under the Note, and such late charge is fully earned and nonrefundable when accrued. Collection or acceptance by Lender of such late charge shall not constitute a waiver of any remedies of Lender provided herein or otherwise at law.

    (e)    <u>**Intentionally Omitted.**</u>

15

**2.9    Term; Release of Collateral.**

(a)    **Term.** This Agreement shall become effective on the Closing Date and shall continue in full force and effect until the Facility Termination Date.

(b)    **Intentionally Omitted.**

(c)    **Release of Collateral.** Lender agrees to release (and to take any actions necessary to release) any Lien held by Lender against Collateral that is sold, transferred, conveyed, or otherwise disposed of by Borrower in a transaction permitted by the Loan Documents and all Collateral and Borrower upon the occurrence of the Facility Termination Date.

**2.10    Loan Account.** Lender will maintain one or more loan accounts for Borrower to which Lender will charge all amounts advanced to or for the benefit of Borrower hereunder or under any of the other Loan Documents and to which Lender will credit all amounts collected under the Loan from or on behalf of Borrower. The unpaid principal amount of the Loan, the unpaid interest accrued thereon, the interest rate or rates applicable to such unpaid principal amount and the accrued and unpaid fees, premiums, and other amounts due hereunder shall at all times be ascertained from the records of Lender and such records shall constitute *prima facie* evidence of the amounts so due and payable, in the absence of manifest error.

**2.11    Deposits and Withdraws from the Specified Deposit Account.** At all times during the term of the Loan Borrower shall cause all Gross Operating Income to be deposited monthly on or before the fifteenth (15th) day of each immediately succeeding month into the Specified Deposit Account. Borrower shall deliver to Lender, on or before the fifteenth (15th) day of each month, an accounting of Borrower's calculation of the Gross Operating Income for the immediately preceding month, which accounting shall be in form and substance acceptable to Lender. Borrower authorizes Lender and any individual designated by Lender as an authorized signatory under the Specified Deposit Account to, at its option, withdraw via ACH or otherwise from the funds deposited in the Specified Deposit Account: (i) to pay on behalf of Borrower any and all payments as and when due under Section 2.3(a) and (ii) upon an Event of Default to pay or discharge any Obligations as they are or become due and payable under the Loan in any order and in any manner as Lender shall elect in Lender's sole discretion. Such authorization is irrevocable and no further direction or authorization shall be required for Lender to make such payments. So long as no Event of Default exist, after payment by Lender of any and all payments as and when due under Section 2.3(a), Borrower may withdraw from the funds deposited in the Specified Deposit Account amounts required to pay operating and business costs and expenses incurred in Silverpeak's Ordinary Course of Business to the extent consistent with an annual operating budget submitted to and approved by Lender. So long as there exists and is continuing an Event of Default, neither Borrower nor any authorized signatory of Borrower shall have the right or authority to withdraw any funds deposited in the Specified Deposit. The terms and conditions of this Section 2.11 shall be set forth in a written agreement executed by Partners Colorado Credit Union and delivered to Lender on or before the Closing Date (the "Specified Deposit Account Agreement").

**2.12    Conversion Right.** Lender may, at its option exercisable by written notice to Borrower at any time prior to the Facility Termination Date or upon (i) a consolidation or merger of Parent, (ii) a sale or other disposition of all or substantially all of the assets of Parent or Silverpeak, (iii) the sale of more than 50% of the equity interests of Parent or Silverpeak, or (iv) the liquidation, dissolution, and winding-up of Parent or Silverpeak, elect to convert (the "Conversion"), immediately prior to any such event, the entire outstanding principal amount of the Loan into Series A Membership Interests of Parent (or, at the sole discretion of Lender, an equivalent security of Parent) such that immediately following such Conversion, Lender will own no less than twenty-eight and eighty eight hundredths percent (28.88%) (or

16

such other amount as is determined by dividing the outstanding principal amount of the Loan immediately prior to such Conversion by $45,000,000) of the fully diluted capitalization of Parent inclusive of all equity interests, options, warrants, and other convertible instruments (but exclusive of the Notes) issued or reserved for issuance by Borrower as of the time of such Conversion. For the avoidance of doubt, for purposes of the Conversion, the enterprise value of the Company shall be $45,000,000. Notwithstanding such Conversion, Borrower shall pay on or before the date of such conversion all accrued and unpaid interest due on outstanding principal amount of the Loan through and including the conversion date. Upon conversion of the Loan and payment of accrued and unpaid interest, Borrower will be released from all of its obligations and liabilities under the Note. Parent will provide Lender at least thirty (30) days' notice of each of the events identified in this Section 2.12(i) – (iv) and will take all necessary steps to comply with the terms of this Section 2.12, including completing any amendments to its governance agreements. Notwithstanding anything herein to the contrary, Lender's conversion rights are subject to all required suitability and application requirements as set forth in the Cannabis Code.

## 3.    CONDITIONS TO EFFECTIVENESS.

**3.1    Conditions Precedent**. The obligation of Lender to make the Loan is subject to the conditions precedent that Lender shall have received, in form and substance satisfactory to Lender, the following (all in form and substance acceptable to Lender):

(a)    duly executed counterparts of this Agreement, the Note, the guaranty agreement executed by a Guarantor, the Parent Pledge Agreement, each Collateral Assignment of Marijuana Licenses, each Collateral Assignment of Lease, each of the other Loan Documents, and each of the other Collateral Documents;

(b)    duly executed counterparts of the Option to Purchase, the Intercreditor Agreements and the Post-Closing Agreement;

(c)    such UCC financing statements, and other applicable documents under the laws of all necessary or appropriate jurisdictions with respect to the perfection of the Liens granted under this Agreement and the other Loan Documents, together with copies of UCC, tax, judgment, and fixture lien search reports and bankruptcy searches in all necessary or appropriate jurisdictions and under all legal names of Obligors, as requested by Lender, indicating that there are no Liens on any of the Collateral other than Permitted Liens or Liens which, in connection with the Loan, will be terminated or released, as applicable;

(d)    a certificate of the Secretary, Assistant Secretary, or Responsible Officer of Borrower, attaching and certifying copies of its certificate of formation or other registered organizational documents, limited liability company agreement, or the equivalent, as applicable, certificates of good standing or existence, as may be available from the Secretary of State of the jurisdiction of organization of such Borrower, and each other jurisdiction specified therein, and of the resolutions of its members, or comparable organizational documents and authorizations, authorizing the execution, delivery and performance of the Loan Documents and certifying the name, title and true signature of each officer of Borrower executing the Loan Documents;

(e)    one or more duly executed and delivered counterparts of Lien Waivers from each lessor, mortgagee or other third party that may have a Lien upon any Collateral that is in such third party's possession or is located or leased by such party to a Borrower;

(f)    a duly executed funds disbursement memo;

17

4874-5262-8788.6

EXHIBIT B

(g)    copies of all consents, approvals, authorizations, registrations, and filings and orders required or advisable to be made or obtained under any requirement of law, or by any contractual obligation of any Obligor, in connection with the execution, delivery, performance, validity, and enforceability of the Loan Documents or any of the transactions contemplated thereby, and such consents, approvals, authorizations, registrations, filings and orders shall be in full force and effect;

(h)    all due diligence items, documentation and information from the Obligors reasonably requested by Lender, including financial information relating to the Collateral and all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act;

(i)    certificates and endorsements of insurance naming Lender as loss payee or additional insured, as applicable, on Borrower and each Obligor's property, casualty and liability policies as may be requested by Lender;

(j)    payment of all fees and expenses of Lender due and payable on the Closing Date;

(k)    a favorable written opinion of counsel to the Obligors, addressed to Lender, and covering such matters relating to the Obligors, the Loan Documents and the transactions contemplated therein as Lender shall reasonably request;

(l)    title searches or examinations with respect to title and an ALTA Lender's Policy of Title Insurance in favor of Lender, issued by a national title insurance company acceptable to Lender, in each case, regarding the Mortgaged Property;

(m)    real estate appraisal and property survey meeting American Land Title Association, endorsed to Lender and regarding the Mortgaged Property;

(n)    evidence satisfactory to Lender and Lender's counsel of the Certificate of Deposit;

(o)    evidence satisfactory to Lender and Lender's counsel as to whether the Mortgaged Property is located within an area identified as having "special flood hazards" as such term is used in the Federal Flood Disaster Protection Act of 1973;

(p)    a broker opinion and/or an appraisal, in either case, with respect to the valuation of the Mortgaged Property;

(q)    all representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects as of the date hereof;

(r)    no Default or Event of Default shall exist as of the date hereof;

(s)    no event or circumstance shall exist or have occurred as of the date hereof which has had, or which could reasonably be expected to have, a Material Adverse Effect;

(t)    there shall not exist any law, regulation, ruling, judgment, order, injunction, or other restraint that, in the judgment of Lender, prohibits, restricts, or imposes a materially adverse condition upon Borrower or any Guarantor, this Agreement, the Loan Documents, or the exercise by Lender of its rights as a secured party with respect to the Collateral;

18

EXHIBIT B

(u)      the completion by Lender or its designees of a satisfactory site visit with respect to the Mortgaged Property;

(v)      a duly executed account control agreement with respect to any deposit and investment account of Borrower which Lender shall request in its sole discretion, including, without limitation, the Specified Deposit Account;

(w)      Intentionally Omitted;

(x)      such other documents, and completion of such other matters, as Lender may reasonably request.

### 4.      SECURITY.

**4.1      Grant of Security Interest**. To secure prompt payment of any and all Obligations and prompt performance by Borrower of each of its covenants and duties under the Loan Documents, Borrower hereby grants Lender a continuing Lien on and security interest in all of Borrower's right, title, and interest in and to all of the following: presently existing and hereafter acquired or arising property, wherever located: all Accounts; chattel paper (including tangible and electronic chattel paper); deposit accounts; securities accounts; documents (including negotiable documents); Equipment (including all accessions and additions thereto); general intangibles (including payment intangibles and software); Intellectual Property; goods (including fixtures); instruments (including promissory notes); Inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions); the Marijuana Licenses and all associated Permits; investment property (including securities and securities entitlements); letter of credit rights; money; commercial tort claims; all books and records with respect to any of the foregoing and the computers and equipment containing any such books and records; any and all cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds, and all supporting obligations and the security therefor or for any right to payment. Such security interest constitutes a valid security interest in the presently existing Collateral, and will constitute a valid security interest in Collateral acquired after the date hereof, subject, in each case, to Permitted Liens; *provided, however.* that any such Lien on and security interest in the Marijuana Licenses and the Inventory, to the extent that the Inventory includes Medical Marijuana, Retail Marijuana, Medical Marijuana Product, or Retail Marijuana product, as those terms are defined in the Cannabis Code, shall be subject to all required suitability and application requirements as set forth in the Cannabis Code. Borrower hereby authorizes Lender to file financing statements, without notice to Borrower, with all appropriate jurisdictions to perfect or protect Lender's interest or rights hereunder, including a notice that any disposition of the Collateral, by Borrower or any other Person, shall be deemed to violate the rights of Lender under the UCC. Such financing statements may indicate the Collateral as "all assets of the Debtor" or words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in Lender's discretion.

**4.2      Delivery of Additional Items**. Obligors shall from time to time execute and deliver to Lender, at the request of Lender, all financing statements and other documents that Lender may reasonably request, in form reasonably satisfactory to Lender, to perfect and continue the perfection of Lender's security interests in the Collateral and in order to fully consummate all of the transactions contemplated under the Loan Documents.

**4.3      Inspection Rights**. Lender (through any of its officers, employees, or agents) shall have the right, upon reasonable prior notice, from time to time during Obligors' usual business hours, to inspect and audit Borrower's books and records (but no more than two such inspections of Obligors' books and records per year shall be at Obligors' expense unless an Event of Default has occurred and is

19

# EXHIBIT B

continuing), and, at any time and from time to time in Lender's sole discretion, to make copies thereof and to conduct examinations and inspections of the Collateral or check, test, and appraise the Collateral in order to verify Obligors' financial condition or the amount, condition of, or any other matter relating to, the Borrower or the Collateral, all at Borrower's expense.

**4.4    Borrower's Accounts, Pledge and Assignment.** As additional security for Borrower's performance under the Loan Documents, Borrower hereby irrevocably pledges and assigns to Lender all monies at any time deposited in the Administrative Account and the Specified Deposit Account. Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign, or grant any security interest in the Administrative Account and the Specified Deposit Account, or any funds on deposit in the Administrative Account or the Specified Deposit Account, or permit any lien to attach thereto, or any levy to be made thereon, or any UCC Financing Statements to be filed thereon, except those naming Lender as the secured party, to be filed with respect thereto. This Agreement is, among other things, intended by the parties to be a security agreement for purposes of the UCC. Following the occurrence of and during the continuation of an Event of Default, Lender may apply all or any part of the funds on deposit in the Administrative Account or the Specified Deposit Account against the amounts outstanding under the Loan in any order and in any manner as Lender shall elect in Lender's sole discretion without seeking the appointment of a receiver and without adversely affecting the rights of Lender to foreclose the liens and security interests securing the Loan or exercise its other rights under the Loan Documents.

**4.5    Mortgaged Property.** Borrower shall execute and deliver to Lender the Security Instrument in recordable form and otherwise in form and substance satisfactory to Lender in all respects, along with each of the other Mortgage Documents requested by Lender from time to time.

**4.6    Assignment of Contracts.** As additional security for the Loan, Borrower hereby transfers and assigns to Lender all of Borrower's right, title, and interest, but not its liability, in, under, and to all construction, architectural, design, and other contracts, and all plans and specifications, for related to the Mortgaged Property. Neither this assignment nor any action by Lender shall constitute an assumption by Lender of any obligation under any such contract, Borrower hereby agrees to perform all of its obligations under all such contracts, and Borrower shall continue to be liable for all obligations of Borrower with respect thereto. Without Lender's prior written approval, Borrower shall not enter into, modify, amend, or terminate any construction, management, leasing, maintenance, or other contract pertaining to the Mortgaged Property.

## 5.    REPRESENTATIONS AND WARRANTIES.

Obligors represent and warrant as follows:

**5.1    Due Organization and Qualification.** Parent is a limited liability company duly existing under the laws of the State of Colorado and qualified and licensed to do business in any state in which the conduct of its business or its ownership of property requires that it be so qualified except where a failure to be so qualified or licensed could not reasonably be expected to have a Material Adverse Effect. Silverpeak is a corporation duly existing under the laws of the State of Colorado and qualified and licensed to do business in any state in which the conduct of its business or its ownership of property requires that it be so qualified except where a failure to be so qualified or licensed could not reasonably be expected to have a Material Adverse Effect. War Chest is a limited liability company duly existing under the laws of the State of Florida and qualified and licensed to do business in any state in which the conduct of its business or its ownership of property requires that it be so qualified except where a failure to be so qualified or licensed could not reasonably be expected to have a Material Adverse Effect. Spoils is a limited liability company duly existing under the laws of the State of Florida and qualified and licensed to do business in any state in which the conduct of its business or its ownership of property requires that it be so qualified

20

EXHIBIT B

except where a failure to be so qualified or licensed could not reasonably be expected to have a Material Adverse Effect.

**5.2     Due Authorization; No Conflict.** The execution, delivery, and performance of the Loan Documents by Obligors and the borrowings and other obligations incurred by Obligors hereunder and under the other Loan Documents are within each Obligor's powers, have been duly authorized, and do not and will not (a) conflict with or constitute a breach of any provision contained in each Obligor's certificate of formation or operating agreement or other applicable organizational or governing documents, (b) require any consent or approval of any governmental agency or authority (other than any consent or approval which has been obtained and is in full force and effect), (b) conflict in any material respect with any provision of applicable law or any judgment, order or decree, which is binding upon any Obligor or any of its respective properties, (c) conflict with or constitute an event of default under any Material Agreement to which any Obligor is a party or by which any Obligor is bound, or (d) require, or result in, the creation or imposition of any Lien on any asset of any Obligor (other than Liens in favor of Lender created pursuant to the Loan Documents). Obligors are not in default under any Material Agreement to which it is a party or by which it is bound.

**5.3     Validity and Binding Nature.** Each of this Agreement and each other Loan Document to which Obligor is a party is the legal, valid, and binding obligation of Obligor, enforceable against Obligor in accordance with its terms, subject to bankruptcy, insolvency and similar laws affecting the enforceability of creditors' rights generally and to general principles of equity.

**5.4     Financial Condition.**

(a)     The financial statements of each Obligor delivered to Lender prior to the Closing Date or pursuant to the terms hereof were prepared in accordance with GAAP (subject, in the case of interim financial statements, to normal year-end adjustments and the absence of footnotes, and where certain Obligors have not prepared financial statement pursuant to GAAP historically, then the financial statements for those Obligors will be prepared consistent with historical practices) and present fairly in all material respects the financial condition of such Obligor and its Subsidiaries (as applicable) as at such dates and the results of its operations for the periods then ended and disclose all Indebtedness and other liabilities (direct or contingent) of such Obligor and its Subsidiaries (as applicable) as of the date thereof.

(b)     Immediately prior to and after giving effect to the Loan hereunder and the use of the proceeds thereof, (i) the fair value of the assets of Borrower is and will be greater than the amount of its liabilities, as such value is established and liabilities evaluated in accordance with applicable Debtor Relief Laws, (ii) the present fair saleable value of Borrower's assets is and will be not less than the amount that will be required to pay the probable liability on its debts as they become absolute and matured, (iii) Borrower is and will be able to realize upon its assets and pay its debts and other liabilities as they mature in the normal course of business, (iv) Borrower does not intend to, and does not believe that it will, incur debts or liabilities beyond its ability to pay as such debts and liabilities mature in the normal course of business, and (v) Borrower is not and does not intend to be engaged in business or a transaction, for which its property would constitute unreasonably small capital.

**5.5     No Material Adverse Effect.** No Material Adverse Effect has occurred and is continuing.

**5.6     No Litigation.** No litigation (including derivative actions), arbitration proceeding or governmental investigation or proceeding is pending or, to Obligors' knowledge, threatened in writing against any Obligor which could reasonably be expected to have a Material Adverse Effect.

21

4874-5262-8788.6

EXHIBIT B

**5.7** **Ownership of Properties; Liens; Leases.** Each Obligor, respectively, owns good and marketable title to all of its properties and assets, real and personal, tangible and intangible, of any nature whatsoever, free and clear of all Liens, charges and claims except for Permitted Liens or other liens disclosed to Lender in writing. Schedule 5.7 attached contains a true, correct and complete list of all Leases for each location leased by Borrower, as a tenant, each of which, as of the Closing Date both immediately before and after giving effect to the transactions contemplated by this Agreement and the other Loan Documents, (a) is lawfully, truly, and exclusively held or owned by Borrower or any of their Subsidiaries, (b) is valid and in full force and effect and has not be amended or modified except as disclosed in Schedule 5.7, (c) has no existing defaults by landlord in the performance of its obligations under such Lease and (d) has no default by Borrower under such Lease which has not been cured.

**5.8** **Collateral.** (i) Obligors have good title to, rights in, and the power to transfer each item of the Collateral upon which it purports to grant a Lien hereunder and under the other Loan Documents, free and clear of any and all Liens except Permitted Liens; (ii) the security interest granted herein and in the other Loan Documents constitutes a valid perfected security interest in the presently-existing Collateral, and will constitute a valid perfected security interest in Collateral acquired after the date hereof, subject, in each case, to Permitted Liens; (iii) no financing statement or other public notice authorized by Obligors with respect to all or any part of the Collateral is on file or of record in any public office, except filings evidencing Liens permitted by the Loan Documents and (iv) each Obligor has good, marketable, and legal title to its assets or leasehold title as to leased assets or rights as to licenses, and the same are not subject to any Liens other than Permitted Liens. Each Obligor's exact legal name and jurisdiction of organization are as set forth in the opening paragraph of this Agreement. Borrower has not used any other legal name or changed its legal name or jurisdiction of organization in the five (5) years prior to the Closing Date.

**5.9** **Compliance with Laws.** Each Obligor and any Subsidiary is in compliance in all material respects with the requirements of all laws and all orders, writs, injunctions, and decrees applicable to it or to its properties, including all applicable US State Cannabis Laws, except in such instances in which (a) such requirement of law or order, writ, injunction, or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. No Obligor is engaged in any Restricted Cannabis Activities.

**5.10** **Governmental and Regulatory Matters.** Borrower and any Subsidiary have obtained all material consents, approvals, and authorizations of, made all declarations or filings with, and given all notices to, all Governmental Authorities that are necessary for the continued operation of Borrower's or Subsidiary's business as currently conducted. Each Obligor holds all Marijuana Licenses and other Permits that are required by any Governmental Authority (excluding those United States federal authorities that may enforce or interpret any laws or regulations or the like, so as to prevent or materially restrict the business of any Obligor, or any laws or regulations that apply to cannabis) to permit it to conduct and operate any Obligor's or its respective Subsidiaries' business as such is conducted on the Closing Date, pursuant to any applicable requirement of law. Schedule 5.10 attached contains a true, correct and complete list of all such Marijuana Licenses and Permits, each of which, as of the Closing Date both immediately before and after giving effect to the transactions contemplated by this Agreement and the other Loan Documents, (a) is lawfully, truly, and exclusively held or owned by Obligors or any of their Subsidiaries, (b) is valid and in full force and effect, (c) is free and clear of all Liens and other encumbrances, (d) has neither been revoked nor is in the process of being revoked by any Governmental Authority, and (e) has no threatened or pending process that would result in its loss, termination, suspension, withdrawal, revocation, or expiration. Each Obligor and each Subsidiary of an Obligor is in material compliance with all laws and regulations pertaining to any and all Marijuana Licenses and other Permits. Neither any Obligor nor any Subsidiary of an Obligor is a party to, or the subject of, any investigation, notice of apparent liability, violation, forfeiture, or other order or complaint issued by or before any Governmental Authority or any

4874-5262-8788.6

other proceedings which could, in any manner, threaten or adversely affect the validity or continued effectiveness of any such Marijuana Licenses or other Permits of any Obligor or any Subsidiary of an Obligor, or give rise to any order of forfeiture. There is no pending threat of cancellation, loss, termination, modification, or nonrenewal of any such Marijuana Licenses or other Permits of any Obligor or any Subsidiary of an Obligor, or any valid basis for such cancellation, loss, termination, modification or nonrenewal. Obligors have no reason to believe that such Marijuana Licenses and other Permits will not be renewed in the ordinary course, or that such renewed Marijuana Licenses and other Permits would be materially different than the corresponding existing versions of such. Each Obligor and each Subsidiary of an Obligor has filed, in a timely manner, all material reports, applications, documents, instruments, and information required to be filed pursuant to applicable rules and regulations or requests of every regulatory body having jurisdiction over any of its Marijuana Licenses or other Permits. Except as provided on Schedule 5.10, neither the Collateral Assignment of Marijuana Licenses no Lien nor other encumbrance (or any associated filings or other actions necessary to perfect such) on the Marijuana Licenses in favor of Lender will result in the Marijuana Licenses' revocation, termination, nullification, or other similar cessation of effectiveness. Obligors and their Subsidiaries have each made all necessary or required disclosures of this Agreement, the other Loan Documents, and the transactions contemplated hereby and thereby to any Governmental Authority that has issued any Obligor a Marijuana License or Permit. Borrower and any Subsidiary have met the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA, and no event has occurred resulting from Borrower's failure to comply with ERISA that could result in Borrower incurring any material liability. Borrower is not an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940. Borrower is not engaged principally, or as one of the important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T and U of the FRB).

**5.11    Environmental Condition.** None of Obligors' properties or assets, including, without limitation, the Mortgaged Property, has ever been used by Obligors or, to Obligors' knowledge, by previous owners or operators, in the disposal of, or to produce, store, handle, treat, release, or transport, any hazardous waste or hazardous substance other than in accordance with applicable law. To Obligors' knowledge, none of Obligors' properties or assets, including, without limitation, the Mortgaged Property, have ever been designated or identified in any manner pursuant to any environmental protection statute as a hazardous waste or hazardous substance disposal site, or a candidate for closure pursuant to any environmental protection statute; no lien arising under any environmental protection statute has attached to any revenues or to any real or personal property owned by Obligors. None of the Obligors have received a summons, citation, notice, or directive from the Environmental Protection Agency or any other Governmental Authority concerning any action or omission by Obligors resulting in the releasing, or otherwise disposing of hazardous waste or hazardous substances into the environment.

**5.12    Taxes.** Except as set forth on Schedule 5.12, each Obligor has timely filed all tax returns and reports required by law to have been filed by it and has paid all taxes and governmental charges due and payable with respect to such return, except any such taxes or charges which are being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books. Each Obligor has made adequate reserves on its books and records in accordance with GAAP for all taxes that have accrued but which are not yet due and payable.

**5.13    Equity Ownership; Subsidiaries.** All issued and outstanding Equity Interests of Borrower and any Subsidiary and any other Equity Interests included in the Collateral are duly authorized and validly issued and all capital stock is fully paid and non-assessable, and free and clear of all Liens other than Permitted Liens, and such securities were issued in compliance with all applicable state and federal laws concerning the issuance of securities. All of the authorized, issued, and outstanding Equity Interests of Borrower and any Subsidiary are owned as set forth on Schedule 5.13 on the Closing Date. On the

23

4874-5262-8788.6

EXHIBIT B

Closing Date, except as set forth on Schedule 5.13, there are no pre-emptive or other outstanding rights, options, warrants, conversion rights, or other similar agreements or understandings for the purchase or acquisition of any Equity Interests of Borrower or any Subsidiary.

**5.14** **Insurance**. Obligors and their properties are insured with financially sound and reputable insurance companies which are not Affiliates of Obligors, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where Obligors operate.

**5.15** **Sanctions and Anti-Corruption Laws**.

(a)    None of any Obligor nor any of their respective Subsidiaries or directors, officers, employees, agents ,or affiliates of such Obligor or Subsidiary is a Sanctioned Person.

(b)    Each Obligor, each of their respective Subsidiaries and their respective directors, officers, and employees and, to the knowledge of Borrower, the agents of each Obligor and each of their respective Subsidiaries, are in compliance with applicable Anti-Corruption Laws and applicable Sanctions. Each Obligor and each of their respective Subsidiaries have instituted and maintain policies and procedures designed to ensure continued compliance with applicable Anti-Corruption Laws and applicable Sanctions.

**5.16** **No Default**. No Default or Event of Default exists or would result from the incurrence by any Obligor of any Obligations hereunder or under any other Loan Document.

**5.17** **Full Disclosure**. No representation, warranty, or other statement of any Obligor in any certificate or statement given to Lender, as of the date such representation, warranty, or other statement was made, taken together with all such certificates and statements given to Lender, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained in the certificates or statements not materially misleading (it being recognized by Lender that the projections and forecasts provided by Obligors are based on good faith estimates and assumptions believed by Obligors to be reasonable as of the date of the applicable projections or assumptions, are not viewed as facts, and that actual results during the period or periods covered by any such projections and forecasts may differ from the projected or forecasted results).

**5.18** **Compliance with Legal Requirements.** The improvements on the Mortgaged Property and the use thereof comply with all existing and future laws, codes, ordinances, rules, regulations, orders, and decrees of governmental authorities and courts having jurisdiction over the Mortgaged Property or Obligors and all terms, conditions and requirements of all permits applicable to the improvements on the Mortgaged Property and the use thereof and all public and private restrictions or other agreements affecting the Mortgaged Property, including, without limitation, building codes, special use permits, zoning codes, environmental regulations, and applicable requirements of fire underwriters.

**5.19** **Zoning.** The Mortgaged Property is zoned to permit the improvements on the Mortgaged Property and the use thereof without additional variances, exceptions, or authorizations.

**5.20** **Permits**. All permits required for the improvements on the Mortgaged Property and the use thereof have been obtained and are in full force and effect with no notices of violation or actual violations with respect thereto.

**5.21** **Restrictive Covenants Etc**. The Mortgaged Property complies with all easements, covenants, conditions, and restrictions of record as applicable to the Mortgaged Property.

24

EXHIBIT B

**5.22    Intentionally Omitted.**

**5.23    Organizational Documents.** Borrower has done all things necessary to preserve its existence and organizational formalities; and has not amended, modified, or otherwise changed its organizational documents (or allowed a general partner, managing member or manager to change its organizational documents) except as has been disclosed to Lender and, in any case, has not made or allowed any such amendment, modification, or change which adversely affects Borrower's or any such general partner's, managing member's, or manager's existence as a single purpose, single asset "bankruptcy remote" entity.

**6.    AFFIRMATIVE COVENANTS.**

Until the Facility Termination Date:

**6.1    Financial Statements, Reports, Certificates, and Notices.** Borrower shall provide Lender with the following (each of which shall be in form and substance reasonably satisfactory to Lender):

(a)    **Annual Financial Statements.** As soon as available and in any event within one hundred twenty (120) days after the end of each fiscal year of Borrower, unaudited consolidated and consolidating balance sheets of Borrower and any Subsidiary as at the end of such year and the related unaudited consolidated and consolidating statements of income, and unaudited consolidated and consolidating statements of retained earnings and cash flows of Borrower and any Subsidiary for such fiscal year, setting forth in each case in comparative form the figures as of the end of and for the previous fiscal year, all in reasonable detail and accompanied by a report thereon of, Borrower's independent certified public accountant, which accountant shall be reasonably acceptable to Lender, together with a management's discussion and analysis of the fiscal year's operating and financial results. Such accountant's report for any unaudited financial statements required hereunder shall state that such financial statements present fairly in all material respects the financial condition as at the end of such fiscal year, and the results of operations and cash flows for such fiscal year of Borrower and any Subsidiary. Any unreviewed financial statements required hereunder shall be certified by the principal accounting and financial officer (or other officer acceptable to Lender in its sole discretion) of Borrower that they are complete and correct and that they present fairly in all material respects the financial condition as at the end of such year, and the results of operations for such year and such portion of the fiscal year of Borrower and its Subsidiaries.

(b)    **Quarterly Financial Statements.** As soon as available and in any event within thirty (30) days after the end of each fiscal quarter, consolidated and consolidating balance sheets of Borrower and its Subsidiaries as at the end of such quarter and the related consolidated and consolidating statements of income and retained earnings and cash flows, of Borrower and its Subsidiaries for such quarter, and the portion of the fiscal year ended at the end of such quarter, all in reasonable detail, reviewed by Borrower's independent certified public accountant, which accountant shall be reasonably acceptable to Lender and certified by the principal accounting and financial officer (or other officer acceptable to Lender in its sole discretion) of Borrower that they are complete and correct and that they present fairly in all material respects the financial condition as at the end of such quarter, and the results of operations for such quarter and such portion of the fiscal year of Borrower and its Subsidiaries.

(c)    **Compliance Certificates.** Together with the financial statements required to be delivered pursuant to Section 6.1(a) and Section 6.1(b) (and beginning with the fiscal quarter ending March 30, 2023, a Compliance Certificate executed by the principal financial and accounting officer of Borrower (or other officer acceptable to Lender in its sole discretion) to the effect that, based upon a review of the activities of Borrower and any Subsidiary and such financial statements during the period covered thereby,

25

4874-5262-8788.6

EXHIBIT B

no Default or Event of Default exists, or if a Default or an Event of Default exists, specifying the nature thereof and Borrower's or any Subsidiary's proposed response thereto.

(d)    **Notice of Default.** Promptly (and in any event within three (3) Business Days) after the occurrence of a Default or an Event of Default, notice thereof and a statement of a Responsible Officer of Borrower specifying the nature thereof and Borrower's proposed response thereto.

(e)    **Litigation.** Promptly after the occurrence thereof, and in any event within three (3) Business Days after any Obligor knows or has reason to know of the occurrence thereof, notice of the institution of or any adverse development in any action, suit or proceeding or any governmental investigation or any arbitration, before any court or arbitrator or any Governmental Authority against any Obligor or any material property of any Obligor.

(f)    **Material Adverse Effect.** Prompt notice of any other event, condition, development, or occurrence that has or results in, or could reasonably be expected to have or result in, a Material Adverse Effect.

(g)    **Formation of Subsidiaries.** Promptly upon forming any Subsidiary, notice thereof, together with the capitalization and ownership of such Subsidiary and copies of such Subsidiary's organizational documents.

(h)    **Other Information.** Promptly, such additional financial and other information, including, but not limited to, financial statements of Borrower and information regarding the Collateral as Lender may from time to time reasonably request.

**6.2    Good Standing.** Each Obligor shall maintain its and any Subsidiary's corporate or other entity existence and good standing in its jurisdiction of incorporation or formation and maintain qualification in each jurisdiction in which it is required under applicable law except where a failure to do so would not reasonably be expected to have a Material Adverse Effect. Each Obligor shall maintain, and shall cause any Subsidiary to maintain, in force all licenses, including the Marijuana Licenses, approvals and agreements, the loss of which could reasonably be expected to have a Material Adverse Effect.

**6.3    Compliance.** Each Obligor shall comply, and cause any Subsidiary to comply, in all material respects with all applicable laws, rules, regulations, decrees, orders, judgments, licenses, and permits including all applicable US State Cannabis Laws, except where failure to comply could not reasonably be expected to have a Material Adverse Effect. Each Obligor shall meet, and shall cause any Subsidiary to meet, the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA, except where a failure to meet such minimum funding requirements could not reasonably be expected to have a Material Adverse Effect. Without limiting the forgoing, each Obligor shall ensure, and cause any Subsidiary to ensure, that no person who owns a controlling interest in or otherwise controls Borrower is or shall be a Sanctioned Person. Each Obligor shall comply, and cause any Subsidiary to comply, with all applicable Anti-Corruption Laws, Bank Secrecy Act and anti-money laundering laws and regulations. Each Obligor will maintain in effect and enforce policies and procedures designed to promote and achieve compliance by each Obligor, any Subsidiary and their respective directors, officers, employees and agents with applicable Anti-Corruption Laws and applicable Sanctions.

**6.4    Taxes.** Each Obligor shall make, and shall cause any Subsidiary to make, due and timely payment or deposit of all federal and material state, local, and other taxes, assessments, or contributions required of it by law, and will execute and deliver to Lender, on demand, appropriate certificates attesting to the payment or deposit thereof; and each Obligor will make, and will cause any Subsidiary to make, timely payment or deposit of all material tax payments and withholding taxes required

26

EXHIBIT B

of it by applicable laws and will, upon request, furnish Lender with proof satisfactory to Lender indicating that each Obligor or any Subsidiary has made such payments or deposits; provided that Borrower or any Subsidiary need not make any payment if the amount or validity of such payment is contested in good faith by appropriate proceedings and is reserved against by each Obligor.

**6.5    Insurance.**

(a)    Each Obligor, at its expense, shall keep the Collateral insured against loss or damage by fire, theft, explosion, sprinklers, and all other hazards and risks, and in such amounts, as ordinarily insured against by other owners in similar businesses conducted in the locations where each Obligor's business is conducted on the date hereof. Obligors shall also maintain (i) insurance relating to Obligors' business, ownership, and use of the Collateral in amounts and of a type that are customary to businesses similar to Obligors' business, and (ii) if required pursuant to, and described in, the definition of the Security Documents, flood insurance.

(b)    All such policies of insurance shall be in such form, with such companies, and in such amounts as are reasonably satisfactory to Lender. All such policies of property and liability insurance shall contain a lender's loss payable and additional insured endorsement (as applicable), in a form satisfactory to Lender, showing, upon Lender's request, Lender as an additional insured and loss payee thereof, and all liability insurance policies shall show Lender as an additional insured and shall specify that the insurer must give at least thirty (30) days' prior notice to Lender before canceling its policy for any reason. Upon Lender's request, Obligors shall deliver to Lender certified copies of such policies of insurance and evidence of the payments of all premiums therefor. After the occurrence and during the continuance of an Event of Default, all proceeds payable under any such policy shall, at the option of Lender, be payable to Lender to be applied on account of the Obligations. If no Event of Default exists, proceeds with respect to Collateral payable under any policy may be used by Obligors to repair or replace damaged or destroyed Collateral or otherwise acquire property useful in its business.

**6.6    Maintenance of Perfected Security Interests; Further Documentation.** Obligors shall take all such actions reasonably requested by Lender to maintain the security interests created by this Agreement as perfected security interests (subject to Permitted Liens) and shall defend such security interest against the claims and demands of all Persons whomsoever. Obligors will furnish to Lender from time to time statements and schedules further identifying and describing the assets and property of Obligors and such other reports in connection therewith as Lender may reasonably request, all in reasonable detail.

**6.7    Changes in Locations, Name, etc.** No Obligor shall change its jurisdiction of organization or the location of its chief executive office, or change its name, identity, or corporate or other organizational structure, in each case except upon fifteen (15) days' prior written notice to Lender and delivery to Lender of all additional financing statements and other documents reasonably requested by Lender as to the validity, perfection and priority of the security interests provided for herein.

**6.8    Further Assurances.** At any time and from time to time Obligors shall execute and deliver such further instruments and take such further action as may reasonably be requested by Lender to effectuate the purposes of this Agreement.

**6.9    Use of Proceeds.** Borrower shall use the proceeds of the Loan to refinance existing debt and to pay certain legal fees and other closing expenses.

**6.10    Certificate of Deposit.** Ducote shall maintain the Certificate of Deposit account established with Hancock Whitney Bank in the name of Ducote in an amount not less than $10,000,000.

27

4874-5262-8788.6

EXHIBIT B

**6.11    Maintenance of Rights and Properties.** Borrower shall not change the location of any Marijuana License without the prior approval of Lender and any such approved change in location shall be in compliance with all applicable laws, and regulations, including the Cannabis Code and all US State Cannabis Laws. Each Obligor shall maintain and preserve all rights, franchises, Permits, privileges, and other authority adequate for the conduct of its business; maintain its properties, equipment, and facilities in good order and repair, working order, and condition; conduct its business in an orderly manner without voluntary interruption; maintain and preserve its existence; and qualify and remain qualified and authorized to do business in each jurisdiction in which the character of its properties or the nature of its business requires such qualification or authorization, except where the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect. Each Obligor shall (a) remain the sole and lawful owner of, and in possession of, its assets, (b) use its assets only in its trade or business, (c) use and maintain its assets only in compliance with all applicable laws, regulations and insurance policies, including all Environmental Laws, and all US State Cannabis Laws, and (d) upon Lender's request, affix plates, tags, or other identifying labels to the Collateral showing ownership thereof by the applicable Obligor and Lender's security interest.

**6.12    Single Purpose Entity.** Borrower shall do all things necessary to preserve its existence and organizational formalities, and shall not, nor shall any general partner, managing member, or manager of Borrower, amend, modify, or otherwise change its organizational documents in a manner which adversely affects Borrower's or any such general partner's, member's, or manager's existence as a single purpose, single asset "bankruptcy remote" entity.

**6.13    Leases.**

(a)    Obligors shall not enter into any Lease that is not approved by the Lender in its reasonable discretion, unless such Lease is an extension or renewal on substantially the same terms and conditions as the prior version of the Lease or is listed on Schedule 6.13(a).

(b)    Obligors covenant that each Obligor: (a) will observe and perform all of the obligations imposed upon such Obligor in any Leases; (b) will use commercially reasonable efforts to enforce or secure, or cause to be enforced or secured, the performance of each and every obligation and undertaking of the respective tenants under any Leases; (c) will not collect or pay any of the rents more than one (1) month in advance of the time when the same become due under the terms of the Leases; (d) will not discount any future accruing rents; (e) will not modify any Lease or surrender, cancel, or terminate any Lease, without the prior written consent of the Lender; and (f) will execute and deliver, at the request of the Lender, all such specific assignments of the Leases and rents in favor of the Lender as the Lender may from time to time require.

(c)    From time to time upon the Lender's request, Obligors shall promptly deliver to the Lender (a) complete executed originals of each Lease, including any exhibits thereto and any guaranty(ies) thereof, (b) a complete rent roll of the Mortgaged Property in such detail as the Lender may require, together with such operating statements and leasing schedules and reports as the Lender may require, (c) any and all financial statements of the tenants, subtenants, and any lease guarantors to the extent available to the Obligors, (d) such other information regarding tenants and prospective tenants and other leasing information as the Lender may reasonably request, and (e) such estoppel certificates, subordination agreements and/or subordination, nondisturbance, and attornment agreements executed by such tenants, subtenants, and guarantors, if any, in such respective forms as the Lender may require; provided, however, that Obligor's failure to obtain the items included in subitem (e) above shall not constitute an Event of Default hereunder provided Obligor has used commercially reasonable efforts to obtain such items

28

4874-5262-8788.6

EXHIBIT B

### 6.14    Inventory and Equipment.

(a)    Maintenance of Inventory. Obligors will do all things necessary to maintain, preserve, protect, and keep its Inventory and the Equipment in good repair and working and saleable condition, except for damaged or defective goods arising in the Ordinary Course of each Obligor's business and except for ordinary wear and tear in respect of such Equipment.

(b)    Equipment. Obligors shall not permit any Equipment to become a fixture with respect to real property or to become an accession with respect to other personal property with respect to which real or personal property Lender does not have a Lien. Obligors will not, without Lender's prior written consent, alter, or remove any identifying symbol or number on any of Obligors' Equipment constituting Collateral.

## 7.    NEGATIVE COVENANTS.

Until the Facility Termination Date, each Obligor agrees that it shall not:

7.1    **Dispositions**. Convey, sell, lease, transfer, or otherwise dispose of all or any part of its business or property, including, without limitation, any Marijuana Licenses, other than: (i) sales or dispositions of worn-out or obsolete Equipment no longer used or useful in the business of Obligor; (ii) sales or dispositions which in the aggregate do not exceed One Hundred Thousand Dollars ($100,000) in any fiscal year; (iii)) partial releases of the Mortgaged Property made subject to and in accordance with Section 2.9; and (iv) sales of Inventory in the Ordinary Course of Business.

7.2    **Mergers or Acquisitions**. Merge or consolidate with or into any other business organization, or acquire all or substantially all of the Equity Interests or property of another Person, except (i) a Subsidiary may merge or consolidate with or into Obligor (provided that Obligor is the surviving entity) and (ii) acquisitions of all or substantially all of the Equity Interests or property of another Person where the aggregate consideration paid in connection with such acquisition does not exceed Fifty Thousand Dollars ($50,000) in any fiscal year.

7.3    **Indebtedness**. Create, incur, guarantee, assume, or be or remain liable with respect to any Indebtedness without the approval of Lender, other than Permitted Indebtedness, which approval shall not be unreasonably withheld by Lender.

7.4    **Liens**. Create, incur, assume, or suffer to exist any Lien with respect to any of its property including, without limitation, any Marijuana Licenses, other than Permitted Liens.

7.5    **Restricted Payments**. Pay any dividends or make any other distribution or payment on account of or in redemption, retirement, or purchase of any Equity Interests.

7.6    **Investments**. Directly or indirectly acquire or own, or make any Investment in or to any Person, other than Permitted Investments.

7.7    **Transactions with Affiliates**. Directly or indirectly enter into or permit to exist any transaction with any Affiliate except for transactions that are in the Ordinary Course of Business of Obligor, upon fair and reasonable terms that are no less favorable to Obligors than would be obtained in an arm's length transaction with a non-affiliated Person.

7.8    **Agreements Affecting Mortgaged Property**. Enter into or submit the Obligors' or the Mortgaged Property to any construction contracts, title encumbrances, or agreements with any other

29

Person for construction, parking, property management, or transfer of all or any interest in the Mortgaged Property or direct or indirect interest in the Obligors, in each case without Lender's approval in Lender's sole discretion.

**7.9    Compliance.** Become an "investment company" or be controlled by an "investment company," within the meaning of the Investment Company Act of 1940, or become principally engaged in, or undertake as one of its important activities, the business of extending credit for the purpose of purchasing or carrying margin stock, or use the proceeds of the Loan for such purpose; or fail to meet the minimum funding requirements of ERISA, permit a Reportable Event or Prohibited Transaction, each as defined in ERISA, or violate any law or regulation, which violation could reasonably be expected to have a Material Adverse Effect.

**7.10    Restrictive Agreements.** Directly or indirectly, enter into, incur or permit to exist any agreement that prohibits, restricts, or imposes any condition upon (a) the ability of Obligors or any Subsidiary to create, incur, or permit any Lien upon any of its assets or properties in favor of Lender, whether now owned or hereafter acquired, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to its Equity Interests, to make or repay loans or advances to Obligors or any Subsidiary, to guarantee Indebtedness of Obligors or any Subsidiary or to transfer any of its property or assets to Obligors or any Subsidiary, except: (i) restrictions or conditions imposed by law or by this Agreement or any other Loan Document or in connection with any document or instrument governing Permitted Liens (provided, that such restrictions only extend to the property subject to such Permitted Liens and do not prohibit Obligors from granting a security interest in Obligors' Collateral in favor of Lender); (ii) restrictions or encumbrances in any agreement, document, or instrument in effect on the Closing Date and disclosed to Lender in writing prior to the date hereof, including any renewals or extensions thereof; and (iii) customary restrictions or encumbrances imposed pursuant to any agreement entered into for the purpose of effecting a transfer or disposition permitted under Section 7.1.

**7.11    Change in Business; Accounting Principles or Fiscal Year End.** Engage in any business other than the businesses currently engaged in by Obligors on the Closing Date and any business substantially similar or related thereto (or incidental thereto); or without Lender's prior written consent, change its accounting principles or the date on which its fiscal year ends.

**7.12    Sanctions and Anti-Corruption Laws.** Obligors will not, nor will Obligors permit any Subsidiary to, directly or indirectly, use the proceeds of the Loan, or lend, contribute, or otherwise make available such proceeds to any subsidiary, joint venture partner , or other Person (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, (ii) in any other manner that would result in a violation of Sanctions by any Person (including any Person participating in the Loan, whether as Lender, underwriter, advisor, investor or otherwise), or (iii) in furtherance of an offer, payment, promise to pay or authorization of the payment or giving of money or anything else of value to any Person in violation of applicable Anti-Corruption Laws .

**7.13    Issuance of Equity Interests; Limitations on Transfer.** Without the prior written approval of Lender, Obligors shall not, directly or indirectly, do any of the following: (i) issue or vote to enable, or take any other action to permit, the issuance any Equity Interests of Borrower or any other securities convertible into, or grant the right to purchase or exchange for any Equity Interests in Borrower, or (ii) sell, assign, transfer, exchange or otherwise dispose of, or grant any option with respect to any Equity Interests of Borrower or the Collateral. Notwithstanding the foregoing, Lender will not unreasonably withhold its approval for the issuance of Equity Interests if: (a) Borrower has determined to the reasonable satisfaction of Lender that a capital call is necessary to maintain the solvency of the business of Borrower as a going concern or (b) Borrower has entered into an agreement to purchase the assets or equity by an

30

EXHIBIT B

acquisition of or merger with one or more business entities in the same or substantially related industry as Borrower and Borrower demonstrates to the reasonable satisfaction of Lender that such purchase would be significantly accreditive to Borrower and its business and that the assets or equity when purchased by Borrower would be encumbered by a first-in-priority Lien of Lender.

## 8.    EVENTS OF DEFAULT.

Any one or more of the following events shall constitute an "Event of Default" under this Agreement:

**8.1    Payments.** (a) If Borrower fails to pay, when due, any principal due and payable under this Agreement, or (b) if Borrower fails to pay, when due, any interest or other amounts due and payable under this Agreement or any other portion of the Obligations and such failure continues unremedied for a period of five (5) days; or

**8.2    Covenants.** If any Obligor fails or neglects to perform or observe or violates any term, provision, condition, covenant contained in this Agreement (other than as otherwise specified in this Section 8), or Borrower or any Obligor fails or neglects to perform or observe any term, provision, condition, or covenant contained in any of the other Loan Documents, and as to any default under such other term, provision, condition or covenant that can be cured, has failed to cure such default within forty-five (45) days after the earlier to occur of (i) Borrower's or the applicable Obligor's receipt of notice thereof from Lender, or (ii) the applicable Obligor or any Responsible Officer of Borrower or the applicable Obligor becoming aware thereof; or

**8.3    Attachment.** If any material portion of any Collateral is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any trustee, receiver, or Person acting in a similar capacity and such attachment, seizure, writ, or distress warrant or levy has not been removed, discharged, or rescinded within twenty (20) days, or if any Obligor is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or a material part of its business affairs, or if a judgment or other claim becomes a lien or encumbrance upon any portion of any Collateral (other than Liens permitted by the Loan Documents), or if a notice of lien, levy, or assessment is filed of record with respect to any Collateral by any Governmental Authority, and the same is not paid within twenty (20) days after Borrower or the applicable Obligor receives notice thereof; or

**8.4    Insolvency.** If any Obligor is adjudicated insolvent, or if an Insolvency Proceeding is commenced by any Obligor, or if an Insolvency Proceeding is commenced against any Obligor and is not dismissed or stayed within sixty (60) days; or

**8.5    Other Agreements.** If there is a default or other failure to perform in any agreement to which any Obligor is a party or by which it is bound either (a) resulting in a right by a third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness in an amount in excess of One Hundred Thousand Dollars ($100,000), or (b) which otherwise could reasonably be expected to have a Material Adverse Effect; or

**8.6    Judgments.** If a judgment or judgments (a) for the payment of money in an amount, individually or in the aggregate, of at least One Hundred Thousand Dollars ($100,000) (to the extent not covered by independent third-party insurance), or (b) which individually or in the aggregate could reasonably be expected to result in a Material Adverse Effect, shall be rendered against any Obligor and shall remain unsatisfied and unstayed. for a period of forty-five (45) days; or

4874-5262-8788.6

**8.7**    **Misrepresentations**. Any Obligor or any Person acting for any Obligor makes any representation, warranty, or other statement now or later in this Agreement, any Loan Document, or in any writing delivered to Lender or to induce Lender to enter this Agreement or any Loan Document, and such representation, warranty, or other statement is false or misleading in any material respect when made; or

**8.8**    **Cessation of Business.** Any Obligor shall commence dissolution proceedings or otherwise shall cease operation of its business as conducted on the date hereof; or

**8.9**    **Loan Documents.** Any material provision of this Agreement or any other Loan Document shall for any reason cease to be valid and binding on, or enforceable against, any Obligor, or any Obligor shall so state in writing, or any Obligor shall bring an action to terminate its obligation under this Agreement or any other Loan Document; or

**8.10**    **Liens**. Any Lien on the Collateral in favor of Lender purported to be created under this Agreement or any other Loan Document, shall fail or cease to be, or shall be asserted by any Obligor not to be, a valid and perfected Lien in favor of Lender, with the priority required by the applicable Loan Documents (subject to Permitted Liens); or

**8.11**    **Change of Control.** The occurrence of a Change of Control.

**8.12**    **Specified Deposit Account**. Borrower's failure to deposit all Gross Operating Income into the Specified Deposit Account as and when required pursuant to Section 2.11 and the withdraw of any funds in the Specified Deposit Account prohibited by Section 2.11 or the Specified Deposit Account Agreement.

**8.13**    **Change in Law** A Change in Law shall occur that creates a Material Adverse Effect on Borrower, or any Obligor or Guarantor shall engage in any Restricted Cannabis Activity.

**8.14**    **Permits**. Any material Permit of an Obligor shall be revoked, fail to be renewed, suspended, or otherwise terminated, or any Obligor shall fail to be eligible for any reason to obtain any material Permit or any Obligor or Individual Guarantor shall fail to be eligible for any reason to obtain any material Permit.

**8.15**    **Fraud or Crime.** Any Obligor, any officer, director, shareholder, or managing employee thereof or Guarantor (i) shall have been found guilty of an act of fraud or shall have been indicted for or convicted of a felony crime, or (ii) shall have become subject to any civil or criminal prosecution, enforcement, asset forfeiture or any other civil or criminal enforcement action or proceeding brought by any US federal Governmental Authority with respect to an alleged breach of US Federal Cannabis Law or by any State or local Governmental Authority with respect to any alleged breach of the Cannabis Code, the US State Cannabis Law or any local cannabis law.

9.    **LENDER'S RIGHTS AND REMEDIES.**

**9.1**    **Rights and Remedies**. Upon the occurrence and during the continuance of an Event of Default, Lender may, at its election, without notice of its election and without demand, do any one or more of the following, all of which are authorized by Obligors:

(a)    Declare all Obligations, whether evidenced by this Agreement, by any of the other Loan Documents, or otherwise, immediately due and payable (provided that upon the occurrence of an Event of Default described in Section 8.4 (Insolvency), all Obligations shall become immediately due and payable without any action by Lender);

32

4874-5262-8788.6

EXHIBIT B

(b)    Exercise any rights and remedies available hereunder, under the other Loan Documents, or under applicable law or equity, with respect to Obligors, the Collateral, or otherwise;

(c)    Settle or adjust disputes and claims directly with account debtors for amounts, upon terms and in whatever order that Lender reasonably considers advisable;

(d).    Make such payments and do such acts as Lender considers necessary or reasonable to protect its security interest in the Collateral. Obligors agree to assemble the Collateral if Lender so requires, and to make the Collateral available to Lender as Lender may designate. Borrower authorizes Lender to enter the premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any encumbrance, charge, or lien which in Lender's determination appears to be prior or superior to its security interest and to pay all expenses incurred in connection therewith. With respect to Obligors' owned premises, Obligor hereby grants Lender a license to enter into possession of such premises and to occupy the same, without charge, in order to exercise any of Lender's rights or remedies provided herein, at law, in equity, or otherwise;

(e)    Set off and apply to the Obligations any and all (i) balances and deposits of Borrower held by Lender, including, without limitation, balances held in the Administrative Account and the Specified Deposit Account, or (ii) indebtedness at any time owing to or for the credit or the account of Borrower held by Lender;

(f)    Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell (in the manner provided for herein) the Collateral. Lender is hereby granted a license or other right, solely pursuant to the provisions of this Section 9.1, to use, without charge, Obligors' labels, Patents, Copyrights, rights of use of any name, trade secrets, trade names, Trademarks, service marks, and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and, in connection with Lender's exercise of its rights under this Section 9.1, Obligors' rights under all licenses and all franchise agreements shall inure to Lender's benefit;

(g)    Dispose of the Collateral by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including Obligors' premises) as Lender determines is commercially reasonable, and apply any proceeds to the Obligations in whatever manner or order Lender deems appropriate and Lender may credit bid and purchase at any public sale. Any deficiency that exists after disposition of the Collateral by Lender will be due and payable immediately by Obligors; and

(h)    Subject to all required suitability and application requirements of Colorado law and local ordinances, petition for and obtain the appointment of a receiver, without notice of any kind whatsoever, to take possession of any or all of the Collateral and business of each Obligor and to exercise such rights and powers as the court appointing such receiver shall confer upon such receiver.

**9.2    Application of Proceeds.** All proceeds from each sale of, or other realization upon, all or any part of the Collateral by Lender after an Event of Default has occurred and is continuing shall be applied as follows: (a) first, to Lender's fees and reimbursable expenses then due and payable pursuant to any of the Loan Documents; (b) second, to interest then due and payable hereunder; (c) third, to the principal balance of the Loan, until the same shall have been paid in full; and (d) fourth, to the extent any proceeds remain, to Borrower or as otherwise provided by a court of competent jurisdiction.

**9.3    Power of Attorney.** Exercisable only upon the occurrence and during the continuance of an Event of Default, Borrower hereby irrevocably appoints Lender (and any of Lender's designated officers, or employees) as Borrower's true and lawful attorney to: (a) send requests for

33

verification of Accounts or notify account debtors of Lender's security interest in the Accounts; (b) receive and open all mail addressed to Borrower for the purpose of collecting the Accounts; (c) notify all account debtors with respect to the Accounts to pay Lender directly; (d) endorse Borrower's name on any checks or other forms of payment or security that may come into Lender's possession; (e) sign Borrower's name on any invoice or bill of lading relating to any Account, drafts against account debtors, schedules and assignments of Accounts, verifications of Accounts, and notices to account debtors; (f) make, settle, and adjust all claims under and decisions with respect to Borrower's policies of insurance; (g) demand, collect, receive, sue, and give releases to any account debtor for the monies due or which may become due upon or with respect to the Accounts and to compromise, prosecute, or defend any action, claim, case or proceeding relating to the Accounts; (h) settle and adjust disputes and claims respecting the accounts directly with account debtors, for amounts and upon terms which Lender determines to be reasonable; (i) sell, assign, transfer, pledge, compromise, discharge or otherwise dispose of any Collateral; (j) execute on behalf of Borrower any and all instruments, documents, financing statements and the like to perfect Lender's interests in the Accounts and collections and file, in its sole discretion, one or more financing or continuation statements and amendments thereto, relative to any of the Collateral; and (k) do all acts and things necessary or expedient, in furtherance of any such purposes. The appointment of Lender as Borrower's attorney in fact, and each and every one of Lender's rights and powers, being coupled with an interest, is irrevocable until all of the Obligations have been fully repaid and performed.

**9.4    Accounts Collection.** During the continuance of an Event of Default, Borrower shall collect all amounts owing to Borrower for Lender, receive in trust all payments as Lender's trustee, and immediately deliver such payments to Lender in their original form as received from the account debtors, with proper endorsements for deposit.

**9.5    Payments by Lender.** If Borrower fails to pay any amounts or furnish any required proof of payment due to third persons or entities, as required under the terms of this Agreement, then Lender may do any or all of the following after reasonable notice to Borrower: (a) make payment of the same or any part thereof; (b) set up such reserves as Lender deems necessary to protect Lender from the exposure created by such failure; or (c) obtain and maintain insurance policies of the type described in Section 6.5 of this Agreement, and take any action with respect to such policies as Lender deems prudent. Any amounts so paid or deposited by Lender shall constitute Obligations, shall be immediately due and payable, and shall bear interest at the then applicable rate hereinabove provided, and shall be secured by the Collateral. Any payments made by Lender shall not constitute an agreement by Lender to make similar payments in the future or a waiver by Lender of any Event of Default under this Agreement.

**9.6    Lender's Liability for Collateral.** So long as Lender complies with the Cannabis Code and with reasonable banking practices and applicable law regarding the safekeeping of the Collateral in the possession or under the control of Lender, Lender shall not in any way or manner be liable or responsible for: (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person whomsoever. All risk of loss, damage or destruction of the Collateral shall be borne by Obligors.

**9.7    Remedies Cumulative.** Lender's rights and remedies under this Agreement, the Loan Documents, and all other agreements shall be cumulative. Lender shall have all other rights and remedies not inconsistent herewith as provided under the UCC, by law, or in equity. No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default on Borrower's part shall be deemed a continuing waiver. No delay by Lender shall constitute a waiver, election, or acquiescence by it. No waiver by Lender shall be effective unless made in a written document signed on behalf of Lender and then shall be effective only in the instance and for the purpose for which it was given.

34

**9.8**    **Demand; Protest**. Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by Lender on which any Obligor may in any way be liable.

**10.    NOTICES.**

Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement or any other agreement entered into in connection herewith shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by a recognized overnight delivery service, certified mail, postage prepaid, return receipt requested, or electronic mail to Borrower or to Lender, as the case may be, at its addresses set forth below:

| | |
|---|---|
| If to Parent: | Silverpeak Holdings, LLC<br>7775 NW 128th Avenue<br>Parkland, FL 33076<br>Attn: Chapman Ducote<br>Email: chapman@chapmanducote.com |
| If to Silverpeak: | Silverpeak Corp.<br>7775 NW 128th Avenue<br>Parkland, FL 33076<br>Attn: Chapman Ducote<br>Email: chapman@chapmanducote.com |
| If to Chapman: | Chapman Ducote<br>7775 NW 128th Avenue<br>Parkland, FL 33076<br>Attn: Chapman Ducote<br>Email: chapman@chapmanducote.com |
| If to War Chest: | War Chest Real Estate, LLC<br>7775 NW 128th Avenue<br>Parkland, FL 33076<br>Attn: Chapman Ducote<br>Email: chapman@chapmanducote.com |
| If to Spoils: | Spoils of War, LLC<br>7775 NW 128th Avenue<br>Parkland, FL 33076<br>Attn: Chapman Ducote<br>Email: chapman@chapmanducote.com |
| with a copy to<br>in any of the above<br>instances: | Curtis Wolfe Law, PA<br>3042 Orange Street<br>Miami, Florida 33133<br>Attn: Curtis Wolfe, Esq. |

35

# EXHIBIT B

Email: curtiswolfe007@gmail.com

If to Lender:    Bay Point Capital Partners II, LP
3050 Peachtree Road NW, Suite 740
Atlanta, GA 30305
Attn: Charles Andros
Email: charlesandros@bay-pointadvisors.com

with a copy to:    Thompson Hine LLP
3560 Lenox Road, Suite 1600
Atlanta, GA 30326
Attn: Stephen B. Schrock, Esq.
Email: stephen.schrock@thompsonhine.com

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

## 11.    GENERAL PROVISIONS.

**11.1    Waiver; Amendments; Integration.** No delay on the part of Lender in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise by Lender of any right, power or remedy preclude other or further exercise thereof, or the exercise of any other right, power or remedy. Neither this Agreement nor the Loan Documents can be amended or terminated orally. No amendment, modification or waiver of, or consent with respect to, any provision of this Agreement or the other Loan Documents shall in any event be effective unless the same shall be in writing and agreed by Lender, and then any such amendment, modification, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. All prior agreements, understandings, representations, warranties, and negotiations between the parties hereto with respect to the subject matter of this Agreement and the Loan Documents, if any, are merged into this Agreement and the Loan Documents.

**11.2    Confirmations.** Borrower and Lender agree from time to time, upon written request received by it from the other, to confirm to the other in writing the aggregate unpaid principal amount of the Loan then outstanding.

### 11.3    Assignments; Participations.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that Obligors may not assign or otherwise transfer any of their rights or obligations hereunder without the prior written consent of Lender. No other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any of the other Loan Documents.

(b)    Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement.

(c)    From and after the effective date of any assignment by Lender of all or any portion of its interest hereunder, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by Lender, have the rights and obligations of Lender under this Agreement, and Lender shall, to the extent of the interest assigned, be released from its obligations under this Agreement (and, in

36

4874-5262-8788.6

# EXHIBIT B

the case of an assignment covering all of Lender's rights and obligations under this Agreement, Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 2.6, 2.7, and 11.14 with respect to facts and circumstances occurring prior to the effective date of such assignment. If the consent of Borrower to an assignment is required hereunder (including a consent to an assignment which does not meet the minimum assignment thresholds specified above), Borrower shall be deemed to have given its consent unless it shall object thereto by written notice to Lender within five (5) Business Days after notice thereof has actually been delivered by Lender to Borrower.

(d)    Lender may at any time, without the consent of, or notice to, Borrower, sell participations to any Person (each, a "Participant") in all or a portion of Lender's rights and/or obligations under this Agreement (including all or a portion of its Loan owing to it); provided that (i) Lender's obligations under this Agreement shall remain unchanged, (ii) Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) Borrower shall continue to deal solely and directly with Lender in connection with Lender's rights and obligations under this Agreement. Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.6 and 2.7 to the same extent as if it were Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section.

To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 11.7 as though it were Lender; provided if such Participant, by exercising any right of set-off or counterclaim or otherwise, obtains payment in respect of any principal of or interest on its participation in the Obligations that would result in such Participant receiving payment of a greater proportion of the aggregate amount of its Obligations than the proportion received by Lender with respect to the Obligations, then the Participant shall purchase (for cash at face value) participations in the Obligations of Lender to the extent necessary so that the benefit of all such payments shall be shared by Lender and the Participant ratably in accordance with the aggregate amount of principal of and accrued interest on their respective interests in the Obligations; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this subsection shall not be construed to apply to any payment made by Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by Lender as consideration for the assignment of or sale of a participation in any of its interest in the Obligations to any assignee or Participant, other than to Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this subsection shall apply). Obligors consent to the foregoing and agrees, to the extent it may effectively do so under applicable law, that Lender acquiring a participation pursuant to the foregoing arrangements may exercise against Obligors rights of set-off and counterclaim with respect to such participation as fully as if Lender were a direct creditor of Borrower in the amount of such participation. If Lender sells a participation, it shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loan or other obligations under the Loan Documents (the "Participant Register"); provided that Lender shall not have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in the Loan or any other obligation under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this agreement notwithstanding any notice to the contrary.

**11.4    Costs, Expenses.** Borrower agrees to pay promptly after demand therefor, all reasonable and documented out-of-pocket costs and expenses of Lender in connection with the preparation, execution, delivery and administration (including perfection and protection of any Collateral, if applicable)

37

4874-5262-8788.6

# EXHIBIT B

of this Agreement, the other Loan Documents and all other documents provided for herein or delivered or to be delivered hereunder or in connection herewith (including any amendment, supplement or waiver to any Loan Document), whether or not the transactions contemplated hereby or thereby shall be consummated, and all reasonable and documented out-of-pocket costs and expenses incurred by Lender after an Event of Default in connection with the collection of the Obligations or the enforcement of this Agreement the other Loan Documents or any such other documents or during any workout, restructuring or negotiations in respect thereof. All Obligations provided for in this Section 11.4 shall survive repayment of the Obligations and termination of this Agreement and shall be secured by the Collateral.

### 11.5    Deposits.

(a)    Borrower agrees to establish an administrative deposit into an account maintained by Lender for the benefit of Lender in an amount of Ten Thousand and No/100 Dollars ($10,000.00) for any expenses incurred by Lender during the term of this Agreement (the "Administrative Account"). Lender will provide Borrower with documentation supporting any costs deducted from this deposit in connection with the deduction thereof. Any remaining balance of such deposit shall be returned to Borrower upon the Facility Termination Date.

(b)    Borrower has paid to Lender an amount of Twenty-Five Thousand and No/100 Dollars ($25,000.00) for expenses incurred by Lender (the "Expense Deposit"). The Expense Deposit shall be non-refundable to Borrower and shall be credited to Borrower on the loan closing statement.

### 11.6    Governing Law; Jurisdiction; Consent to Service of Process.

(a)    This Agreement and the other Loan Documents and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be construed in accordance with and be governed by the law (without giving effect to the conflict of law principles thereof) of the State of Colorado. THE PARTIES TO THIS AGREEMENT ACKNOWLEDGE THAT (A) COLORADO HAS PASSED AMENDMENTS TO THE COLORADO CONSTITUTION AND ENACTED CERTAIN LEGISLATION TO GOVERN THE MARIJUANA INDUSTRY AND (B) THE POSSESSION, SALE, MANUFACTURE, AND CULTIVATION OF MARIJUANA IS ILLEGAL UNDER FEDERAL LAW. THE PARTIES WAIVE ANY DEFENSES BASED UPON INVALIDITY OF CONTRACTS FOR PUBLIC POLICY REASONS AND/OR THE SUBSTANCE OF THE CONTRACT VIOLATING FEDERAL LAW.

(b)    Obligors hereby irrevocably and unconditionally submits, for themselves and their property, to the exclusive jurisdiction of the Business Case Division of the Fulton County Superior Court located in Atlanta, Georgia, and of any appellate court from any thereof, in each case in any action or proceeding arising out of or relating to this Agreement or any other Loan Document or the transactions contemplated hereby or thereby, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such court or, to the extent permitted by applicable law, such appellate court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or any other Loan Document shall affect any right that Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against Obligors or its properties in the courts of any jurisdiction.

38

EXHIBIT B

(c)    Obligors irrevocably and unconditionally waive any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding described in subsection (b) of this Section and brought in any court referred to in subsection (b) of this Section. Each of the parties hereto irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Each party to this Agreement irrevocably consents to the service of process in the manner provided for notices in Section 10. Nothing in this Agreement or in any other Loan Document will affect the right of any party hereto to serve process in any other manner permitted by law.

**11.7    Right of Set-off.** In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, Lender shall have the right, at any time or from time to time upon the occurrence and during the continuance of an Event of Default, without prior notice to Borrower, any such notice being expressly waived by Borrower to the extent permitted by applicable law, to set off and apply against all deposits (general or special, time or demand, provisional or final) of Borrower at any time held or other obligations at any time owing by Lender to or for the credit or the account of Borrower against any and all Obligations held by Lender, irrespective of whether Lender shall have made demand hereunder and although such Obligations may be unmatured. Lender agrees promptly to notify Borrower after any such set-off and any application made by Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.

**11.8    Severability.** Whenever possible each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**11.9    Nature of Remedies.** All Obligations of Obligors and rights of Lender expressed herein or in any other Loan Document shall be in addition to and not in limitation of those provided by applicable law. No failure to exercise and no delay in exercising, on the part of Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**11.10    Entire Agreement.** This Agreement, together with the other Loan Documents, embodies the entire agreement and understanding among the parties hereto and supersedes all prior or contemporaneous agreements and understandings of such Persons, verbal or written, relating to the subject matter hereof and thereof and any prior arrangements made with respect to the payment by Borrower of (or any indemnification for) any fees, costs or expenses payable to or incurred (or to be incurred) by or on behalf of Lender.

**11.11    Counterparts.** This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Agreement. Receipt of an executed signature page to this Agreement by facsimile or other electronic transmission shall constitute effective delivery thereof. Electronic records of executed Loan Documents maintained by Lender shall deemed to be originals.

**11.12    Electronic Signatures.** This Agreement and any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to this Agreement (each a "Communication"), including Communications required to be in writing, may be in the

39

4874-5262-8788.6

EXHIBIT B

form of an Electronic Record and may be executed using Electronic Signatures. Obligors agrees that any Electronic Signature on or associated with any Communication shall be valid and binding on Obligors to the same extent as a manual signature, and that any Communication entered into by Electronic Signature, will constitute the legal, valid and binding obligation of Obligors enforceable against such in accordance with the terms thereof to the same extent as if manually executed. Any Communication may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Communication. For the avoidance of doubt, the authorization under this paragraph may include use or acceptance by Lender of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention. Lender may, at its option, create one or more copies of any Communication in the form of an imaged Electronic Record ("Electronic Copy"), which shall be deemed created in the Ordinary Course of Business of such Person's business, and destroy the original paper document. All Communications in the form of an Electronic Record, including an Electronic Copy, shall be considered an original for all purposes, and shall have the same legal effect, validity and enforceability as a paper record. Notwithstanding anything contained herein to the contrary, Lender is under no obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by Lender pursuant to procedures approved by it; provided, further, without limiting the foregoing, (a) to the extent Lender has agreed to accept such Electronic Signature, Lender shall be entitled to rely on any such Electronic Signature purportedly given by or on behalf of Obligors without further verification and (b) upon the request of Lender, any Electronic Signature shall be promptly followed by such manually executed counterpart. For purposes hereof, "Electronic Record" and "Electronic Signature" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

      **11.13   Captions.** Section captions used in this Agreement are for convenience only and shall not affect the construction of this Agreement.

      **11.14   USA Patriot Act Notice.** Lender (for itself and not on behalf of any other party) hereby notifies Borrower that, pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56, signed into law October 26, 2001 (the "Patriot Act"), it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender, as applicable, to identify Borrower in accordance with the Patriot Act.

      **11.15   INDEMNIFICATION BY OBLIGORS. IN CONSIDERATION OF THE EXECUTION AND DELIVERY OF THIS AGREEMENT BY LENDER AND THE AGREEMENT BY LENDER TO EXTEND THE LOAN PROVIDED HEREUNDER, OBLIGORS HEREBY AGREE TO INDEMNIFY, EXONERATE AND HOLD LENDER AND EACH OF THE OFFICERS, DIRECTORS, EMPLOYEES, AFFILIATES AND AGENTS OF LENDER (EACH A "LENDER PARTY") FREE AND HARMLESS FROM AND AGAINST ANY AND ALL ACTIONS, CAUSES OF ACTION, SUITS, LOSSES, LIABILITIES, DAMAGES AND EXPENSES (COLLECTIVELY, THE "INDEMNIFIED LIABILITIES"), INCURRED BY LENDER PARTIES OR ANY OF THEM AS A RESULT OF, OR ARISING OUT OF, OR RELATING TO (A) ANY PURCHASE OF ASSETS, EQUITY INTERESTS, OR OTHER SIMILAR TRANSACTION FINANCED OR PROPOSED TO BE FINANCED IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY, WITH THE PROCEEDS OF ANY OF THE LOAN, (B) THE USE, HANDLING, RELEASE, EMISSION, DISCHARGE, TRANSPORTATION, STORAGE, TREATMENT OR DISPOSAL OF ANY HAZARDOUS SUBSTANCE AT ANY PROPERTY OWNED OR LEASED BY OBLIGORS, (C) ANY VIOLATION OF ANY ENVIRONMENTAL LAWS WITH RESPECT TO CONDITIONS AT ANY PROPERTY OWNED OR LEASED BY OBLIGORS OR THE OPERATIONS CONDUCTED THEREON, (D) THE INVESTIGATION, CLEANUP OR**

40

EXHIBIT B

REMEDIATION OF OFFSITE LOCATIONS AT WHICH OBLIGORS OR ITS RESPECTIVE PREDECESSORS ARE ALLEGED TO HAVE DIRECTLY OR INDIRECTLY DISPOSED OF HAZARDOUS SUBSTANCES OR (E) THE EXECUTION, DELIVERY, PERFORMANCE OR ENFORCEMENT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT BY ANY OF LENDER PARTIES, EXCEPT FOR ANY SUCH INDEMNIFIED LIABILITIES ARISING ON ACCOUNT OF THE APPLICABLE LENDER PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL, NONAPPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION. IF AND TO THE EXTENT THAT THE FOREGOING UNDERTAKING MAY BE UNENFORCEABLE FOR ANY REASON, OBLIGORS HEREBY AGREE TO MAKE THE MAXIMUM CONTRIBUTION TO THE PAYMENT AND SATISFACTION OF EACH OF THE INDEMNIFIED LIABILITIES WHICH IS PERMISSIBLE UNDER APPLICABLE LAW. ALL OBLIGATIONS PROVIDED FOR IN THIS <u>SECTION 11.14</u> SHALL SURVIVE REPAYMENT OF THE OBLIGATIONS, ANY FORECLOSURE UNDER, OR ANY MODIFICATION, RELEASE OR DISCHARGE OF, ANY OR ALL OF THE COLLATERAL AND TERMINATION OF THIS AGREEMENT.

11.16 <u>Nonliability of Lender</u>. The relationship between Borrower on the one hand and Lender on the other hand shall be solely that of borrower and lender. Lender has no fiduciary relationship with or duty to Obligors arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between Borrower, on the one hand, and Lender, on the other hand, in connection herewith or therewith is solely that of debtor and creditor. Lender undertakes no responsibility to Obligors to review or inform Obligors of any matter in connection with any phase of Obligors' business or operations. Obligors agree that Lender shall have no liability to Obligors (whether sounding in tort, contract or otherwise) for losses suffered by Obligors in connection with, arising out of, or in any way related to the transactions contemplated and the relationship established by the Loan Documents, or any act, omission or event occurring in connection therewith, unless it is determined in a final non-appealable judgment by a court of competent jurisdiction that such losses resulted from the gross negligence or willful misconduct of the party from which recovery is sought. NO LENDER PARTY SHALL HAVE ANY LIABILITY WITH RESPECT TO, AND OBLIGORS HEREBY WAIVES, RELEASES AND AGREES NOT TO SUE FOR ANY SPECIAL, PUNITIVE, EXEMPLARY, INDIRECT OR CONSEQUENTIAL DAMAGES RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ARISING OUT OF ITS ACTIVITIES IN CONNECTION HEREWITH OR THEREWITH (WHETHER BEFORE OR AFTER THE CLOSING DATE). Obligors acknowledge that they have been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents to which it is a party. No joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby between Obligors and Lender.

11.17 <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 11.16</u>.

41

EXHIBIT B

**11.18** **Confidentiality.** Obligors hereby agree to keep all information regarding the terms set forth in this Agreement and the other Loan Documents (the "Confidential Terms") confidential and shall not divulge any Confidential Terms to any Person without the prior written consent of Lender, except to the extent that (i) it is necessary to do so in working with legal counsel, auditors, taxing authorities, or other governmental agencies or regulatory bodies, or in order to comply with any applicable federal or state laws including, without limitation, federal securities laws applicable to Obliogrs or any Affiliate thereof, or (ii) any of the Confidential Terms are in the public domain other than due to a breach of this covenant (such as recording Loan Documents pursuant to the terms thereof, etc.); provided, however, that nothing herein shall prevent any party from disclosing any such information to its affiliates, employees, directors, agents, attorneys, accountants, or other professional advisors deemed necessary or appropriate in the reasonable judgment of the disclosing party, in each case, who are made aware of and instructed to comply with the provisions of this Section 11.17; and, provided, further, no disclosure made with respect to this Agreement shall include a copy of this Agreement to the extent that a summary would suffice in lieu thereof. In this connection, Obligors shall not issue any press releases referencing or regarding the Confidential Terms or Lender without the prior review and written consent to such issuance by Lender. The provisions set forth in this Section shall survive the termination of this Agreement for a period of one year following such termination.

**11.19** **Time of Essence.** Time is of the essence for the performance of all obligations set forth in this Agreement.

**11.20** **Survival.** All covenants, representations and warranties made in this Agreement shall continue in full force and effect until the Facility Termination Date. The obligations of Obligors to indemnify Lender with respect to the expenses, damages, losses, costs and liabilities described in Section 11.15 shall survive until all applicable statute of limitations periods with respect to actions that may be brought against Lender have run.

**11.21** **Governmental Authority Reformation.** This Agreement and the transactions contemplated hereby are subject to review by the Licensing Division and applicable local licensing authorities with jurisdiction over the Marijuana Licenses. If any such Governmental Authority determines that this Agreement must be reformed, the parties shall negotiate in good faith to so reform this Agreement according to such Governmental Authority's requirements, while effectuating the original intent of this Agreement as near as possible.

*[Remainder of page intentionally blank; signature pages follow.]*

42

EXHIBIT B

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**BORROWER:**

SILVERPEAK HOLDINGS, LLC

By: _____
Name: Chapman Ducote
Title: Manager

SILVERPEAK CORP.

By: _____
Name: Chapman Ducote
Title: President

**GUARANTOR:**

_____
Chapman Ducote

WAR CHEST REAL ESTATE, LLC

By: _____
Name: Chapman Ducote
Title: Manager

SPOILS OF WAR, LLC.

By: _____
Name: Chapman Ducote
Title: President

LOAN AND SECURITY AGREEMENT
SIGNATURE PAGE

4874-5262-8788.6

EXHIBIT B

**LENDER:**

**BAY POINT CAPITAL PARTNERS II, LP,**
a Delaware limited partnership

By: Bay Point Advisors, LLC,
    a Delaware limited liability company
Its: General Partner

By: _____(SEAL)
Name: Charles Andros
Title: Manager

2

EXHIBIT B

## SCHEDULE OF EXCEPTIONS

*[BORROWER TO COMPLETE OR INDICATE "NONE"; LENDER TO APPROVE]*

<u>Subsidiaries</u> (Section 5.6)

None

<u>Leases</u> (Section 6.13)

Sublease Agreement between Silverpeak Corp. and Lance Perryman dated May 3rd, 2022 for the farmhouse on the Basalt property.

<u>Permitted Indebtedness</u> (Section 7.3)

1. ALCC Note $1,500,000

2. Yacapital $500,000

<u>Permitted Liens</u> (Section 7.4)

None

<u>Permitted Investments</u> (Section 7.6)

None

EXHIBIT B

## Schedule 5.7

### Leases with Borrower as Tenant

| Landlord | Current Status | Address | City | St | Zip Code |
|---|---|---|---|---|---|
| ORG Properties, LLC | Operating | 520 E Cooper Ave, Aspen, CO 81611** | | | |
| | Operating | Co-Located ^^^ | | | |
| Basalt Real Estate LLC | Operating | 24480 and 24530 CO-82, Basalt, CO 81621 | | | |
| | Operating | Co-Located ^^^ | | | |
| 2119 Larimer #1, LLC | Operating | 2119 Larimer St, Denver, CO 80205 | | | |
| | Operating | Co-Located ^^^ | | | |
| Lamar Investments , LLC | Operating | 2748 W Alameda Ave, Denver, CO 80219 | | | |
| Keyline Investments  Gordon Eatherton & Gregory Herbers | Operating | 750 Canosa Ct, Denver, CO 80204 | | | |
| | Operating | Co-Located ^^^ | | | |
| Dark Horse Management | Operating | 2145 S Kalamath St, Denver CO | | | |
| Tebo Properties | Operating | 1063 Courtesy Road, Louisville, CO 80027 | | | |
| 972 West Dillon Road, LLC | Operating | 972 West Dillon Road, Louisville, CO 80027 | | | |
| Mel Rey Ventures, LLC, | Operating | 23 Mel Ray Rd., Glenwood Springs, CO 81601 | | | |
| JDC Beasley Family Partnership | Operating | 393 E 2nd St, Parachute, CO 81635 | | | |

1

4874-5262-8788.6

EXHIBIT B

## Schedule 5.10

### Marijuana Licenses and Permits

| LICENSE TYPE | LICENSE ADDRESS | CO DoR MED LICENSE NUMBER |
|---|---|---|
| | | OE-000011 |
| Retail Dispensary | 520 E Cooper Ave, Aspen, CO 81611 | 402R-00140 |
| Medical Dispensary | Co-Located ^^^ | 402-00798 |
| Retail Cultivation | 24480 and 24530 CO-82, Basalt, CO 81621 | 403R-00274 |
| Medical Cultivation | Co-Located ^^^ | 403-01539 |
| Retail Dispensary | 2119 Larimer St, Denver, CO 80205 | 402R-00253 |
| Medical Dispensary | Co-Located ^^^ | 402-00174 |
| Delivery Permit | Co-Located ^^^ | N/A |
| Retail Dispensary | 2748 W Alameda Ave, Denver, CO 80219 | 402R-00137 |
| Delivery Permit | Co-Located ^^^ | N/A |
| Retail Cultivation | 750 Canosa Ct, Denver, CO 80204 | 403R-00181 |
| Central Distribution | Co-Located ^^^ | 501R-00009 |
| Retail MIP (Permissive Use) | 2145 S Kalamath St, Denver CO | 404R-00305 |
| Medical MIP (Permissive Use) | Co-Located ^^^ | 404-00479 |

2

4874-5262-8788.6

EXHIBIT B

| Retail Dispensary | 1063 Courtesy Road, Louisville, CO 80027 | 402R-00816 |
| Retail Dispensary | 972 West Dillon Road, Louisville, CO 80027 | 402R-00794 |
| Retail Dispensary | 23 Mel Ray Rd., Glenwood Springs, CO 81601 | 402R-00462 |
| Retail Dispensary | 393 E 2nd St, Parachute, CO 81635 | 402R-00693 |

3

4874-5262-8788.6

EXHIBIT B

## Schedule 5.12

Taxes

2021 CORPORATION INCOME TAX RETURN FOR THE YEAR ENDED DECEMBER 31, 2021 IN THE AMOUNT DUE OF $860,923

4

4874-5262-8788.6

EXHIBIT B

### EXHIBIT A

### NOTE

$13,000,000.00                                                    October 18, 2022

FOR VALUE RECEIVED, SILVERPEAK HOLDINGS LLC, a Colorado limited liability company, and SILVERPEAK CORP., a Colorado corporation (collectively, jointly and severally, "Borrower"), promises to pay to the order of BAY POINT CAPITAL PARTNERS II, LP, a Delaware limited partnership (together with its successors and assigns, "Lender"), as lender under that certain Loan and Security Agreement, as of even date herewith, between Borrower and Lender (as amended, modified, renewed, replaced, supplemented, or restated from time to time, the "Loan Agreement"), at the office of Lender located at 3050 Peachtree Road NW, Suite 740, Atlanta, GA 30305, the principal sum of THIRTEEN MILLION AND NO/100 DOLLARS ($13,000,000.00) (the "Principal Sum"), on the dates and in the amounts provided in the Loan Agreement. Capitalized terms not otherwise defined herein shall have the meanings given thereto in the Loan Agreement.

Borrower promises to pay interest on the unpaid Principal Sum from time to time on the dates and at the rate or rates provided for in the Loan Agreement and in all cases in accordance with the terms of the Loan Agreement. Interest on any overdue Principal Sum shall accrue at a rate per annum as provided in the Loan Agreement. The outstanding Principal Sum, together with all accrued unpaid interest thereon, shall be due and payable as set forth in the Loan Agreement, and, unless sooner paid, the entire outstanding Principal Sum shall be due and payable in full on the Maturity Date. All such payments of principal and interest shall be made in lawful money of the United States in immediately available funds at the office of Lender designated above or otherwise specified by Lender from time to time pursuant to the Loan Agreement.

All repayments of the Principal Sum shall be recorded by Lender and, prior to any transfer hereof, endorsed by Lender on a schedule attached hereto, or on a continuation of such schedule attached to and made a part hereof; provided that the failure of Lender to make, or any error of Lender in making, any such recordation or endorsement shall not affect the obligations of Borrower hereunder or under the Loan Agreement.

This Note (this "Note") is a Loan Document and is the "Note" referred to in, and is entitled to the benefits of, the Loan Agreement which, among other things, contains provisions for the acceleration of the maturity hereof upon the happening of certain events, for prepayment of the Principal Sum prior to the maturity hereof and for the amendment or waiver of certain provisions of the Loan Agreement, all upon the terms and conditions therein specified. The obligations evidenced by the Note are secured by the Collateral, in accordance with the terms and conditions of the Loan Agreement.

If an Event of Default shall occur and be continuing, the entire unpaid Principal Sum and all of the unpaid interest accrued thereon may become or be declared due and payable in the manner and with the effect provided in the Loan Agreement.

Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, demand, protest, notice of demand, dishonor, protest and nonpayment, and any other notice required by law relative hereto, except to the extent as otherwise may be expressly provided for in the Loan Documents. Without limiting the generality of the foregoing, the acceptance by Lender from time to time of any payment under this Note which is past due or which is less than the payment in full of all amounts due and payable at the time

5

4874-5262-8788.6

EXHIBIT B

of such payment shall not (i) constitute a waiver of or impair or extinguish the right of Lender to accelerate the maturity of the Obligations or to exercise any other right or remedy at the time or at any subsequent time, or nullify any prior exercise of any such right or remedy, or (ii) constitute a waiver of the requirement of punctual payment and performance or a novation in any respect.

The terms of this Note and of the other Loan Documents shall bind and inure to the benefit of the successors and assigns of the parties. The foregoing sentence shall not be construed to permit Borrower to assign the Note except as otherwise permitted under the Loan Agreement. As further provided in the Loan Agreement, Lender may, at any time, sell, transfer, or assign all on a portion of its interest in this Note and the other Loan Documents, subject to the terms of the Loan Agreement.

Time is of the essence with respect to Borrower's obligations under this Note. A determination that any provision of this Note is unenforceable or invalid shall not affect the enforceability or validity of any other provision and the determination that the application of any provision of this Note to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances. This Note may not be amended except in a writing specifically intended for such purpose and executed by the party against whom enforcement of the amendment is sought. Any notice, request, or demand to or upon Borrower or Lender shall be deemed to have been properly given or made when delivered in accordance with the Loan Agreement.

Borrower agrees, in the event that this Note or any portion hereof is collected by law or through an attorney at law, to pay all reasonable costs of collection, including, without limitation, reasonable attorneys' fees actually incurred, in accordance with the terms and conditions of the Loan Agreement. This Note shall be construed in accordance with and governed by the laws of the State of Colorado, without regard to the conflict of law principles thereof. If Borrower consists of more than one entity, the obligations and liabilities of each such entity will be joint and several.

Under no circumstances or event whatsoever shall the aggregate of all amounts deemed interest hereunder and charged or collected pursuant to the terms of this Note exceed the highest rate permissible under any law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto. In the event that such court determines Lender has charged or received interest hereunder in excess of the highest applicable rate, Lender shall apply, in its sole discretion, and set off such excess interest received by Lender against other Obligations due or to become due and such rate shall automatically be reduced to the maximum rate permitted by such law.

Whenever reference is made to the payment of "attorneys' fees," "reasonable attorneys' fees" or words of similar import in this Note or any of the other Loan Documents, the same shall mean and refer to the payment of actual attorneys' fees incurred based upon the attorney's normal hourly rate and the number of hours worked.

*[Remainder of page intentionally blank; signature page follows.]*

4874-5262-8788.6

EXHIBIT B

IN WITNESS WHEREOF, Borrower has caused this Note to be duly executed under seal, by its duly authorized officer as of the day and year first above written.

**BORROWER:**

**SILVERPEAK HOLDINGS LLC,**
a Colorado limited liability company

By: _____
Name:  Chapman Ducote
Title:    Manager

**SILVERPEAK CORP.,**
a Colorado corporation

By: _____
Name: Chapman Ducote
Title: President

1

4874-5262-8788.6

## **EXHIBIT B**

Legal Description

LOT NUMBERED TWO (2) OF LOWE'S SUBDIVISION, AS THE SAME IS SHOWN AND DESIGNATED ON THE PLAT ENTITLED, "PLAT OF LOTS 1 THROUGH 7, LOWE'S SUBDIVISION, WITHIN PROJECTED SECTIONS 5 AND 8, T11N, R3E, N.M.P.M., TOWN OF ALAMEDA GRANT, CITY OF ALBUQUERQUE, BERNALILLO COUNTY, NEW MEXICO", FILED IN THE OFFICE OF THE COUNTY CLERK OF BERNALILLO COUNTY, NEW MEXICO ON APRIL 9, 2002, IN PLAT BOOK 2002C, FOLIO 110.

TOGETHER WITH NON-EXCLUSIVE RIGHTS OF EASEMENT FOR INGRESS AND EGRESS AS PROVIDED FOR IN AND SUBJECT TO THE PROVISIONS OF DECLARATION OF RESTRICTIVE EASEMENTS, COVENANTS AND RESTRICTIONS AGREEMENT FILED OCTOBER 6, 2006, RECORDED AS DOCUMENT NO. 2006152666, RECORDS OF BERNALILLO COUNTY, NEW MEXICO, TO THE EXTENT OF AND ONLY FOR THE DURATION AS PROVIDED FOR THEREIN.

TOGETHER WITH NON-EXCLUSIVE RIGHTS OF EASEMENT FOR INGRESS AND EGRESS AS PROVIDED FOR IN AND SUBJECT TO THE PROVISIONS OF RECIPROCAL EASEMENT AGREEMENT FILED JANUARY 31, 2002, RECORDED AS DOCUMENT NO. 2002013954, RECORDS OF BERNALILLO COUNTY, NEW MEXICO, TO THE EXTENT OF AND ONLY FOR THE DURATION AS PROVIDED FOR THEREIN.

2

4874-5262-8788.6

EXHIBIT B

## EXHIBIT C

## FORM OF COMPLIANCE CERTIFICATE

To:    Bay Point Capital Partners II, LP
3050 Peachtree Road NW, Suite 740
Atlanta, GA 30305
Attn: Charles Andros


Ladies and Gentlemen:

Reference is made to that certain Loan and Security Agreement, dated as of October 18, 2022 (as amended, modified, supplemented or restated from time to time, the ("Loan Agreement"), by and between SILVERPEAK HOLDINGS, LLC, a Colorado limited liability company ("Parent"), SILVERPEAK CORP., a Colorado corporation ("Silverpeak"), and together with Parent, collectively, the "Borrower"), CHAPMAN DUCOTE, a resident of the State of Florida ("Ducote"); WAR CHEST REAL ESTATE, LLC, a Florida limited liability company ("War Chest"), SPOILS OF WAR LLC, a Florida limited liability company ("Spoils" together with Ducote and War Chest, "Guarantor"), as guarantor, and BAY POINT CAPITAL PARTNERS II, LP, a Delaware limited partnership (together with its successors and assigns, "Lender"). Capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Loan Agreement.

The undersigned, the duly elected, qualified, and acting [＿＿＿＿] of Borrower, hereby certifies to Lender as follows:

1.    The consolidated and consolidating financial statements of Borrower and its Subsidiaries (if any), attached hereto for the fiscal **[quarter] [year]** ended [＿＿＿＿＿＿] (the "Reporting Date") present fairly in all material respects the financial condition of Borrower and its Subsidiaries (if any), as of the end of such fiscal **[quarter] [year]** on a consolidated and consolidating basis, and the related statements of operations of Borrower and its Subsidiaries (if any), for such fiscal **[quarter] [year]**, in accordance with generally accepted accounting principles consistently applied (subject, in the case of such monthly financial statements, to normal year-end adjustments and the absence of footnotes).

2.    Based upon a review of the activities of Borrower and any Subsidiary and the financial statements attached hereto during the period covered thereby, as of the date hereof, **[there exists no Default or Event of Default.] [the following Default(s) or Event(s) of Default exist, and Borrower has taken or propose    to    take    the    following    actions    with    respect    thereto:** [＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿]

*[Remainder of page intentionally blank; signature page follows]*

3

4874-5262-8788.6

EXHIBIT B

The undersigned has delivered this Compliance Certificate as of [_____].

## **BORROWER:**

SILVERPEAK HOLDINGS, LLC

By:_____
Name: Chapman Ducote
Title: Manager

SILVERPEAK CORP.

By:_____
Name: Chapman Ducote
Title: President

4874-5262-8788.6

# EXHIBIT B

## EXHIBIT B

EXHIBIT B

## NOTE

$13,000,000.00                                                          October 18, 2022

FOR VALUE RECEIVED, SILVERPEAK HOLDINGS LLC, a Colorado limited liability company, and SILVERPEAK CORP., a Colorado corporation (collectively, jointly and severally, "Borrower"), promises to pay to the order of BAY POINT CAPITAL PARTNERS II, LP, a Delaware limited partnership (together with its successors and assigns, "Lender"), as lender under that certain Loan and Security Agreement, as of even date herewith, between Borrower and Lender (as amended, modified, renewed, replaced, supplemented, or restated from time to time, the "Loan Agreement"), at the office of Lender located at 3050 Peachtree Road NW, Suite 740, Atlanta, GA 30305, the principal sum of THIRTEEN MILLION AND NO/100 DOLLARS ($13,000,000.00) (the "Principal Sum"), on the dates and in the amounts provided in the Loan Agreement. Capitalized terms not otherwise defined herein shall have the meanings given thereto in the Loan Agreement.

Borrower promises to pay interest on the unpaid Principal Sum from time to time on the dates and at the rate or rates provided for in the Loan Agreement and in all cases in accordance with the terms of the Loan Agreement. Interest on any overdue Principal Sum shall accrue at a rate per annum as provided in the Loan Agreement. The outstanding Principal Sum, together with all accrued unpaid interest thereon, shall be due and payable as set forth in the Loan Agreement, and, unless sooner paid, the entire outstanding Principal Sum shall be due and payable in full on the Maturity Date. All such payments of principal and interest shall be made in lawful money of the United States in immediately available funds at the office of Lender designated above or otherwise specified by Lender from time to time pursuant to the Loan Agreement.

All repayments of the Principal Sum shall be recorded by Lender and, prior to any transfer hereof, endorsed by Lender on a schedule attached hereto, or on a continuation of such schedule attached to and made a part hereof; provided that the failure of Lender to make, or any error of Lender in making, any such recordation or endorsement shall not affect the obligations of Borrower hereunder or under the Loan Agreement.

This Note (this "Note") is a Loan Document and is the "Note" referred to in, and is entitled to the benefits of, the Loan Agreement which, among other things, contains provisions for the acceleration of the maturity hereof upon the happening of certain events, for prepayment of the Principal Sum prior to the maturity hereof and for the amendment or waiver of certain provisions of the Loan Agreement, all upon the terms and conditions therein specified. The obligations evidenced by the Note are secured by the Collateral, in accordance with the terms and conditions of the Loan Agreement.

If an Event of Default shall occur and be continuing, the entire unpaid Principal Sum and all of the unpaid interest accrued thereon may become or be declared due and payable in the manner and with the effect provided in the Loan Agreement.

Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, demand, protest, notice of demand, dishonor, protest and nonpayment, and any other notice required by law relative hereto, except to the extent as otherwise may be expressly provided for in the Loan Documents. Without limiting the generality of the foregoing, the acceptance by Lender from time to time of any payment under this Note which is past due or which is less than the payment in full of all amounts due and payable at the time of such payment shall not (i) constitute a waiver of or impair or extinguish the right of Lender to accelerate the maturity of the Obligations or to exercise any other right or remedy at the time or at any subsequent time,

4883-9215-2884

EXHIBIT B

or nullify any prior exercise of any such right or remedy, or (ii) constitute a waiver of the requirement of punctual payment and performance or a novation in any respect.

The terms of this Note and of the other Loan Documents shall bind and inure to the benefit of the successors and assigns of the parties. The foregoing sentence shall not be construed to permit Borrower to assign the Note except as otherwise permitted under the Loan Agreement. As further provided in the Loan Agreement, Lender may, at any time, sell, transfer, or assign all on a portion of its interest in this Note and the other Loan Documents, subject to the terms of the Loan Agreement.

Time is of the essence with respect to Borrower's obligations under this Note. A determination that any provision of this Note is unenforceable or invalid shall not affect the enforceability or validity of any other provision and the determination that the application of any provision of this Note to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances. This Note may not be amended except in a writing specifically intended for such purpose and executed by the party against whom enforcement of the amendment is sought. Any notice, request, or demand to or upon Borrower or Lender shall be deemed to have been properly given or made when delivered in accordance with the Loan Agreement.

Borrower agrees, in the event that this Note or any portion hereof is collected by law or through an attorney at law, to pay all reasonable costs of collection, including, without limitation, reasonable attorneys' fees actually incurred, in accordance with the terms and conditions of the Loan Agreement. This Note shall be construed in accordance with and governed by the laws of the State of Colorado, without regard to the conflict of law principles thereof. If Borrower consists of more than one entity, the obligations and liabilities of each such entity will be joint and several.

Under no circumstances or event whatsoever shall the aggregate of all amounts deemed interest hereunder and charged or collected pursuant to the terms of this Note exceed the highest rate permissible under any law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto. In the event that such court determines Lender has charged or received interest hereunder in excess of the highest applicable rate, Lender shall apply, in its sole discretion, and set off such excess interest received by Lender against other Obligations due or to become due and such rate shall automatically be reduced to the maximum rate permitted by such law.

Whenever reference is made to the payment of "attorneys' fees," "reasonable attorneys' fees" or words of similar import in this Note or any of the other Loan Documents, the same shall mean and refer to the payment of actual attorneys' fees incurred based upon the attorney's normal hourly rate and the number of hours worked.

*[Remainder of page intentionally blank; signature page follows.]*

4883-9215-2884

EXHIBIT B

IN WITNESS WHEREOF, Borrower has caused this Note to be duly executed under seal, by its duly authorized officer as of the day and year first above written.

**BORROWER:**

**SILVERPEAK HOLDINGS LLC,**
a Colorado limited liability company

By: _____
Name: Chapman Ducote
Title:   Manager

**SILVERPEAK CORP.,**
a Colorado corporation

By: _____
Name: Chapman Ducote
Title: President

NOTE
SIGNATURE PAGE

4883-9215-2884

EXHIBIT B

## **EXHIBIT C**

EXHIBIT B

# UCC Financing Statement

**Colorado Secretary of State**
Date and Time: 10/20/2022 12:55:41 PM
Master ID: 20222107620
Validation Number: 20222107620
Amount: $8.00

## Debtor: (Organization)

Name: SILVERPEAK CORP.

Address1: 232 Woods Road

Address2:

City: Aspen            State: CO            ZIP/Postal Code: 81611

Province:              Country: United States

## Debtor: (Organization)

Name: SILVERPEAK HOLDINGS, LLC

Address1: 232 Woods Road

Address2:

City: Aspen            State: CO            ZIP/Postal Code: 81611

Province:              Country: United States

## Secured Party: (Organization)

Name: BAY POINT CAPITAL PARTNERS II, LP

Address1: 3050 Peachtree Road NW, Suite 740

Address2:

City: Atlanta          State: GA            ZIP/Postal Code: 30305

Province:              Country: United States

## Collateral

**Description:**

See attached

EXHIBIT B

Attachment #: 1

# UCC State Filing - CO

File name: UCC - State Filing (CO) - Silverpeak    Uploaded: 10/20/2022 12:54:42 PM
Holdings, LLC and Silverpeak Corp. (Final).pdf

EXHIBIT B

████████████████████
████████████████████
████████████████████
████████████████████

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
**Stephen B. Schrock, Esq. 404-541-2909**

B. E-MAIL CONTACT AT FILER (optional)
**stephen.schrock@thompsonhine.com**

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

⌐ **Thompson Hine LLP**
   **3560 Lenox Road, Suite 1600**
   **Atlanta, Georgia 30326**
   **Attn: Stephen B. Schrock, Esq.** ⌐

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **SILVERPEAK HOLDINGS, LLC** | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **232 Woods Road** | **Aspen** | **CO** | **81611** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **SILVERPEAK CORP.** | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **232 Woods Road** | **Aspen** | **CO** | **81611** | **USA** |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **BAY POINT CAPITAL PARTNERS II, LP** | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **3050 Peachtree Road NW, Suite 740** | **Atlanta** | **GA** | **30305** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
**See Exhibit A attached hereto and incorporated herein.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER-REFERENCE DATA:
**UCC Financing Statement; (Colorado SOS)**

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

EXHIBIT B

EXHIBIT A

All of the properties, assets and rights of the Debtor, consisting of all corporate and business assets, properties and rights of the Debtor whether now owned or hereafter acquired or arising and all proceeds, products and accessions thereof including, all Accounts (as defined below); chattel paper (including tangible and electronic chattel paper); deposit accounts; securities accounts; documents (including negotiable documents); Equipment (as defined below) (including all accessions and additions thereto); general intangibles (including payment intangibles and software); Intellectual Property (as defined below); goods (including fixtures); instruments (including promissory notes); Inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions); the Marijuana Licenses (as defined below) and all associated Permits (as defined below); investment property (including securities and securities entitlements); letter of credit rights; money; commercial tort claims; all books and records with respect to any of the foregoing and the computers and equipment containing any such books and records; any and all cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds, and all supporting obligations and the security therefor or for any right to payment, subject in the cases of the Marijuana Licenses, associated Permits, Inventory, Equipment, and all other matters with a direct nexus to any cannabis operations, to all application, suitability and other requirements, as required by (without limitation of other applicable law) Code Colo. Regs. Sec. 212-3, 1-115 set forth within the definition of "Indirect Financial Interest Holder."

"Accounts" means all presently existing and hereafter arising accounts, contract rights, payment intangibles, and all other forms of obligations owing to Borrower arising out of the sale or lease of goods or the rendering of services by Borrower, whether or not earned by performance, and any and all credit insurance, guaranties, and other security therefor, as well as all merchandise returned to or reclaimed by Borrower and Borrower's books and records relating to any of the foregoing.

"Equipment" means all present and future machinery, equipment, tenant improvements, furniture, fixtures, vehicles, tools, parts, and attachments in which Borrower has any interest.

"Intellectual Property" means all of Borrower's right, title, and interest in and to the following: Copyrights, Trademarks, and Patents; all trade secrets, all design rights, claims for damages by way of past, present, and future infringement of any of the rights included above, all licenses or other rights to use any of the Copyrights, Patents, or Trademarks, and all license fees and royalties arising from such use to the extent permitted by such license or rights; all amendments, renewals, and extensions of any of the Copyrights, Trademarks, or Patents; and all proceeds and products of the foregoing, including without limitation all payments under insurance or any indemnity or warranty payable in respect of any of the foregoing.

"Inventory" means all inventory in which Borrower has or acquires any interest, including work in process and finished products intended for sale or lease or to be furnished under a contract of service, of every kind and description now or at any time hereafter owned by or in the custody or possession, actual or constructive, of Borrower, including (i) cannabis plants at any stage of their lifecycle, including immature, vegetative, flowering, and harvested cannabis and cannabis plant material, whether or not packaged, (ii) cannabis-infused products, including topicals, edibles, tinctures, and concentrates, (iii) such inventory as is temporarily out of its custody or possession or in transit, (iv) including any returns upon any accounts or other proceeds, including insurance proceeds, resulting from the sale or disposition of any of the foregoing and any documents of title representing any of the above, and (vi) Borrower's books and records relating to any of the foregoing.

"Marijuana Licenses" means each Permit issued by the Colorado Marijuana Enforcement Division or any other state or municipal Governmental Authority regarding or related to cannabis.

"Permit(s)" means, with respect to any Person, any authorizations, consents, permits, approvals, authorizations, licenses, registrations, certificates, concessions, grants, variances, permissions, and exemptions from, and all filings, contractual obligations and registrations with, and all reports to, any Governmental Authority, in each case whether or not having the force of law and applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject, which are required for (a) the execution, delivery and performance of the

EXHIBIT B

Loan Documents, (b) the transactions contemplated by the Loan Documents, (c) the conduct of the business of each Obligor, and (d) the ownership (or lease) of the properties of each Obligor.

EXHIBIT B

**EXHIBIT D**

EXHIBIT D

EXHIBIT B

## PLEDGE AGREEMENT

THIS PLEDGE AGREEMENT (this "*Agreement*"), dated as of October 18, 2022, is made by **CHAPMAN DUCOTE**, an individual resident of the State of Colorado (the "*Pledgor*"), in favor of **BAY POINT CAPITAL PARTNERS II, LP**, a Delaware limited partnership (together with its successors and assigns, the "*Lender*").

## WITNESSETH:

WHEREAS, **SILVERPEAK HOLDINGS, LLC**, a Colorado limited liability company, and **SILVERPEAK CORP.**, a Colorado corporation (collectively, "*Borrower*") and the Lender are parties to that certain Loan and Security Agreement as of even date herewith (as amended, restated, supplemented, extended or otherwise modified from time to time, the "*Loan Agreement*"), pursuant to which the Lender made certain loans and other financial accommodations to the Borrower;

WHEREAS, in contemplation of additional loans and other financial accommodations provided to the Borrower under the Loan Agreement, the Lender and the Pledgor have agreed that the Pledgor (i) guarantee the Borrower's obligations thereunder and all of the other Secured Obligations (as defined below) arising out of the Loan Agreement and any other Loan Document entered into in connection therewith, pursuant to a proposed Guaranty Agreement, to be dated on or about the date hereof (the "*Guaranty*"), executed by Pledgor, as guarantor, in favor Lender, and (ii) grant the Lender a security interest in the Collateral (as defined below) in furtherance thereof;

WHEREAS, the Pledgor is the record and beneficial owner of all rights, title, and interest in and to War Chest Real Estate, LLC, a Florida limited liability company (the "*Issuer*"), as further described on Exhibit A hereto (the "*Pledged Interests*"); and

WHEREAS, the Pledgor has agreed to execute and deliver to the Lender this Agreement as security for the Secured Obligations (as defined below).

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE 1

## DEFINITIONS

**SECTION 1.1 Certain Terms.** The following terms when used in this Agreement, including its preamble and recitals, shall have the following meanings (such definitions to be equally applicable to the singular and plural forms thereof):

"*Agreement*" shall have the meaning so given in the introductory paragraph, as may be from time to time amended, supplemented, restated, or otherwise modified.

"*Borrower*" shall have the meaning so given in the recitals hereto.

"*Collateral*" shall mean, collectively, (a) the Pledged Interests; (b) all other Pledged Property, whether now or hereafter delivered to the Pledgor or any Lender in connection with this Agreement; (c) all rights relating to the foregoing, including all voting rights; and (d) all proceeds of any of the foregoing.

4893-1489-9764

EXHIBIT B

"*Event of Default*" shall mean any event described in <u>Section 5.1</u>.

"*Guaranty*" shall have the meaning so given in the recitals hereto.

"*Issuer*" shall have the meaning so given in the recitals hereto.

"*Lender*" shall have the meaning so given in the introductory paragraph.

"*Loan Agreement*" shall have the meaning so given in the recitals hereto.

"*Pledged Interests*" shall have the meaning so given in the recitals hereto.

"*Pledged Property*" shall mean all Pledged Interests and all certificates evidencing the Pledged Interests (if any), and all dividends, distributions, securities, cash, instruments, interest payments, and other property and proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Pledged Interests.

"*Pledgor*" shall have the meaning so given in the introductory paragraph.

"*Secured Obligations*" means (i) all obligations of the Borrower under the Loan Agreement, including the repayment of all principal, interest, and other amounts due thereunder or evidenced thereby, (ii) all of the obligations of the Pledgor under the Guaranty, and (iii) all obligations of the Pledgor hereunder.

"*UCC*" means the Uniform Commercial Code as in effect in the State of Colorado from time to time or any other applicable jurisdiction.

**SECTION 1.2 <u>Definitions, Cross-References</u>.** Capitalized terms used herein and not otherwise defined (including the preamble and recitals hereof) shall have the meanings assigned to them in the Loan Agreement, unless the context otherwise requires or unless otherwise defined herein. References in this Agreement to any Section, unless otherwise specified, are references to such Section of this Agreement, and references in such Section to any subsection or clause, unless otherwise specified, are references to such subsection or clause of such Section.

**SECTION 1.3 <u>UCC Definitions</u>.** Unless otherwise defined herein or the context otherwise requires, terms for which meanings are provided in the UCC are used in this Agreement, including its preamble and recitals, with such meanings.

## ARTICLE 2

## PLEDGE

**SECTION 2.1 <u>Grant of Security Interest</u>.** The Pledgor hereby pledges, assigns, delivers, sets over, conveys and transfers to the Lender and hereby grants to the Lender a continuing lien on and security interest in and to, all of the Pledgor's respective right, title, and interest in and to the Collateral, whether now existing or hereafter arising.

**SECTION 2.2 <u>Security for Secured Obligations</u>.** This Agreement and the Collateral secure the payment in full and performance of all Secured Obligations.

2

4893-1489-9764

EXHIBIT B

SECTION 2.3  <u>Delivery of Pledged Property; Registration of Pledge; Transfer</u>. All certificates and instruments representing or evidencing any Collateral (if any), including all Pledged Interests, shall be delivered to the Lender and shall be held by the Lender, shall be in suitable form for transfer by delivery, and shall be accompanied by all necessary instruments of transfer or assignment, duly executed in blank. In addition, the Lender shall have the right at any time to request that the Pledgor exchange any certificates or instruments representing or evidencing any Pledged Interests for certificates or instruments of smaller or larger denominations.

SECTION 2.4  <u>No Duty upon Lender</u>. The powers conferred on the Lender hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Beyond reasonable care in the custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Lender shall have no duty as to any Collateral or as to the taking of, any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral. The Lender shall not be liable or responsible for any loss or damage to any of the Collateral, or from any diminution in the value thereof, by reason of the act or omission of any carrier, forwarding agency, or other agent selected by the Lender in good faith.

SECTION 2.5  <u>Continuing Security Interest; Transfer of Secured Obligations</u>. This Agreement shall: (a) create a continuing security interest in the Collateral; (b) remain in full force and effect until the payment in full and performance of all Secured Obligations; (c) be binding upon the Pledgor, its successors and assigns, provided, however, that Pledgor may not assign any of its rights or obligations hereunder without the prior written consent of the Lender; and (d) inure to the benefit of the Lender and its permitted successors, transferees and assigns. Without limitation to the foregoing, the Lender may assign or otherwise transfer its rights under the Loan Agreement or any other Secured Obligation, held by it to any other person or entity, in accordance with the terms of the Loan Agreement, and such other person or entity shall thereupon become vested with all the benefits in respect thereof granted herein or otherwise. Upon the occurrence of the event described in <u>Section 2.5(b)</u> above, the security interest granted herein shall terminate and all rights to the Collateral shall revert to the Pledgor. Upon any such termination, the Lender will, at the Pledgor's expense, execute, and deliver to the Pledgor such documents as the Pledgor shall reasonably request to evidence such termination, without recourse or warranty to the Lender.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES

SECTION 3.1  <u>Representations and Warranties</u>. The Pledgor represents and warrants as follows:

(a)    The Pledgor is and at all times will be the legal and beneficial owner of, and has and will have at all times good and marketable title to (and have and will at all times have full right and authority to pledge and assign), all Collateral, free and clear of all liens or other charges or encumbrances, except the lien granted pursuant hereto in favor of the Lender.

(b)    The delivery of the Collateral to the Lender is effective to create a valid, perfected, first priority security interest in such Collateral and all proceeds thereof, securing the Secured Obligations, except that the filing of a financing statement, the taking of possession or some other action may be required under the UCC to perfect a security interest in certain proceeds of the Collateral that does not constitute Pledged Interests or other securities or instruments.

(c)    The Pledged Interests have been duly authorized and validly issued, and (to the extent applicable) are fully paid, and nonassessable.

3

4893-1489-9764

EXHIBIT B

(d)     The Pledged Interests constitute the issued and outstanding equity interests of the Issuer described on Exhibit A hereto.

(e)     No authorization, approval, or other action by and no notice to or filing with, any governmental authority is or will be required either: (i) for the pledge by the Pledgor of any Collateral pursuant to this Agreement or for the execution, delivery, or performance of this Agreement by the Pledgor, or (ii) for the exercise by the Lender of the voting or other rights provided for in and in accordance with the terms of this Agreement or the remedies in respect of the Collateral pursuant to this Agreement (except, with respect to any Pledged Interests, as may be required in connection with a disposition of such Pledged Interests by laws affecting the offering and sale of securities generally).

## ARTICLE 4

## COVENANTS

**SECTION 4.1** **Protect Collateral; Further Assurances**. The Pledgor will not sell, assign, transfer, pledge, or encumber in any other manner the Collateral (except in favor of the Lender hereunder). The Pledgor will warrant and defend the right, title, and security interest herein granted to the Lender in and to the Collateral (and all right, title, and interest represented by the Collateral) against the claims and demands of all persons or entities. The Pledgor agrees that at any time, and from time to time, at the expense of the Pledgor, the Pledgor will promptly execute and deliver all further instruments, and take all further action, that may be necessary, or that the Lender may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable the Lender to exercise and enforce their rights and remedies hereunder with respect to any Collateral.

**SECTION 4.2** **Issuance of Equity Interests**. The Pledgor will not, subsequent to the date of this Agreement, without the prior written consent of the Lender, cause or permit the Issuer to issue or grant any warrants, options of any nature or other instruments convertible into shares of any class of stock or issue any additional equity interests.

**SECTION 4.3** **Taxes**. The Pledgor will pay all taxes, assessments, and charges levied, assessed, or imposed upon the Collateral before the same become delinquent or become liens upon any of the Collateral except where the same may be contested in good faith by appropriate proceedings and as to which adequate reserves have been provided.

**SECTION 4.4** **No Dissolution**. The Pledgor shall not file or pursue or take any action which may, directly or indirectly, cause a dissolution or liquidation of or with respect to the Issuer or seek a partition of any property of the Issuer.

**SECTION 4.5** **Continuous Pledge**. The Pledgor will at all times keep pledged to the Lender pursuant hereto all Pledged Interests, all dividends and distributions received after a Default or an Event of Default with respect thereto, and all other Collateral.

**SECTION 4.6** **Dividends; Voting Rights**. In addition, the Pledgor agrees that:

(a)     after any Event of Default shall have occurred and be continuing or if any Event of Default shall occur as a result thereof, promptly upon receipt thereof by the Pledgor and without any request therefore by the Lender, the Pledgor shall deliver (properly endorsed where required hereby or requested by the Lender) to the Lender all dividends and distributions, all of which shall be held by the Lender as additional Collateral for use in accordance with Section 5.5;

4

4893-1489-9764

EXHIBIT B

(b)    after any Event of Default shall have occurred and be continuing, upon notice to the Pledgor by the Lender, all rights of the Pledgor to exercise or refrain from exercising voting or other consensual rights in respect of the Collateral shall cease and all such rights shall thereupon become vested in the Lender who shall thereupon have the sole right to exercise or refrain from exercising such voting and other consensual rights; and

(c)    after any Event of Default shall have occurred and be continuing, promptly upon request of the Lender, the Pledgor shall deliver to the Lender such proxies and other documents as may be necessary to allow the Lender to exercise the voting and other consensual rights with respect to any Collateral.

Except as set forth in the immediately preceding sentence, the Pledgor shall be entitled to exercise, in its reasonable judgment, the voting powers, and all other incidental rights of ownership with respect to any Pledged Interests and to the receipt of all dividends and distributions. All dividends, distributions, cash payments and proceeds which the Pledgor is then obligated to deliver to the Lender, shall, until delivery to the Lender, be held by the Pledgor separate and apart from his other property in trust for the Lender. The Lender agrees that unless an Event of Default shall have occurred and be continuing, the Lender shall, upon the written request of the Pledgor, promptly deliver such proxies and other documents, if any, as shall be reasonably requested by the Pledgor which are necessary to allow the Pledgor to exercise voting power with respect to any membership interests (including Pledged Interests) constituting Collateral.

SECTION 4.7  **Additional Covenants and Agreements**. So long as any of the Secured Obligations remain outstanding or so long as this Agreement shall remain in effect the Pledgor covenants and agrees as follows: (a) the Pledgor will not be subrogated to the Lender's rights to any other collateral and any proceeds thereof in which the Lender holds a security interest to secure payment of any of the Secured Obligations; and (b) the Pledgor agrees that the Lender may at any time and from time to time, without notice to, or the consent of, the Pledgor: (i) retain any of the Collateral in satisfaction of any of the Secured Obligations to the extent permitted by applicable law, (ii) retain or obtain a security interest or lien in any property in addition to the Collateral to secure payment or performance of any of the Secured Obligations, (iii) allow or cause any Secured Obligations to be incurred, (iv) retain or obtain persons or entities that are primarily or secondarily obligated upon any of the Secured Obligations other than the Pledgor, (v) extend or renew any of the Secured Obligations for any period (whether or not longer than the original term), (vi) release, compromise or modify any of the Secured Obligations, (vii) release, in whole or in part, any person or entity primarily or secondarily obligated upon any of the Secured Obligations or enter into any compromise with respect to the obligation of any such person or entity relative to any of the Secured Obligations, (viii) release, with or without consideration, the Lender's security interest or lien in any property other than the Collateral which may at any time secure payment or performance of any of the Secured Obligations, (ix) accept substitutions or exchanges for any property other than the Collateral which may at any time secure payment or performance of any of the Secured Obligations, and (x) exercise its rights as a secured party and dispose of the Collateral without having first resorted to any property securing any of the Obligations other than the Collateral and without having first proceeded against or demanded payment from any person or entity primarily or secondarily obligated upon any of the Obligations.

## ARTICLE 5

## EVENTS OF DEFAULT; REMEDIES

SECTION 5.1  **Events of Default**. Each of the following shall constitute an *"Event of Default"* hereunder: (a) if there shall occur any Event of Default under the Loan Agreement or any Note; (b) if any of the Collateral shall be attached or levied upon or seized in any legal proceeding, or held by virtue of any lien or distress; or (c) if any representation or warranty of the Pledgor set forth herein shall be untrue in any

5

4893-1489-9764

EXHIBIT B

material respect or if the Pledgor shall default in the due performance and observance of any covenant contained herein.

**SECTION 5.2** <u>**Actions upon Event of Default**</u>. In addition to its rights and remedies provided hereunder, whenever an Event of Default shall have occurred and be continuing, the Lender shall have all rights and remedies of a secured party upon default under this Agreement, the UCC or other applicable law. Any notification required by law of any intended disposition by the Lender of any of the Collateral shall be deemed reasonably and properly given if given at least ten (10) days before such disposition. Without limitation of the above, the Lender may whenever an Event of Default shall have occurred and be continuing, take all or any of the following actions after giving at least ten (10) days prior notice to the Pledgor: (a) take control of any proceeds of the Collateral; and (b) execute (in the name, place and stead of the Pledgor) endorsements, assignments, stock powers, and other instruments of conveyance or transfer with respect to all or any of the Collateral.

**SECTION 5.3** <u>**Attorney-in-Fact**</u>. The Pledgor hereby irrevocably appoints the Lender its true and lawful attorney, with full power of substitution, in the name of the Pledgor, the Lender, or otherwise, for the sole use and benefit of the Lender, but at the Pledgor' expense, upon the occurrence and during the continuation of an Event of Default to take any action and to execute any instrument which the Lender may deem reasonably necessary or advisable enable the Lender to realize the benefit of the security interest provided for in this Agreement. The power of attorney given herein is coupled with an interest and is irrevocable.

**SECTION 5.4** <u>**Private Sales**</u>.

(a) the Pledgor recognizes that the Lender may be unable, after the occurrence and during the continuance of any Event of Default, to effect a public sale of any or all the Pledged Interests by reason of certain prohibitions contained in the Securities Act of 1933, as amended (the "*Securities Act*") and applicable state securities law or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers that will be obligated to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. The Pledgor acknowledges and agrees that any such private sale may result in prices and other terms less favorable than if such sale were a public sale. The Lender shall be under no obligation to delay sale of any of the Pledged Interests for the period of time necessary to permit the Issuer to register such securities for public sale under the Securities Act, or under applicable state securities law, even if such Subsidiary would agree to do so.

(b) The Pledgor further agrees to use their reasonable best efforts, after the occurrence and during the continuance of an Event of Default, to do or cause to be done all such acts as may be necessary to make such sale or sales of all or any portion of the Pledged Interests pursuant to this <u>Section 5.4</u> valid and binding and in compliance with any and all applicable law.

**SECTION 5.5** <u>**Application of Proceeds**</u>. All cash proceeds received by the Lender in respect of any sale of, collection from, or other realization upon, all or any part of the Collateral may, in the discretion of the Lender, be held by the Lender as additional collateral security for, or then or at any time thereafter be applied in whole or in part by the Lender against, all or any part of the Secured Obligations in the following order: (a) <u>first</u>, to the unpaid interest accrued and then due or owing on the Secured Obligations; (b) <u>second</u>, on account of all principal of any Secured Obligations then due or owing; and (c) <u>third</u>, to any other Secured Obligations then due or owing. After payment in full of the Secured Obligations, any surplus of such cash or cash proceeds held by the Lender and remaining after payment in full of all the Secured Obligations, shall be paid over to the Pledgor or to whomsoever may be lawfully entitled to receive such surplus.

6

4893-1489-9764

EXHIBIT B

SECTION 5.6 **Indemnity**. The Pledgor agrees to indemnify and hold harmless the Lender, its subsidiaries, affiliates, successors, and assigns and their respective agents, directors, employees, and officers from and against any and all complaints, claims, defenses, demands, actions, bills, causes of action (including, without limitation, costs and attorneys' fees), and losses of every nature and kind whatsoever, which may be raised or sustained by any directors, officers, employees, shareholders, creditors, regulators, successors in interest, or receivers of the Pledgor, the Issuer, or any third party as a result of or arising out of, directly or indirectly, the Lender extending credit as evidenced by the Secured Obligations to the Borrower, and taking the Collateral as security for the Secured Obligations, in each case other than with respect to losses determined by a court of competent jurisdiction to have resulted from the Lender's gross negligence or willful misconduct, and the Pledgor agrees to be liable for any and all judgments which may be recovered in any such action, claim, proceeding, suit, or bill, including any compromise or settlement thereof, and defray any and all expenses, including, without limitation, costs and attorneys' fees, that may be incurred in or by reason of such actions, claims, proceedings, suits, or bills. This obligation to indemnify shall survive the payment of the Secured Obligations and the satisfaction of this Agreement.

## ARTICLE 6

## MISCELLANEOUS

SECTION 6.1 **Amendments**. No amendment or waiver of any provision of this Agreement nor consent to any departures by the Pledgor herefrom shall in any event be effective unless the same shall be in writing, signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it is given.

SECTION 6.2 **Obligations Not Affected**. The obligations of the Pledgor under this Agreement shall remain in full force and effect without regard to, and shall not be impaired or affected by: (a) any amendment or modification or addition or supplement to the Loan Agreement or any Note, any instrument delivered in connection therewith or any assignment or transfer thereof; (b) any exercise, non-exercise or waiver by the Lender of any right, remedy, power or privilege under or in respect of, or any release of any guaranty or collateral provided pursuant to, this Agreement or the Loan Agreement; (c) any waiver, consent, extension, indulgence or other action or inaction in respect of this Agreement, the Loan Agreement or any Note or any assignment or transfer of any thereof; or (d) any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like, of the Pledgor or any other person or entity, whether or not the Pledgor shall have notice or knowledge of any of the foregoing.

SECTION 6.3 **Protection of Collateral**. The Lender may from time to time perform, at its option, any act which the Pledgor agrees hereunder to perform and which the Pledgor shall fail to perform, and the Lender may from time to time take any other action which Lender reasonably deems necessary for the maintenance, preservation or protection of any of the Collateral or of its security interest therein.

SECTION 6.4 **Notices**. All notices or communications given to the Pledgor or the Lender pursuant to the terms of this Agreement shall be deemed effective when given in accordance with Guaranty. Unless otherwise specifically provided herein to the contrary, such written notices and communications shall be delivered by hand or overnight courier service, or mailed by first class mail, postage prepaid, addressed to the parties hereto at the addresses referred to herein or to such other addresses as either party may designate to the other party by a written notice given in accordance with the provisions of this Agreement. Any written notice delivered by hand or by overnight courier service shall be deemed given or received upon receipt. Any written notice delivered by U.S. Mail shall be deemed given or received on the third (3rd) business day after being deposited in the U.S. Mail.

7

4893-1489-9764

EXHIBIT B

**SECTION 6.5** Waivers by the Pledgor. To the extent permitted by applicable law, and except to the extent provided for herein, the Pledgor hereby waives (a) notice of acceptance of this Agreement; (b) presentment and demand for payment of the Secured Obligations; (c) protest and notice of dishonor or default to the Pledgor or to any other party with respect to the Secured Obligations; and (d) all other notices to which the Pledgor might otherwise be entitled. To the extent permitted by applicable law, the Pledgor further waives any right to require that any action be brought against any other party, the right to require that resort be had to any security or to any balance of any credit on the books of the Lender in favor of the Pledgor or any other party, and to recover losses caused by the Lender's failure to approve or correct any list of Collateral provided to the Lender for any purpose by any person or entity. The Pledgor waives all rights, claims and defenses based on principles of suretyship.

**SECTION 6.6** Governing Law; Jurisdiction.

(a)    This Agreement shall be construed in accordance with and be governed by the law (without giving effect to the conflict of law principles thereof) of the State of Colorado.

(b)    To the fullest extent permitted by applicable law, the Pledgor hereby irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdiction of any state or federal court located in Fulton County, Georgia and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby or thereby, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in any such court. The Pledgor agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Lender may otherwise have to bring any action or proceeding relating to this Agreement against the Pledgor or its respective properties in the courts of any jurisdiction.

(c)    To the fullest extent permitted by applicable law, the Pledgor irrevocably and unconditionally waives any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding described in paragraph (b) of this Section and brought in any court referred to in paragraph (b) of this Section. The Pledgor irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

**SECTION 6.7** Waiver of Jury Trial. THE PLEDGOR IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). THE PLEDGOR (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**SECTION 6.8** Limitation of Liability. NEITHER THE LENDER NOR ANY AFFILIATE THEREOF, SHALL HAVE ANY LIABILITY WITH RESPECT TO, AND THE PLEDGOR HEREBY WAIVES, RELEASES AND AGREES NOT TO SUE UPON, ANY CLAIM FOR ANY SPECIAL, INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES SUFFERED BY THE PLEDGOR IN CONNECTION WITH, ARISING OUT OF, OR IN ANY WAY RELATED TO THIS

8

4893-1489-9764

EXHIBIT B

AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREIN OR ANY ACT, OMISSION OR EVENT OCCURRING IN CONNECTION HEREWITH.

**SECTION 6.9 Counterparts, Effectiveness, etc.** This Agreement may be executed in any number of separate counterparts, each of which signed counterparts shall be deemed to be an original, and all of which counterparts, taken together, shall constitute one and the same instrument. Upon approval by Lender in its sole discretion, signatures to this Agreement or to any document signed in connection with this Agreement transmitted in a commonly accepted electronic format that reproduces an image of the actual executed signature page shall be deemed a binding original and shall have the same legal effect, validity, and enforceability as a manually executed counterpart of the document to the extent and as provided for in the Federal Electronic Signatures in Global and National Commerce Act and the applicable state law based on the Uniform Electronic Transactions Act. Lender may also require that any such documents and signatures delivered electronically be confirmed by a manually signed original thereof; provided that the failure to request or deliver the same shall not limit the effectiveness of any electronically delivered document or signature. This Agreement shall become effective when counterparts hereof executed on behalf of the Pledgor and the Lender shall have been received by the Lender.

*[Signature page follows]*

9

4893-1489-9764

EXHIBIT B

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

PLEDGOR:

By: _____
CHAPMAN DUCOTE, an individual

WITNESS:

_Jeanne Hanahan_

Sworn and executed before me
this 18th day of October, 2022

Notary Public

```
JEANNE HANAHAN
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20134036792
My Commission Expires: September 27, 2025
```

LENDER:

**BAY POINT CAPITAL PARTNERS II, LP,**
a Delaware limited partnership

By: Bay Point Advisors, LLC,
a Delaware limited liability company
Its: General Partner

By: _____
Name:  Charles Andros
Title:  Manager

[PLEDGE AGREEMENT SIGNATURE PAGE]

4893-1489-9764

EXHIBIT B

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

PLEDGOR:

By:  _____
CHAPMAN DUCOTE, an individual

WITNESS:

_____

Sworn and executed before me
this 18ᵗʰ day of October, 2022

Notary Public

LENDER:

**BAY POINT CAPITAL PARTNERS II, LP,**
a Delaware limited partnership

By: Bay Point Advisors, LLC,
    a Delaware limited liability company
Its: General Partner

By: _____
Name:  Charles Andros
Title:  Manager

[PLEDGE AGREEMENT SIGNATURE PAGE]

4893-1489-9764

EXHIBIT B

## EXHIBIT A

## PLEDGED INTERESTS

| Issuer | Class of Ownership Interests | % of Ownership Interests Held by Pledgor Pledged | % of Total Interests that Pledgor's Pledged Interests Represent |
|---|---|---|---|
| WAR CHEST REAL ESTATE, LLC | Membership Interests | 100% | 100% |

Exhibit A

4893-1489-9764

EXHIBIT B

**EXHIBIT** E

EXHIBIT B

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE
# FINANCING STATEMENT FORM

| A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON | FLORIDA SECURED TRANSACTION REGISTRY |
|---|---|
| Stephen B. Schrock, Esq. 404541-2909 | |
| B. Email Address | FILED |
| C. SEND ACKNOWLEDGEMENT TO: | |
| Name   Stephen B. Schrock, Esq. | 2022 Oct 20 03:48 PM |
| Address   3560 Lenox Road, Suite 1600 | ******** 20220337570X ******** |
| Address | |
| City/State/Zip   Atlanta, Georgia 30326 | **THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY** |

## 1. DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (1a OR 1b) – Do Not Abbreviate or Combine Names

| 1.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 1.b INDIVIDUAL'S SURNAME  DUCOTE | FIRST PERSONAL NAME  CHAPMAN | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1.c MAILING ADDRESS Line One  1276 South Venetian Way | This space not available. | | |
| MAILING ADDRESS Line Two | CITY  Miami Beach | STATE  FL | POSTAL CODE  33139 | COUNTRY  USA |

## 2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b) – Do Not Abbreviate or Combine Names

| 2.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2.c MAILING ADDRESS Line One | This space not available. | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |

## 3. SECURED PARTY'S NAME  (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – INSERT ONLY ONE SECURED PARTY (3a OR 3b)

| 3.a ORGANIZATION'S NAME  Bay Point Capital Partners II, LP | | | |
|---|---|---|---|
| 3.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3.c MAILING ADDRESS Line One  3050 Peachtree Road NW, Suite 740 | This space not available. | | |
| MAILING ADDRESS Line Two | CITY  Atlanta | STATE  GA | POSTAL CODE  30305 | COUNTRY  USA |

**4. This FINANCING STATEMENT covers the following collateral:**

All of Debtor's pledged membership interests in War Chest Real Estate, LLC, a Florida limited liability company (the "Pledged Interests"), and all certificates evidencing the Pledged Interests, and all dividends, distributions, securities, cash, instruments, interest payments and other property and proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Pledged Interests.

| 5. ALTERNATE DESIGNATION (if applicable) | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR |
|---|---|---|---|
| | ☐ AG LIEN | ☐ NON-UCC FILING | ☐ SELLER/BUYER |

**6. Florida DOCUMENTARY STAMP TAX – YOU ARE REQUIRED TO CHECK EXACTLY ONE BOX**

☐ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☑ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**
FL State Filing

STANDARD FORM - FORM UCC-1 (REV.05/2013)          Filing Office Copy          Approved by the Secretary of State, State of Florida

EXHIBIT B

# **EXHIBIT** F

EXHIBIT B

IN WITNESS WHEREOF, the undersigned have executed this Memorandum of Tenancy-In-Common Agreement as of the day and year first above written.

CO-OWNERS:

WAR CHEST JR, LLC, a
Utah limited liability company

By: _____

Nathanael Monson, Manager

By: _____

Brandon Goodman, Manager

STATE OF _Utah_____ )
                     ) ss.
COUNTY OF _Utah_____ )

The foregoing instrument was acknowledged before me this __12__ day of __March__ _____, 2026 by Nathanael Monson, as Manager of WAR CHEST JR, LLC, a Utah limited liability company.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires: _12 · 13 · 2028_____

KAMI L WICKHAM
NOTARY PUBLIC · STATE OF UTAH
COMMISSION# 740699
COMM. EXP. 12-13-2028

STATE OF _Utah_____ )
                     ) ss.
COUNTY OF _Utah_____ )

The foregoing instrument was acknowledged before me this __11__ day of __March__ _____, 2026 by Brandon Goodman, as Manager of WAR CHEST JR, LLC, a Utah limited liability company.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires: _12 · 13 · 2028_____

KAMI L WICKHAM
NOTARY PUBLIC · STATE OF UTAH
COMMISSION# 740699
COMM. EXP. 12-13-2028

199005588v1

EXHIBIT B

**EXHIBIT A**

**LEGAL DESCRIPTION OF THE PROPERTY**

A part of the Southwest Quarter of Section 34, Township 21 North, Range 10 East in the City of Muncie, Delaware County, Indiana, described as follows: Commencing at an iron pipe at the Southeast corner of the Southwest Quarter of Section 34, Township 21 North, Range 10 East; thence South 89 degrees 25 minutes 31 seconds West 618.48 feet (assuming bearing) along the South line of said Quarter Section; thence North 00 degrees 27 minutes 08 seconds West 50.00 feet parallel with the East line of said Quarter Section to the point of beginning; thence South 89 degrees 25 minutes 31 seconds West 437.00 feet; thence North 00 degrees 16 minutes 02 seconds West 350.00 feet along a line that is parallel with and 270.00 feet East of the West line of the East Half of said Quarter Section; thence South 89 degrees 25 minutes 31 seconds West 270.00 feet to a point on the West line thereof; thence North 00 degrees 16 minutes 02 seconds West 342.50 feet along the West line of said Half-Quarter Section; thence North 89 degrees 25 minutes 31 seconds East 704.73 feet; thence South 00 degrees 27 minutes 08 seconds East 692.50 feet to the point of beginning, containing 9.05 acres, more or less.

199005588v1

DELAWARE COUNTY RECORDED 2026R04269 PAGE 4 OF 4

EXHIBIT B

**EXHIBIT** G

EXHIBIT B

## GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT (this "Agreement") is made this 18th day of October, 2022, by CHAPMAN DUCOTE, an individual ("Guarantor"), in favor of BAY POINT CAPITAL PARTNERS II, LP, a Delaware limited partnership.

## RECITALS:

A.      The provisions of Section 1 below are applicable to these Recitals.

B.      Lender has made or is making a term loan to SILVERPEAK HOLDINGS, LLC, a Colorado limited liability company, and SILVERPEAK CORP., a Colorado corporation (collectively, "Borrower") in the maximum principal amount of Thirteen Million and No/100 Dollars ($13,000,000.00) ("Loan"), which is or will be secured by (i) a Deed of Trust, Assignment of Leases and Rents, and Security Agreement (as amended, modified, substituted, extended, and renewed from time to time, the "Mortgage") from Borrower for the benefit of Lender, covering the Property (as hereinafter defined), (ii) Reserved, (iii) a Second Preferred Ship Mortgage from SPOILS OF WAR LLC, a Florida limited liability company, for the benefit of Lender, and (iv) a Pledge Agreement from CHAPMAN DUCOTE, an individual, for the benefit of Lender (collectively, the "Security Instruments").

C.      The Loan is being made pursuant to a Loan and Security Agreement dated as of even date herewith by and between Borrower and Lender (as amended, modified, substituted, extended, and renewed from time to time, the "Loan Agreement"), and is evidenced by a Note dated as of even date herewith from Borrower to Lender (as amended, modified, substituted, extended, and renewed from time to time, the "Note").

D.      Guarantor will benefit directly or indirectly and substantially from the making of the Loan. Guarantor's execution and delivery of this Guaranty is a condition precedent to Lender's agreement to make the Loan.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to induce Lender to make the Loan, Guarantor hereby covenants and agrees with Lender as follows:

1.      Definitions and Rules of Construction. Terms defined herein, including terms defined in the preamble and the Recitals above shall have the respective meanings given herein as definitions. Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Loan Agreement. The rules of construction set forth in Section 1.2 of the Loan Agreement shall be applicable to this Guaranty.

2.      Guaranty.

2.1      Guaranty of Payment. The Guarantor hereby unconditionally and irrevocably, jointly and severally, guarantees to Lender: (a) the due and punctual payment in full (and not merely the collectability) of all of the Obligations, including (i) the principal of the Loan and the interest thereon (including interest accruing after the commencement of any bankruptcy or insolvency proceeding by or against Borrower, whether or not allowed in such proceeding), and

in each case when due and payable, whether on any installment payment date or at the stated or accelerated maturity, all according to the terms of the Note and the Security Instruments (the "Guaranteed Principal Obligation"), and (ii) all other sums and charges which may at any time be due and payable in accordance with, or secured by, the Loan Agreement, the Note, the Security Instruments or any other document evidencing or securing the Loan (together with the Loan Agreement, the Note and the Security Instruments, the "Loan Documents"), in each case when due and payable in accordance with the Loan Documents, whether on any installment payment date or at the stated or accelerated maturity; and (b) the due and punctual performance of all of the other terms, covenants and conditions contained in the Note and the other Loan Documents required, on the part of Borrower or any subsequent owner of the property made subject to the Security Instruments (the "Property," as more particularly described in the Security Instruments) to be performed.

3.        Guaranty Unconditional. The obligations and liabilities of Guarantor under this Guaranty shall be absolute and unconditional, irrespective of the genuineness, validity, priority, regularity, or enforceability of the Loan Agreement, the Note, the Security Instruments, or any of the other Loan Documents or any other circumstance which might otherwise constitute a legal or equitable discharge of a surety or guarantor. Guarantor expressly agrees that Lender may, in its sole and absolute discretion, without notice to or further assent of Guarantor and without in any way releasing, affecting, or impairing the obligations and liabilities of Guarantor hereunder, do any one or more of the following at any time or from time to time: (a) waive compliance with, or any defaults under, or grant any other indulgences with respect to, the Loan Documents; (b) modify, amend, change, or terminate any provisions of the Loan Documents; (c) grant extensions or renewals of or with respect to the Note or the other Loan Documents; (d) effect any release, subordination, compromise, or settlement in connection with the Note and the other Loan Documents; (e) agree to the substitution, exchange, release or other disposition of all or any part of the Property, or any other collateral for the Loan; (f) make advances for the purpose of performing any term or covenant contained in any of the Loan Documents with respect to which Borrower or the then owner of the Property shall be in default; (g) assign or otherwise transfer the Loan Documents or this Guaranty or any interest therein or herein; (h) deal in all respects with Borrower or the then owner of the Property as if this Guaranty were not in effect; or (i) effect any release, compromise, or settlement with any one or more of Guarantor. The obligations of Guarantor under this Guaranty shall be unconditional, irrespective of the genuineness, validity, regularity, or enforceability of the Note or the Security Instruments, or any security given therefor or in connection therewith, or any other circumstances which might otherwise constitute a legal or equitable discharge of a surety or guarantor.

4.        Guaranty Primary. The obligations and liability of Guarantor under this Guaranty shall be primary, direct and immediate; shall not be conditional or contingent upon pursuit by Lender of any remedies it may have against Borrower with respect to the Loan Documents, whether pursuant to the terms thereof or by law; and shall not be subject to any counterclaim, recoupment, set-off, reduction, or defense based upon any claim that any Guarantor may have against Borrower, Lender, or any other Guarantor. Without limiting the generality of the foregoing, Lender shall not be required to make any demand on Borrower and/or the then owner of the Property, or to sell at foreclosure or otherwise pursue or exhaust its remedies against the Property or any part thereof and/or against Borrower or the then owner of the Property, before, simultaneously with or after enforcing its rights and remedies hereunder against any of Guarantor.

2

EXHIBIT B

Any one or more successive and/or concurrent actions may be brought hereon against Guarantor either in the same action, if any, brought against Borrower and/or the then owner of the Property or in separate actions, as often as Lender may deem advisable.

5.      Waivers.    Guarantor hereby unconditionally and irrevocably waives: (a) presentment and demand for payment of the principal of or interest on the Note and protest of non-payment; notice of acceptance of this Guaranty and of presentment, demand, and protest; (b) notice of any default under this Guaranty or any of the Loan Documents and notice of all indulgences; (c) all errors and omissions in connection with Lender's administration of all indebtedness guaranteed by this Guaranty, except errors and omissions resulting from acts of bad faith; (d) demand for observance, performance, or enforcement of any terms or provisions of this Guaranty or any of the Loan Documents; (e) any right or claim of right to cause a marshalling of the assets of Borrower; (f) any guaranty or suretyship defenses that might otherwise be available to Guarantor in law or equity; (g) any act or omission of Lender (except acts or omissions in bad faith) which changes the scope of Guarantor's risk hereunder; and (h) all other notices and demands otherwise required by law which Guarantor may lawfully waive. The obligations of Guarantor hereunder shall remain in full force and effect without regard to, and shall not be affected or impaired by any release, waiver or discharge of the Guarantor from its liability under any obligation of this Guaranty.

This Guaranty shall be effective as a waiver of, and Guarantor hereby expressly waives, any and all rights to which Guarantor may otherwise have been entitled under any suretyship laws in effect from time to time, and any other right or privilege, whether existing under statute, at law, or in equity, to require Lender to take prior recourse or proceedings against any collateral, security or other party whatsoever. Without any limitation of the foregoing, Guarantor hereby expressly waives any defenses to collection of any deficiency from Guarantor.

6.      Reimbursement for Expenses. If Lender shall commence any action or proceeding for the enforcement of this Guaranty, Guarantor shall reimburse Lender promptly upon demand, for all expenses incurred in connection therewith, including, without limitation, reasonable attorneys' fees.

7.      Intentionally Omitted.

8.      Acceleration. Anything in this Guaranty or in any of the Loan Documents to the contrary notwithstanding, Lender, at its option, may, as to Guarantor, accelerate the indebtedness guaranteed by Guarantor hereunder in the event of: (a) the making by any Guarantor of an assignment for the benefit of creditors; (b) the appointment of a custodian for any Guarantor or for any property of any of Guarantor; (c) the commencement of any proceeding by any Guarantor under any bankruptcy, reorganization, arrangement, insolvency, readjustment, receivership, or like law or statute; (d) the commencement of any proceeding against any Guarantor under any bankruptcy, reorganization, arrangement, insolvency, readjustment, receivership, or like law or statute which is not discharged or dismissed within sixty (60) days after institution thereof; or (e) the death or legal disability of any Guarantor which is a natural person; or (f) as to any Guarantor which is not a natural person, the termination, dissolution, liquidation, consolidation, reorganization, or merger of any such Guarantor, without the prior written consent of Lender.

3

Bay Point – Guaranty Agreement – Silverpeak ($13MM) - Ducote
4860-2663-0964

EXHIBIT B

9.    Subordination of Guarantor Subordinated Debt. If any of Guarantor shall advance any sums to Borrower or if Borrower shall hereafter become indebted to any Guarantor before the last to occur of the termination of all rights of Borrower to obtain advances of Loan proceeds and the full and final payment of the Obligations, such sums and indebtedness ("Guarantor Subordinated Debt") shall be subordinate in all respects to the Obligations. Any payment to Guarantor on account of Guarantor Subordinated Debt shall be collected and received by Lender or Guarantor in trust for Lender and shall be paid over to Lender on account of the Obligations without impairing or releasing the obligations of Guarantor hereunder.

Without the prior written consent of Lender, Guarantor shall not ask, demand, receive, accept, sue for, set off, collect, or enforce Guarantor Subordinated Debt or any collateral and security therefor. The Guarantor represents and warrants to Lender that Guarantor Subordinated Debt is unsecured and agrees not to receive or accept any collateral or security therefor without the prior written permission of Lender. The Guarantor shall not assign, transfer, hypothecate, or dispose of Guarantor Subordinated Debt while this Guaranty is in effect. In the event of any sale, receivership, insolvency, or bankruptcy proceeding, or assignment for the benefit of creditors, or any proceeding by or against Borrower for any relief under any bankruptcy or insolvency law or other laws relating to the relief of debtors, readjustment of indebtedness, reorganizations, compositions, or extensions, then and in any such event any payment or distribution of any kind or character, either in cash, securities or other property, which shall be payable or deliverable upon, or with respect to, all or any part of Guarantor Subordinated Debt or otherwise shall be paid or delivered directly to Lender for application to the obligations and liabilities of Guarantor under this Guaranty (whether due or not due and in such order and manner as Lender may determine in the exercise of its sole discretion) until the obligations of Guarantor hereunder shall have been fully paid and satisfied. The Guarantor hereby irrevocably authorizes and empowers Lender to demand, sue for, collect, and receive every such payment or distribution on account of Guarantor Subordinated Debt and give acquittance therefor and to file claims and take such other proceedings in Lender's own name or in the name of Guarantor or otherwise, as Lender may deem necessary or advisable to carry out the provisions of this Guaranty. The Guarantor hereby agrees to execute and deliver to Lender such powers of attorney, assignments, endorsements, or other instruments as may be requested by Lender in order to enable Lender to enforce any and all claims upon, or with respect to, Guarantor Subordinated Debt, and to collect and receive any and all payments or distributions which may be payable or deliverable at any time upon or with respect thereto.  .

So as to secure the performance by Guarantor of the provisions of this Guaranty, Guarantor assigns, pledges, and grants to Lender a security interest in, and lien on, Guarantor Subordinated Debt, all proceeds thereof and all and any security and collateral therefor. Upon the request of Lender, Guarantor shall endorse, assign, and deliver to Lender all notes, instruments, and agreements evidencing, securing, guarantying, or made in connection with Guarantor Subordinated Debt.

10.    Subrogation. Notwithstanding anything to the contrary contained herein, Guarantor shall not have any right of subrogation in or under any of the Loan Documents or to participate in any way therein, or in any right, title or, interest in and to any security or right of recourse for the Obligations or any right to reimbursement, exoneration, contribution, indemnification, or any similar rights, until the last to occur of the termination of all rights of Borrower to receive advances of Loan proceeds and the full and final payment of the Obligations.

4

EXHIBIT B

11.    Representations and Warranties.

    11.1    Intentionally Omitted.

    11.2    Due Authorization; No Conflict. The execution, delivery, and performance of this Guaranty by Guarantor and the other Loan Documents to which it is a party are within Guarantor's powers and do not and will not: (a) require any consent or approval of any governmental agency or authority (other than any consent or approval which has been obtained and is in full force and effect), (b) conflict in any material respect with any provision of applicable law or any judgment, order, or decree, which is binding upon Guarantor or any of its respective properties, (c) conflict with or constitute an event of default under any agreement to which Guarantor is a party or by which Guarantor is bound, or (d) require, or result in, the creation or imposition of any lien on any asset of Guarantor. Guarantor is not in default under any agreement to which it is a party or by which it is bound.

    11.3    Validity and Binding Nature. This Agreement and each other Loan Document to which Guarantor is a party is the legal, valid, and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, subject to bankruptcy, insolvency, and similar laws affecting the enforceability of creditors' rights generally and to general principles of equity.

    11.4    Financial Condition. The financial statements of each Guarantor delivered to Lender prior to the Closing Date or pursuant to the terms hereof were prepared in accordance with GAAP (subject, in the case of interim financial statements, to normal year-end adjustments and the absence of footnotes) and present fairly in all material respects the financial condition of such Guarantor and its subsidiaries (as applicable) as at such dates and the results of its operations for the periods then ended and disclose all Indebtedness and other liabilities (direct or contingent) of such Guarantor and its subsidiaries (as applicable) as of the date thereof.

    11.5    No Litigation. No litigation (including derivative actions), arbitration proceeding, or governmental investigation or proceeding is pending or, to Guarantor's knowledge, threatened in writing against Guarantor which could reasonably be expected to have a material adverse effect.

    12.    Financial Statements. Guarantor shall provide to Lender, as and when required, the financial information required to be delivered to Lender with respect to Guarantor pursuant to the terms of the Security Instruments and the other Loan Documents, certified by them to be true and correct and in such form and detail as may be reasonably requested by Lender. Guarantor also agrees to provide Lender with such other financial information at such other times as may be reasonably requested by Lender.

    13.    Governing Law. The provisions of this Guaranty shall be construed, interpreted, and enforced in accordance with the laws of the State of Colorado as the same may be in effect from time to time.

    14.    Consent to Jurisdiction. Guarantor irrevocably submits to the jurisdiction of any state or federal court sitting in the State of Georgia over any suit, action, or proceeding arising out of or relating to this Guaranty. Guarantor irrevocably waives, to the fullest extent permitted by

5

EXHIBIT B

law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding brought in any such court and any claim that any such suit, action, or proceeding brought in any such court has been brought in an inconvenient forum. Final judgment in any such suit, action, or proceeding brought in any such court shall be conclusive and binding upon Guarantor and may be enforced in any court to whose jurisdiction Guarantor are subject, by a suit upon such judgment provided that service of process is effected upon Guarantor in a manner specified in this Guaranty or as otherwise permitted by applicable law.

15.    Service of Process. To the fullest extent permitted by applicable law, Guarantor irrevocably consents to the service of process in the manner provided for notices in Section 18. Nothing in this Guaranty will affect the right of Guarantor or Lender to serve process in any other manner permitted by law.

16.    WAIVER OF TRIAL BY JURY. TO THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW IN EFFECT FROM TIME TO TIME, GUARANTOR HEREBY WAIVES ANY RIGHT IT MIGHT AT ANY TIME HAVE TO TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR IN ANY WAY PERTAINING OR RELATING TO THIS AGREEMENT OR THE EXERCISE OF ANY RIGHTS AND REMEDIES HEREUNDER, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE.

17.    Avoided Payments. If at any time any payment, or portion thereof, made by, or for the account of, any of Guarantor on account of any of the obligations and liabilities hereunder is set aside by any court or trustee having jurisdiction as a voidable preference or fraudulent conveyance or must otherwise be restored or returned by Lender under any insolvency, bankruptcy or other federal and/or state laws or as a result of any dissolution, liquidation or reorganization of Borrower or upon, or as a result of, the appointment of any receiver, intervenor or conservator of, or trustee or similar officer for, Borrower or any substantial part of its properties or assets, Guarantor hereby jointly and severally agree that this Guaranty shall continue and remain in full force and effect or be reinstated, as the case may be, all as though such payment(s) had not been made.

18.    Notices. Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement or any other agreement entered into in connection herewith shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by a recognized overnight delivery service, certified mail, postage prepaid, return receipt requested, or electronic mail to Guarantor or to Lender, as the case may be, at its addresses set forth below:

| If to Guarantor: | Chapman Ducote |
| | 7775 NW 128th Street |
| | Parkland, FL 33068 |
| | Email: chapman@chapmanducote.com |

| with a copy to: | Curtis Wolfe Law PA |

6

EXHIBIT B

3042 Orange Street
Miami, FL 33133
Attn: Curtis Wolfe
Email: curtiswolfe007@gmail.com

If to Lender:    Bay Point Capital Partners II, LP
3050 Peachtree Road NW, Suite 740
Atlanta, GA 30305
Attn: Charles Andros
Email: charlesandros@bay-pointadvisors.com


with a copy to:    Thompson Hine LLP
3560 Lenox Road, Suite 1600
Atlanta, GA 30326
Attn: Stephen B. Schrock, Esq.
Email: stephen.schrock@thompsonhine.com

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

19.    Remedies Cumulative. All rights and remedies afforded to Lender by reason of this Guaranty, the Loan Documents, or by law are separate and cumulative and the exercise of one shall not in any way limit or prejudice the exercise of any other such rights or remedies. Every right, power, and remedy given by this Guaranty to Lender shall be concurrent and may be pursued separately, successively, or together against Guarantor or any one or more of them; and each such right, power, and remedy may be exercised from time to time as often as Lender may deem expedient. No delay or omission by Lender in exercising any such right or remedy shall operate as a waiver thereof. No waiver of any rights and remedies hereunder, and no modification or amendment hereof, shall be deemed made by Lender unless in writing and duly signed by Lender. Any such written waiver shall apply only to the particular instance specified therein and shall not impair the further exercise of such right or remedy or of any other right or remedy of Lender and no single or partial exercise of any right or remedy hereunder shall preclude any other or further exercise thereof or any other right or remedy.

20.    Powers of Attorney. The powers of attorney granted by Guarantor to Lender in this Guaranty shall be unaffected by the disability of the principal so long as any portion of the Loan remains unpaid or unperformed. Lender shall have no obligation to exercise any of the foregoing rights and powers in any event.

21.    Severability. If any provision (or any part of any provision) contained in this Guaranty shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision (or remaining part of the affected provision) of this Guaranty, but this Guaranty shall be construed as if such invalid, illegal, or unenforceable provision (or part thereof) had never been contained herein but only to the extent it is invalid, illegal, or unenforceable.

7

EXHIBIT B

22.    Successors and Assigns. This Agreement shall inure to the benefit of, and be enforceable by, Lender and its successors and assigns as holder of the Note, and shall be binding upon, and enforceable against, Guarantor and their respective heirs, personal representatives, successors, and assigns.

23.    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic ("pdf", "tif" or "jpeg") format shall be effective as delivery of a manually executed counterpart of this Agreement. Further, each party hereto agrees that any electronic signatures, whether digital or encrypted, of the parties to this Agreement and each other agreement, instrument or document delivered in connection herewith are intended to authenticate this writing and to have the same force and effect as manual signatures. For purposes of this Section, "electronic signature" means any electronic sound, symbol, or process attached to or logically associated with a record and executed and adopted by a party with the intent to sign such record, including facsimile or email electronic signatures.

[SIGNATURES APPEAR ON FOLLOWING PAGES]

8

EXHIBIT B

WITNESS the signatures and seals of Guarantor as of the day and year first above written.

GUARANTOR:

By:_____
CHAPMAN DUCOTE, an individual

Bay Point – Guaranty Agreement – Silverpeak ($13MM) - Ducote
4860-2663-0964

EXHIBIT B

**EXHIBIT** H

EXHIBIT B

## GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT (this "Agreement") is made this 18th day of October, 2022, by SPOILS OF WAR LLC, a Florida limited liability company ("Guarantor"), in favor of BAY POINT CAPITAL PARTNERS II, LP, a Delaware limited partnership.

### RECITALS:

A.    The provisions of Section 1 below are applicable to these Recitals.

B.    Lender has made or is making a term loan to SILVERPEAK HOLDINGS, LLC, a Colorado limited liability company, and SILVERPEAK CORP., a Colorado limited liability company ("Borrower") in the maximum principal amount of Thirteen Million and No/100 Dollars ($13,000,000.00) ("Loan"), which is or will be secured by (i) a Deed of Trust, Assignment of Leases and Rents, and Security Agreement (as amended, modified, substituted, extended, and renewed from time to time, the "Mortgage") from Borrower for the benefit of Lender, covering the Property (as hereinafter defined), (ii) reserved, (iii) a Second Preferred Ship Mortgage from Guarantor, for the benefit of Lender, and (iv) a Pledge Agreement from CHAPMAN DUCOTE, an individual, for the benefit of Lender (collectively, the "Security Instruments").

C.    The Loan is being made pursuant to a Loan and Security Agreement dated as of even date herewith by and between Borrower and Lender (as amended, modified, substituted, extended, and renewed from time to time, the "Loan Agreement"), and is evidenced by a Note dated as of even date herewith from Borrower to Lender (as amended, modified, substituted, extended, and renewed from time to time, the "Note").

D.    Guarantor will benefit directly or indirectly and substantially from the making of the Loan. Guarantor's execution and delivery of this Guaranty is a condition precedent to Lender's agreement to make the Loan.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to induce Lender to make the Loan, Guarantor hereby covenants and agrees with Lender as follows:

1.    Definitions and Rules of Construction. Terms defined herein, including terms defined in the preamble and the Recitals above shall have the respective meanings given herein as definitions. Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Loan Agreement. The rules of construction set forth in Section 1.2 of the Loan Agreement shall be applicable to this Guaranty.

2.    Guaranty.

2.1    Guaranty of Payment. The Guarantor hereby unconditionally and irrevocably, jointly and severally, guarantees to Lender: (a) the due and punctual payment in full (and not merely the collectability) of all of the Obligations, including (i) the principal of the Note Loan and the interest thereon (including interest accruing after the commencement of any bankruptcy or insolvency proceeding by or against Borrower, whether or not allowed in such proceeding), and in each case when due and payable, whether on any installment payment date or

EXHIBIT B

at the stated or accelerated maturity, all according to the terms of the Note and the Security Instruments (the "Guaranteed Principal Obligation"), and (ii) all other sums and charges which may at any time be due and payable in accordance with, or secured by, the Loan Agreement, the Note, the Security Instruments or any other document evidencing or securing the Loan (together with the Loan Agreement, the Note and the Security Instruments, the "Loan Documents"), in each case when due and payable in accordance with the Loan Documents, whether on any installment payment date or at the stated or accelerated maturity; and (b) the due and punctual performance of all of the other terms, covenants and conditions contained in the Note and the other Loan Documents required, on the part of Borrower or any subsequent owner of the property made subject to the Security Instruments (the "Property," as more particularly described in the Security Instruments) to be performed.

3.  Guaranty Unconditional. The obligations and liabilities of Guarantor under this Guaranty shall be absolute and unconditional, irrespective of the genuineness, validity, priority, regularity, or enforceability of the Loan Agreement, the Note, the Security Instruments, or any of the other Loan Documents or any other circumstance which might otherwise constitute a legal or equitable discharge of a surety or guarantor. Guarantor expressly agrees that Lender may, in its sole and absolute discretion, without notice to or further assent of Guarantor and without in any way releasing, affecting or impairing the obligations and liabilities of Guarantor hereunder, do any one or more of the following at any time or from time to time: (a) waive compliance with, or any defaults under, or grant any other indulgences with respect to, the Loan Documents; (b) modify, amend, change, or terminate any provisions of the Loan Documents; (c) grant extensions or renewals of or with respect to the Note or the other Loan Documents; (d) effect any release, subordination, compromise, or settlement in connection with the Note and the other Loan Documents; (e) agree to the substitution, exchange, release, or other disposition of all or any part of the Property, or any other collateral for the Loan; (f) make advances for the purpose of performing any term or covenant contained in any of the Loan Documents with respect to which Borrower or the then owner of the Property shall be in default; (g) assign or otherwise transfer the Loan Documents or this Guaranty or any interest therein or herein; (h) deal in all respects with Borrower or the then owner of the Property as if this Guaranty were not in effect; or (i) effect any release, compromise or settlement with any one or more of Guarantor. The obligations of Guarantor under this Guaranty shall be unconditional, irrespective of the genuineness, validity, regularity, or enforceability of the Note or the Security Instruments, or any security given therefor or in connection therewith, or any other circumstances which might otherwise constitute a legal or equitable discharge of a surety or guarantor.

4.  Guaranty Primary. The obligations and liability of Guarantor under this Guaranty shall be primary, direct and immediate; shall not be conditional or contingent upon pursuit by Lender of any remedies it may have against Borrower with respect to the Loan Documents, whether pursuant to the terms thereof or by law; and shall not be subject to any counterclaim, recoupment, set-off, reduction, or defense based upon any claim that any Guarantor may have against Borrower, Lender, or any other Guarantor. Without limiting the generality of the foregoing, Lender shall not be required to make any demand on Borrower and/or the then owner of the Property, or to sell at foreclosure or otherwise pursue or exhaust its remedies against the Property or any part thereof and/or against Borrower or the then owner of the Property, before, simultaneously with or after enforcing its rights and remedies hereunder against any of Guarantor. Any one or more successive and/or concurrent actions may be brought hereon against Guarantor

2

either in the same action, if any, brought against Borrower and/or the then owner of the Property or in separate actions, as often as Lender may deem advisable.

5.    Waivers. Guarantor hereby unconditionally and irrevocably waives: (a) presentment and demand for payment of the principal of or interest on the Note and protest of non-payment; notice of acceptance of this Guaranty and of presentment, demand, and protest; (b) notice of any default under this Guaranty or any of the Loan Documents and notice of all indulgences; (c) all errors and omissions in connection with Lender's administration of all indebtedness guaranteed by this Guaranty, except errors and omissions resulting from acts of bad faith; (d) demand for observance, performance, or enforcement of any terms or provisions of this Guaranty or any of the Loan Documents; (e) any right or claim of right to cause a marshalling of the assets of Borrower; (f) any guaranty or suretyship defenses that might otherwise be available to Guarantor in law or equity; (g) any act or omission of Lender (except acts or omissions in bad faith) which changes the scope of Guarantor's risk hereunder; and (h) all other notices and demands otherwise required by law which Guarantor may lawfully waive. The obligations of Guarantor hereunder shall remain in full force and effect without regard to, and shall not be affected or impaired by any release, waiver, or discharge of the Guarantor from its liability under any obligation of this Guaranty.

This Guaranty shall be effective as a waiver of, and Guarantor hereby expressly waives, any and all rights to which Guarantor may otherwise have been entitled under any suretyship laws in effect from time to time, and any other right or privilege, whether existing under statute, at law or in equity, to require Lender to take prior recourse or proceedings against any collateral, security or other party whatsoever. Without any limitation of the foregoing, Guarantor hereby expressly waives any defenses to collection of any deficiency from Guarantor.

6.    Reimbursement for Expenses. If Lender shall commence any action or proceeding for the enforcement of this Guaranty, Guarantor shall reimburse Lender promptly upon demand, for all expenses incurred in connection therewith, including, without limitation, reasonable attorneys' fees.

7.    Intentionally Omitted.

8.    Acceleration. Anything in this Guaranty or in any of the Loan Documents to the contrary notwithstanding, Lender, at its option, may, as to Guarantor, accelerate the indebtedness guaranteed by Guarantor hereunder in the event of: (a) the making by any Guarantor of an assignment for the benefit of creditors; (b) the appointment of a custodian for any Guarantor or for any property of any of Guarantor; (c) the commencement of any proceeding by any Guarantor under any bankruptcy, reorganization, arrangement, insolvency, readjustment, receivership, or like law or statute; (d) the commencement of any proceeding against any Guarantor under any bankruptcy, reorganization, arrangement, insolvency, readjustment, receivership, or like law or statute which is not discharged or dismissed within sixty (60) days after institution thereof; or (e) the death or legal disability of any Guarantor which is a natural person; or (f) as to any Guarantor which is not a natural person, the termination, dissolution, liquidation, consolidation, reorganization, or merger of any such Guarantor, without the prior written consent of Lender.

Bay Point – Guaranty Agreement – Silverpeak ($13MM) – Spoils of War
4860-2663-0964

EXHIBIT B

9.      Subordination of Guarantor Subordinated Debt. If any of Guarantor shall advance any sums to Borrower or if Borrower shall hereafter become indebted to any Guarantor before the last to occur of the termination of all rights of Borrower to obtain advances of Loan proceeds and the full and final payment of the Obligations, such sums and indebtedness ("Guarantor Subordinated Debt") shall be subordinate in all respects to the Obligations. Any payment to Guarantor on account of Guarantor Subordinated Debt shall be collected and received by Lender or Guarantor in trust for Lender and shall be paid over to Lender on account of the Obligations without impairing or releasing the obligations of Guarantor hereunder.

Without the prior written consent of Lender, Guarantor shall not ask, demand, receive, accept, sue for, set off, collect, or enforce Guarantor Subordinated Debt or any collateral and security therefor. The Guarantor represents and warrants to Lender that Guarantor Subordinated Debt is unsecured and agrees not to receive or accept any collateral or security therefor without the prior written permission of Lender. The Guarantor shall not assign, transfer, hypothecate, or dispose of Guarantor Subordinated Debt while this Guaranty is in effect. In the event of any sale, receivership, insolvency, or bankruptcy proceeding, or assignment for the benefit of creditors, or any proceeding by or against Borrower for any relief under any bankruptcy or insolvency law or other laws relating to the relief of debtors, readjustment of indebtedness, reorganizations, compositions, or extensions, then and in any such event any payment or distribution of any kind or character, either in cash, securities or other property, which shall be payable or deliverable upon, or with respect to, all or any part of Guarantor Subordinated Debt or otherwise shall be paid or delivered directly to Lender for application to the obligations and liabilities of Guarantor under this Guaranty (whether due or not due and in such order and manner as Lender may determine in the exercise of its sole discretion) until the obligations of Guarantor hereunder shall have been fully paid and satisfied. The Guarantor hereby irrevocably authorizes and empowers Lender to demand, sue for, collect, and receive every such payment or distribution on account of Guarantor Subordinated Debt and give acquittance therefor and to file claims and take such other proceedings in Lender's own name or in the name of Guarantor or otherwise, as Lender may deem necessary or advisable to carry out the provisions of this Guaranty. The Guarantor hereby agrees to execute and deliver to Lender such powers of attorney, assignments, endorsements, or other instruments as may be requested by Lender in order to enable Lender to enforce any and all claims upon, or with respect to, Guarantor Subordinated Debt, and to collect and receive any and all payments or distributions which may be payable or deliverable at any time upon or with respect thereto.

So as to secure the performance by Guarantor of the provisions of this Guaranty, Guarantor assigns, pledges, and grants to Lender a security interest in, and lien on, Guarantor Subordinated Debt, all proceeds thereof and all and any security and collateral therefor. Upon the request of Lender, Guarantor shall endorse, assign, and deliver to Lender all notes, instruments and agreements evidencing, securing, guarantying or made in connection with Guarantor Subordinated Debt.

10.     Subrogation. Notwithstanding anything to the contrary contained herein, Guarantor shall not have any right of subrogation in or under any of the Loan Documents or to participate in any way therein, or in any right, title, or interest in and to any security or right of recourse for the Obligations or any right to reimbursement, exoneration, contribution, indemnification, or any similar rights, until the last to occur of the termination of all rights of Borrower to receive advances of Loan proceeds and the full and final payment of the Obligations.

4

EXHIBIT B

11. Representations and Warranties.

11.1 Due Organization and Qualification. Guarantor is a corporation, limited liability company, or limited partnership duly existing under the laws of the jurisdiction of its incorporation or formation and qualified and licensed to do business in any state in which the conduct of its business or its ownership of property requires that it be so qualified except where a failure to be so qualified or licensed could not reasonably be expected to have a material adverse effect.

11.2 Due Authorization; No Conflict. The execution, delivery, and performance of this Guaranty by Guarantor and the other Loan Documents to which it is a party are within Guarantor's powers, have been duly authorized, and do not and will not: (a) conflict with or constitute a breach of any provision contained in Guarantor's certificate of formation or operating agreement or other applicable organizational or governing documents, (b) require any consent or approval of any governmental agency or authority (other than any consent or approval which has been obtained and is in full force and effect), (b) conflict in any material respect with any provision of applicable law or any judgment, order, or decree, which is binding upon Guarantor or any of its respective properties, (c) conflict with or constitute an event of default under any agreement to which Guarantor is a party or by which Guarantor is bound, or (d) require, or result in, the creation or imposition of any lien on any asset of Guarantor. Guarantor is not in default under any agreement to which it is a party or by which it is bound.

11.3 Validity and Binding Nature. This Agreement and each other Loan Document to which Guarantor is a party is the legal, valid, and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, subject to bankruptcy, insolvency, and similar laws affecting the enforceability of creditors' rights generally and to general principles of equity.

11.4 Financial Condition. The financial statements of each Guarantor delivered to Lender prior to the Closing Date or pursuant to the terms hereof were prepared in accordance with GAAP (subject, in the case of interim financial statements, to normal year-end adjustments and the absence of footnotes) and present fairly in all material respects the financial condition of such Guarantor and its subsidiaries (as applicable) as at such dates and the results of its operations for the periods then ended and disclose all Indebtedness and other liabilities (direct or contingent) of such Guarantor and its subsidiaries (as applicable) as of the date thereof.

11.5 No Litigation. No litigation (including derivative actions), arbitration proceeding or governmental investigation or proceeding is pending or, to Guarantor's knowledge, threatened in writing against Guarantor which could reasonably be expected to have a material adverse effect.

12. Financial Statements. Guarantor shall provide to Lender, as and when required, the financial information required to be delivered to Lender with respect to Guarantor pursuant to the terms of the Security Instruments and the other Loan Documents, certified by them to be true and correct and in such form and detail as may be reasonably requested by Lender. Guarantor also

5

EXHIBIT B

agrees to provide Lender with such other financial information at such other times as may be reasonably requested by Lender.

13.    Governing Law. The provisions of this Guaranty shall be construed, interpreted, and enforced in accordance with the laws of the State of Colorado as the same may be in effect from time to time.

14.    Consent to Jurisdiction. Guarantor irrevocably submits to the jurisdiction of any state or federal court sitting in the State of Georgia over any suit, action, or proceeding arising out of or relating to this Guaranty. Guarantor irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding brought in any such court and any claim that any such suit, action, or proceeding brought in any such court has been brought in an inconvenient forum. Final judgment in any such suit, action, or proceeding brought in any such court shall be conclusive and binding upon Guarantor and may be enforced in any court to whose jurisdiction Guarantor are subject, by a suit upon such judgment provided that service of process is effected upon Guarantor in a manner specified in this Guaranty or as otherwise permitted by applicable law.

15.    Service of Process. To the fullest extent permitted by applicable law, Guarantor irrevocably consents to the service of process in the manner provided for notices in Section 18. Nothing in this Guaranty will affect the right of Guarantor or Lender to serve process in any other manner permitted by law.

16.    WAIVER OF TRIAL BY JURY. TO THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW IN EFFECT FROM TIME TO TIME, GUARANTOR HEREBY WAIVES ANY RIGHT IT MIGHT AT ANY TIME HAVE TO TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR IN ANY WAY PERTAINING OR RELATING TO THIS AGREEMENT OR THE EXERCISE OF ANY RIGHTS AND REMEDIES HEREUNDER, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE.

17.    Avoided Payments. If at any time any payment, or portion thereof, made by, or for the account of, any of Guarantor on account of any of the obligations and liabilities hereunder is set aside by any court or trustee having jurisdiction as a voidable preference or fraudulent conveyance or must otherwise be restored or returned by Lender under any insolvency, bankruptcy or other federal and/or state laws or as a result of any dissolution, liquidation, or reorganization of Borrower or upon, or as a result of, the appointment of any receiver, intervenor, or conservator of, or trustee or similar officer for, Borrower or any substantial part of its properties or assets, Guarantor hereby jointly and severally agree that this Guaranty shall continue and remain in full force and effect or be reinstated, as the case may be, all as though such payment(s) had not been made.

18.    Notices. Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement or any other agreement entered into in connection herewith shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by a

6

EXHIBIT B

recognized overnight delivery service, certified mail, postage prepaid, return receipt requested, or electronic mail to Guarantor or to Lender, as the case may be, at its addresses set forth below:

| | |
|---|---|
| If to Guarantor: | Spoils of War LLC<br>7775 NW 128th Street<br>Parkland, FL 33076<br>Attn: Chapman Ducote<br>Email: Chapman@chapmanducote.com |
| with a copy to: | Curtis Wolfe Law PA<br>3042 Orange Street<br>Miami, FL 33133<br>Attn: Curtis Wolfe<br>Email: curtiswolfe007@gmail.com |
| If to Lender: | Bay Point Capital Partners II, LP<br>3050 Peachtree Road NW, Suite 740<br>Atlanta, GA 30305<br>Attn: Charles Andros<br>Email: charlesandros@bay-pointadvisors.com |
| with a copy to: | Thompson Hine LLP<br>3560 Lenox Road, Suite 1600<br>Atlanta, GA 30326<br>Attn: Stephen B. Schrock, Esq.<br>Email: stephen.schrock@thompsonhine.com |

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

19.     Remedies Cumulative. All rights and remedies afforded to Lender by reason of this Guaranty, the Loan Documents, or by law are separate and cumulative and the exercise of one shall not in any way limit or prejudice the exercise of any other such rights or remedies. Every right, power and remedy given by this Guaranty to Lender shall be concurrent and may be pursued separately, successively or together against Guarantor or any one or more of them; and each such right, power and remedy may be exercised from time to time as often as Lender may deem expedient. No delay or omission by Lender in exercising any such right or remedy shall operate as a waiver thereof. No waiver of any rights and remedies hereunder, and no modification or amendment hereof, shall be deemed made by Lender unless in writing and duly signed by Lender. Any such written waiver shall apply only to the particular instance specified therein and shall not impair the further exercise of such right or remedy or of any other right or remedy of Lender and no single or partial exercise of any right or remedy hereunder shall preclude any other or further exercise thereof or any other right or remedy.

20.     Powers of Attorney. The powers of attorney granted by Guarantor to Lender in this Guaranty shall be unaffected by the disability of the principal so long as any portion of the Loan

7

EXHIBIT B

remains unpaid or unperformed. Lender shall have no obligation to exercise any of the foregoing rights and powers in any event.

21.     Severability. If any provision (or any part of any provision) contained in this Guaranty shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision (or remaining part of the affected provision) of this Guaranty, but this Guaranty shall be construed as if such invalid, illegal, or unenforceable provision (or part thereof) had never been contained herein but only to the extent it is invalid, illegal, or unenforceable.

22.     Successors and Assigns. This Agreement shall inure to the benefit of, and be enforceable by, Lender and its successors and assigns as holder of the Note, and shall be binding upon, and enforceable against, Guarantor and their respective heirs, personal representatives, successors and assigns.

23.     Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic ("pdf", "tif" or "jpeg") format shall be effective as delivery of a manually executed counterpart of this Agreement. Further, each party hereto agrees that any electronic signatures, whether digital or encrypted, of the parties to this Agreement and each other agreement, instrument or document delivered in connection herewith are intended to authenticate this writing and to have the same force and effect as manual signatures. For purposes of this Section, "electronic signature" means any electronic sound, symbol, or process attached to or logically associated with a record and executed and adopted by a party with the intent to sign such record, including facsimile or email electronic signatures.

[SIGNATURES APPEAR ON FOLLOWING PAGES]

8

EXHIBIT B

WITNESS the signatures and seals of Guarantor as of the day and year first above written.

GUARANTOR:

**SPOILS OF WAR LLC,**
a Florida limited liability company

By:_____
Name: Chapman Ducote
Title: Manager

Bay Point – Guaranty Agreement – Silverpeak ($13MM) – Spoils of War
4860-2663-0964

EXHIBIT B

# **Exhibit I**

EXHIBIT B



February 1, 2026

Mr. Chapman Ducote
Silverpeak Holdings, LLC
7775 NW 128th Avenue
Parkland, Florida 33076

Dear Chapman,

Please allow this engagement letter ("Engagement Letter") and the Standard Terms and Conditions attached hereto (collectively, the "Agreement") to set forth and confirm the understanding and agreement between ACM Capital Partners, LLC ("ACM") and Silverpeak Holdings, LLC – a Colorado limited liability company and its affiliates, ("You", "Your", the "Company", or the "Client"). The terms of our engagement are set forth below.

1.      **Effective Date** - This Agreement shall become effective (the "Effective Date") upon the last date this Agreement is signed by ACM and Client.

2.      **Scope of Services** –

ACM will perform the following consulting and advisory services at the direction of the Client (the "Engagement"):

- Assess Baypoint Capital Partners II, LP's ("Baypoint") collateral position;
- Develop a comprehensive strategy to mitigate Baypoint's present remedies;
- Develop a working relationship with Baypoint in order to defer potential adverse action against the Company
- Determine the market value of the collateral in an abbreviated sale process
- Develop a marketing plan to liquidate the collateral in an accelerated fashion;
- Negotiate a payoff of the Baypoint loan prior to the liquidation / sale of the collateral

3.      **Fee and Billing Arrangements** -

(a) ACM's customary hourly billing rates range from $300-$600.

**Retainer:** The Client shall pay ACM a nonrefundable $15,000 retainer upon execution of this Engagement Letter. The retainer shall be applied to the final invoice.

(b) A success fee payable by the Company to ACM (the "Success Fee") equal to 7.5% of the total liquidation proceeds received by the Company; plus 10% of any net positive spread between the total liquidation proceeds received by the Company and the total payoff and full satisfaction of the Baypoint loan. ("Net Positive Spread"). Net Positive Spread shall include all assets of the Company, including real estate, in the event that ACM is able to bring a single buyer for the entire transaction (business + real estate). But if the real estate buyer is sourced by a real estate broker(s) separately engaged by the Company, those assets shall be excluded

755 Crandon Blvd, Suite 2
Key Biscayne, FL 33149

EXHIBIT B



from Net Positive Spread and ACM shall not be paid for assistance with the sale of such assets.

As an example, should the net proceeds received from the sale of the collateral equal $14,000,000 and the negotiated payoff of the loan is $12,000,000, then ACM would be entitled to 7.5% of the Net Positive Spread of $2,000,000 or $200,000.

The Success Fees earned shall be paid upon the sale of the collateral and payoff of the loan from the Net Positive Spread.

(c) In addition to the fees earned by ACM, the Client agrees to reimburse ACM for any actual and reasonable out-of-pocket expenses incurred in the provision of services hereunder, including without limitation, travel, delivery services, postage, data room charges, vendor charges, and other related out-of-pocket expenses and the fees billed by ACM's counsel. ACM may require a separate cost retainer before undertaking any costs it deems significant.

(d) Except as otherwise expressly set forth in this Engagement Letter, our fees are not contingent upon the financial position and results of operations of the Client or any other Client initiatives, goals or projections or results of this engagement. We cannot guarantee results or final developments in this matter, and You understand and agree that we do not do so.

(e) Either party may terminate this engagement upon written notice of at least five (5) business days. Termination does not relieve the Client from the obligation of paying all fees in full for services performed and expenses incurred through the Termination Date.

(f) ACM will present invoices to the Client on a bi-weekly basis, which invoices shall accrue during the term of this engagement. Such invoices are payable upon completion of the engagement first from the Net Positive Spread; and second, if not paid in full from the Net Positive Spread, from the Retainer. In the event that the Client disagrees with or questions any amount due under an invoice, the Client agrees that it shall communicate such disagreement to ACM in writing within fifteen (15) days of the applicable invoice date. The writing shall set forth the specific basis for the dispute and the amount or portion of the invoice being disputed. Any disputes not raised in that manner within such fifteen (15) day period shall be deemed waived by Client. All fees incurred must be paid in full prior to ACM's issuance of any reports or rendering of any deposition or trial testimony. ACM shall have the right to halt or terminate entirely its services without notice under the Engagement Letter until payment is received on past due invoices.

(g) The Client acknowledges and agrees that it will not, directly or indirectly, solicit, engage, permit to be engaged or hire any ACM professional to provide services for the Client independently, as an employee of the Client or as an employee of a service provider other than ACM during the Term of this Agreement and for a period of two (2) years from the Termination Date of this Engagement Letter without the written consent of ACM. If, prior to written consent by ACM, any ACM professional is hired or utilized by the Client, the Client shall pay ACM the greater of $75,000 or 50% of such professional's annual salary. The Client acknowledges that damages alone would not be an adequate remedy for the breach this provision of this agreement. Accordingly, without prejudice to any other rights and remedies it may have, ACM shall be entitled to the granting of equitable relief (including without limitation injunctive relief) concerning any

755 Crandon Blvd, Suite 2
Key Biscayne, FL 33149

EXHIBIT B



threatened or actual breach of any of this provision of this Agreement.

4.    **Entire Agreement** - This Engagement Letter, along with the attached Terms and Conditions, constitute the entire agreement between ACM and Client concerning this engagement. All prior agreements, discussions, representations, warranties, and covenants are merged herein. There are no warranties, representations covenants, or agreements, expressed or implied, between the parties except those expressly set forth in this Agreement. Any amendments or modifications of this Agreement shall be in writing and executed by ACM and Client.

5.    **Dispute Resolution** - In the event of any dispute or claim relating to this Agreement or the services provided hereunder, you and ACM agree that (i) any and all disputes between you and ACM shall be fully and finally resolved by binding arbitration in the State of Colorado; (ii) you are waiving any and all rights to a jury trial but all court remedies will be available in arbitration, (iii) all disputes shall be resolved by a neutral arbitrator who shall issue a written opinion; and (iv) the arbitration shall provide for adequate discovery.

6.    **Counterparts** – This Agreement may be executed in multiple counterparts, each of which together shall be deemed an original, but all of which together shall constitute on and the same Agreement.

Once again, thank you for allowing ACM to assist you in this matter. ACM prides itself on working side by side with its clients in helping them achieve their objectives. If this Agreement conforms to your understanding of our agreement, please sign it and return it electronically. Your signature below will confirm that you have reviewed and agree to the terms. If you have any questions, please call me at 305.978.0720.

Very truly yours,

James F. Martin
Managing Partner
ACM Capital Partners, LLC

**Agreed to and Accepted:**

Silverpeak Holdings, LLC.

By: _____

Title: **CHAPMAN    DULOTE**

Date: **2|1|26**

755 Crandon Blvd, Suite 2
Key Biscayne, FL 33149

EXHIBIT B



### ACM Capital Partners, LLC
### Standard Terms and Conditions for Advisory Services

1.  **Services** - It is understood and agreed that ACM's services may include advice and recommendations, but all decisions in connection with the use of such advice and recommendations shall be the responsibility of, and made by, the Client. References herein to Client shall refer collectively to the addressee(s) of the engagement letter or other agreement to which these Standard Terms and Conditions are attached (the engagement letter or any such other agreement is hereinafter referred to as the "Engagement Letter"). The Engagement Letter, any Exhibits or Schedules thereof, and these Standard Terms and Conditions shall be collectively referred to as the "Agreement."

2.  **Payment of Invoices** - Client agrees to pay ACM's invoices within thirty (30) days of the invoice date or such other due date as may be indicated in the Engagement Letter. ACM shall have the right to halt or terminate entirely, without notice, its services under the Engagement Letter until payment is received on past due invoices. All fees, charges and other amounts payable to ACM under the Agreement do not include any sales, use, excise, value added or other applicable taxes, tariffs or duties, payment of which shall be Client's sole responsibility, excluding any applicable taxes based on ACM's net income or taxes arising from the employment or independent contractor relationship between ACM and its personnel. In the event that Client disagrees with or questions any amount due under an invoice, Client agrees that it shall communicate such disagreement or questions to ACM in writing, within fifteen (15) days of the invoice date and shall waive the right to do so if such disagreement or questions are not communicated to ACM in writing within that time period.

3.  **Termination** – ACM's engagement shall terminate on the completion of ACM's services as specified in the Engagement Letter, provided, however, that ether party may terminate ACM's engagement at any time by giving written notice to the other party; provided that Client may provide notice of termination on not less than five (5) days (or as otherwise provided in the Engagement Letter) before the effective date of termination. Client shall pay ACM in full for all services rendered or expenses incurred as of the date of termination or Client's breach of any provision of this Agreement

4.  **Tail Period** - If at any time within the twelve (12) months following the Expiration Date or Termination of this Agreement (the "Tail Period'), the Client completes any type of a debt or equity transaction or receives consideration from any investor(s) (i) first identified to the Client by ACM during the Term; or (ii) with whom the Client has spoken to as a result of an ACM introduction, then the Client shall and shall cause its affiliates to, pay to ACM all compensation, fees and expenses as described in this Agreement.

5.  **Ownership** –

    **(a)** <u>ACM Property</u> – ACM has created, acquired, owns or otherwise has rights in, and may, in connection with the performance of services under the Agreement, employ, provide, modify, create, acquire or otherwise obtain rights in, various concepts, ideas, methods, methodologies, procedures, processes, know-how, and techniques, models, templates, software, user interfaces and screen designs; general purpose consulting and software tools, utilities and routines; and logic, coherence and methods or operation of systems (collectively "ACM Property"). ACM retains all ownership rights in the ACM Property. ACM acknowledges that ACM shall have no ownership rights to Client's confidential information or tangible or intangible property.

    **(b)** <u>Ownership of Work Product</u> – All documents, material or information of any kind created by ACM in connection with this engagement, including, without limitation, any written reports, memoranda, work papers or status summaries, are work product (collectively, "Work Product"). All Work Product shall be owned and maintained by ACM. It is agreed that all Work Product and all other working papers and other documents prepared by ACM, ACM attorneys, or ACM professionals, pursuant to this engagement will be maintained as confidential materials and will not be disclosed to third parties without the Client's consent, except as may be required by law, regulation,

755 Crandon Blvd, Suite 2
Key Biscayne, FL 33149

EXHIBIT B



or judicial or administrative processes. ACM agrees to notify the Client promptly of any of the following events: (i) a request by anyone to examine, inspect, or copy any Work Product or other working papers, documents or records relating to this engagement; or (ii) any attempt to serve, or the actual service of, any court order, subpoena, or summons upon ACM that requires the production of such documents or records.

6.   **Client Representation and Warranties** –
     (a) Client's financial and operational history, its present condition, financial and otherwise, shall be as represented to ACM and satisfactory to ACM. Client shall supply ACM with such financial statements, contracts and other corporate records and documents as ACM shall deem reasonably necessary and shall also supply ACM's counsel with all financial statements, contracts, documents and other corporate papers of information as may be reasonably requested by ACM or their counsel. In addition, Client shall fully inform ACM of any events that might have a material effect on the financial condition or prospects of the company.

     (b) Client acknowledges and agrees that ACM may, in performing its obligations pursuant to this Agreement, use data, material and other information furnished by Client without any independent investigation or verification and that ACM shall be entitled to rely upon the accuracy and completeness of such information in performing the services under the Agreement.

7.   **Third-party Representations and Warranties – Client agrees that ACM is a third-party beneficiary of, and may rely upon, representations and warranties, indemnities and applicable covenants, set forth in any agreement with third-parties who invest for the benefit of Client.**

8.   **Limitation on Warranties – CLIENT ACKNOWLEDGES AND AGREES THAT (I) ACM WILL ACT SOLEY ON CLIENT'S BEHALF IN ACCORDANCE WITH THE SCOPE OF SERVICES IDENTIFIED IN THE ENGAGEMETN LETTER AND (2) THIS AGREEMENT DOES NOT ENSURE OR GUARANTEE ANY PARTICULAR OUTCOME OR RESULTS. ACM DOES NOT MAKE AND WILL NOT BE LIABLE FOR ANY WARRANTIES OTHER THAN THOSE EXPRESSLY INCLUDED IN THIS AGREEMENT. ACM EXPLICITLY DISCLAIMS ALL OTHER WARRANTIES, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

9.   **Limitation on Damages** – ACM shall not be liable to the Client for any actions, damages, claims, liabilities, costs, expenses or losses in any way arising out of or relating to the services performed under the Agreement for an aggregate amount in excess of the fees paid to ACM for services rendered by ACM under the Agreement. In no event shall ACM be liable for consequential, special, indirect, incidental, punitive or exemplary damages, costs, expenses, or losses (including, without limitation, lost profits and opportunity costs). The provisions of this Paragraph shall apply regardless of the form of action, damage, claim, liability, cost, expense, or loss whether in contract, statue, tort or otherwise.

10.  **Indemnification** –

     **(a)** Client will indemnify, defend and hold harmless ACM, its shareholders, affiliates, principals, members, managers, officers, directors, employees, subcontractors, attorneys, professionals, representatives and agents (collectively, the "Indemnified Parties" or individually, the "Indemnified Party") against any and all losses, claims, damages, liabilities, penalties, obligations and expenses, including, without limitation, the costs and expenses for counsel or others (including employees of ACM, based on their then current hourly billing rates) in investigating, preparing or defending any action or claim, whether or not in connection with litigation in which any Indemnified Party is a party, as and when incurred, caused by, relating to, based upon or arising out of (directly or indirectly) the Agreement, including, without limitation, ACM's costs and expenses to collect or recover from the Client any fees due hereunder; provided, however, that such indemnity shall not apply to any such loss, claim, damage, liability

755 Crandon Blvd, Suite 2
Key Biscayne, FL 33149

EXHIBIT B



or expense to the extent it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from such Indemnified Party's gross negligence or willful misconduct. The Client and ACM acknowledge and agree that all Indemnified Parties shall be intended third-party beneficiaries of this Paragraph 10 and all other provisions of this Agreement necessary to enforce the terms of this Paragraph.

**(b)** Client acknowledges and agrees that any advice, recommendations, information or Work Product provided to Client by Indemnified Party in connection with this engagement is for the confidential use of Client and, except as otherwise required by law or permitted by the Agreement, Client will not disclose or permit access to such advice, recommendations, information or Work Product to any third party or summarize or refer to such advice, recommendations, information or Work Product or to Indemnified Party's engagement without, in each case, ACM's prior written consent. Client is responsible for all information it provides to third parties directly, or indirectly through Indemnified Party, and it agrees to clearly so state in writing to all such third parties. In furtherance of the foregoing, Client will indemnify, defend and hold harmless the Indemnified Parties from and against any and all liabilities suffered by or asserted against the Indemnified Parties in connection with a third party claim to the extent resulting from such party's use or possession of or reliance upon ACM's advice, recommendations, information or Work Product pursuant to Paragraph (a).

**(c)** The Indemnified Parties shall promptly notify Client of any claim for which they seek indemnification provided that any failure to notify Client or timely notify the Client shall not impact, in any way, the applicability of the indemnification provisions contained herein. The Client shall have the right to conduct the defense or settlement of any such claim at its sole expense, and the Indemnified Parties shall cooperate. The Indemnified Parties shall nonetheless have the right to participate in such defense at Client's cost. The Indemnified Parties shall have the right to approve the settlement of any claim that imposes any liability or obligation other than the payment of money damages.

11. **Third-Party Beneficiaries** – Client and ACM understand and agree that there are no third-party beneficiaries of this Agreement, including, but not limited to, individuals and entities affiliated with Client or ACM. Accordingly, no third-party shall have any right to pursue or enforce any right or remedy hereunder, to assert a claim against ACM or to assert reliance in any manner on ACM's advice or work product.

12. **Cooperation; Use of Information** –

Client agrees to cooperate with ACM in the performance of the services under the Agreement and shall provide ACM with timely access to and use of Client's personnel, facilities, equipment, data and information to the extent necessary for ACM to perform the services under the Agreement. The Engagement Letter may set forth additional obligations of Client in connection with the engagement. As requested by ACM, Client acknowledges that Client's failure to assign Client personnel having skills commensurate with their role with respect to this engagement could adversely affect ACM's ability to provide the services under the Agreement.

13. **Force Majeure** –ACM shall not be liable for any delays resulting from circumstances or caused beyond its reasonable control, including, without limitation, fire or other casualty, acts of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

14. **Limitation on Actions** – No action, regardless of form, arising out of or relating to this Agreement, may be brought by Client more than one year after the cause of action has accrued.

15. **Independent Contractor** – It is understood and agreed that each of the parties hereto is an independent contractor and that neither party is or shall be considered an agent, distributor, fiduciary or representative of the other. Neither

755 Crandon Blvd, Suite 2
Key Biscayne, FL 33149

EXHIBIT B



party shall act or represent itself, directly or by implication, as an agent of the other or in any manner assume or create any obligation on behalf of or in the name of, the other.

16. **Confidentiality-**

**(a)** "Confidential Information" means all documents, software, reports, data, records, forms and other materials (including without limitation Work Product) obtained by one party (the "Receiving Party") from the other party (the "Disclosing Party") in the course of performing the services under the Agreement: (i) that have been marked as confidential; (ii) whose confidential nature has been made known by the Disclosing Party to the Receiving Party; or (iii) that due to their character and nature, a reasonable person under like circumstances would treat as confidential. Notwithstanding the foregoing, Confidential Information does not include information that: (1) is already known to the Receiving Party at the time of disclosure by the Disclosing Party; (2) is or becomes publicly known through no wrongful act of the Receiving Party; (3) is independently developed by the Receiving Party without benefit of the Disclosing Party's Confidential Information; or (4) is received by the Receiving Party from a third party without restriction and without breach of an obligation of confidentiality.

**(b)** The Receiving Party will deliver to the Disclosing Party all Confidential Information of the Disclosing Party and all copies thereof when the Disclosing Party requests the same, except for one copy thereof that the Receiving Party may retain for its records. The Receiving Party shall not use or disclose to any person, firm or entity an Confidential Information of the Disclosing Party without the Disclosing Party's express, prior written permission; provided, however, that notwithstanding the foregoing, the Receiving Party may disclose Confidential Information to the extent that it is required to be disclosed pursuant to a statutory or regulatory provision or court order, to fulfill professional obligations and standards, or to ACM's counsel in the event of a dispute.

**(c)** Each party shall be deemed to have met its nondisclosure obligations under this Paragraph 12 as long as it exercises the same level of care to protect the other's information as it exercises to protect its own Confidential Information but in no event less than reasonable care, except to the extent that applicable law or professional standards impose a higher requirement.

**(d)** If the Receiving Party receives a subpoena or other validly issued administrative or judicial demand requiring it to disclose the Disclosing Party's Confidential Information, the Receiving Party shall provide prompt written notice to the Disclosing Party of such demand in order to permit it to seek a protective order. So long as the Receiving Party gives notice as provided herein, the Receiving Party shall be entitled to comply with such demand to the extent permitted by law, subject to any protective order or the like that may have been entered in the matter.

**(e)** Notwithstanding anything to the contrary set forth herein, no provision in the Engagement Letter or these Terms and Conditions is or is intended to be construed as a condition of confidentiality within the meaning of Internal Revenue Code sections 6011, 6111, 6112 or the regulations thereunder. Client (and each employee, representative, or other agent of Client) may disclose to any and all persons, without limit of any kind, the tax treatment and tax structure of any transaction within the scope of this engagement that reduces or defers Federal tax and all materials of any kind (including opinions or other tax analyses) that are provided to Client relating to such tax treatment and tax structure.

17. **Conflicts** – Nothing in this Agreement shall be construed to limit the ability of ACM or its affiliates to pursue, investigate, analyze, invest in, or engage in investment banking, financial advisory or any other business relationship with entities other than the Client, notwithstanding that such entities may be engaged in business that is similar to or competitive with the business of the Client, and notwithstanding that such entities may have actual or potential operations, products, services, plans, ideas, customers or supplies similar or identical to the Client's or may have been identified by the Client as potential merger or acquisition targets or potential candidates for some other business combination, cooperation or relationship. The Client expressly acknowledges and agrees that is does not

755 Crandon Blvd, Suite 2
Key Biscayne, FL 33149

EXHIBIT B



claim any proprietary interest in the identity of any other entity in its industry or otherwise, and that the identity of any such entity is not confidential information.

18. **Survival** - The provisions of Paragraphs 1, 2, and 4 through 33 hereof shall survive the expiration or termination of this Agreement. The expiration or termination of this Agreement shall not affect ACM's right to receive, and Client's obligation to pay, any and all fees, expenses and other amounts due hereunder, as more fully set forth in this Agreement.

19. **Assignment** - Neither party may assign, transfer or delegate any of its rights or obligations without the prior written consent of the other party, such consent not to be unreasonably withheld; provided, however, that ACM may (i) assign its rights and obligations under the Agreement to any Affiliate or any successor to ACM's business, and (ii) use subcontractors to provide services under the Agreement without having to obtain the consent of the Client.

20. **Severability** - In the event that any term or provision of this Agreement shall be held to be invalid, void or unenforceable, then the remainder of this Agreement shall not be affected, and each such term and provision of the Agreement shall be valid and enforceable to the fullest extent permitted by law.

21. **Authority** – Each signatory represents and warrants that he or she possesses all required legal authority to enter into this Agreement on behalf of the entity for which he is signing and to bind that entity to the terms hereof.

22. **Governing Law** – This Agreement, including the interpretation and enforcement thereof, shall be governed by and construed in accordance with the laws of the State of Colorado, without regard to the conflict of laws provisions thereof.

23. **Miscellaneous -**
In accepting this engagement, Client acknowledges the completion of this engagement will not constitute a basis for Client's assessment or evaluation of internal controls over financial reporting and disclosure controls and procedures, or its compliance with principal officer certification requirements under Section 302 of the Sarbanes-Oxley Act of 2002 (the "Act"). This engagement shall not be construed to support Client's responsibilities under Section 404 of the Act requiring each annual report filed under Section 13(a) or 15(d) of the Securities Exchange Act of 1934 to contain an internal control report from management.

24. **Communication** - ACM may communicate with Client by electronic mail or otherwise transmit documents in electronic form during the course of this engagement. Client accepts the inherent risks of these forms of communication (including the security risks of interception of or unauthorized access to such communications, the risks of corruption of such communications, the risks of viruses or other harmful devices) and agrees that it may rely only upon a final hardcopy version of a document or other communication that ACM transmits to Client.

25. **Intellectual Property** - Neither party shall use the other party's name, trademarks, service marks, logos, trade names and/or branding without such party's prior written consent. Notwithstanding anything herein to the contrary, ACM may reference or list Client's name and/or general description of the engagement. Client also agrees that upon reasonable prior notice from ACM, Client will be willing to provide a reference for ACM (e.g. in the form of analyst telephone calls, client telephone calls, presentations and the like).

26. **Notices** - Any notices given to ACM pursuant to this Agreement shall be in writing, delivered to the address(es) set forth in the Engagement Letter via US Postal Service with return receipt requested, and shall be considered given when received. Any notices given to Client pursuant to this Agreement may be in writing or verbal with written

755 Crandon Blvd, Suite 2
Key Biscayne, FL 33149

EXHIBIT B



confirmation within five business days to the address(es) set forth in the Engagement Letter, and shall be considered effective when given.

27. **Severability** – In the event that any term or provision of this Agreement shall be held to be invalid, void or unenforceable, then the remainder of this Agreement shall not be affected, and each such term and provision of the Agreement shall be valid and enforceable to the fullest extent permitted by law.

28. **Entire Agreement** - This Agreement, including the Engagement Letter, the Standard Terms and Conditions and any Exhibits or Schedules, constitutes the entire agreement between ACM and Client with respect to this engagement and supersede all other oral and written representation, understandings or agreements relating to this engagement. It is expressly understood by all parties hereto that there have been no representations, express or implied, other than as set forth in this Agreement, and that no party hereto has been induced to enter into this Agreement by any such representation.

29. **Modification** – This Agreement may not be modified, amended, changed, discharged or terminated orally, but only in writing and signed by both ACM and Client.

30. **Representation by Counsel** – Each of the parties to this Agreement asserts that they have been had the opportunity to be represented by counsel in connection with this Agreement and that the terms and conditions of this Agreement are understood fully and agreed to and accepted voluntarily. Further, each of the parties to this Agreement declare that their counsel participated in the drafting of this Agreement and that, accordingly, this Agreement shall not be construed more strongly against any party hereto because it drafted this Agreement.

31. **Attorneys' Fees** – In the event of any litigation or arbitration arising out of this Agreement, the prevailing party shall be entitled to recover its fees, costs and expenses (including, without limitation, reasonable attorneys' fees, arbitration fees, and court costs).

32. **No Recourse Against Nonparty Affiliates** – All claims, obligations, liabilities or causes of action that may be based upon, arise under or in any way relate to this Agreement may be made only against the parties to this Agreement. Any person or entity not a party to this Agreement, including but not limited to, any director, officer, employee, member, partner, manager, stockholder, affiliate, agent, or attorney, shall have no liability for any claims, causes of action, obligations, or liabilities arising under or in any way related to this Agreement.

[THE REST OF THIS PAGE INTENTIONALLY LEFT BLANK]

755 Crandon Blvd, Suite 2
Key Biscayne, FL 33149

EXHIBIT B

**EXHIBIT** I

EXHIBIT B

## GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT (this "Agreement") is made this 18th day of October, 2022, by WAR CHEST REAL ESTATE, LLC, a Florida limited liability company ("Guarantor"), in favor of BAY POINT CAPITAL PARTNERS II, LP, a Delaware limited partnership (together with its successors and assigns, the "Lender").

## RECITALS:

A.    The provisions of Section 1 below are applicable to these Recitals.

B.    Lender has made or is making a term loan to SILVERPEAK HOLDINGS, LLC, a Colorado limited liability company, and SILVERPEAK CORP., a Colorado corporation (collectively, the "Borrower") in the maximum principal amount of Thirteen Million and No/100 Dollars ($13,000,000.00) ("Loan"), which is or will be secured by a Deed of Trust, Assignment of Leases and Rents, and Security Agreement (as amended, modified, substituted, extended, and renewed from time to time, the "Security Instrument") from Guarantor to the trustees named therein for the benefit of Lender, covering the Property (as hereinafter defined).

C.    The Loan is being made pursuant to a Loan and Security Agreement dated as of even date herewith by and between Borrower, Guarantor and Lender (as amended, modified, substituted, extended, and renewed from time to time, the "Loan Agreement"), and is evidenced by a Note dated as of even date herewith from Borrower to Lender (as amended, modified, substituted, extended, and renewed from time to time, the "Note").

D.    Guarantor will benefit directly or indirectly and substantially from the making of the Loan. Guarantor's execution and delivery of this Guaranty is a condition precedent to Lender's agreement to make the Loan.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to induce Lender to make the Loan, Guarantor hereby covenants and agrees with Lender as follows:

1.    Definitions and Rules of Construction.   Terms defined herein, including terms defined in the preamble and the Recitals above shall have the respective meanings given herein as definitions. Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Loan Agreement. The rules of construction set forth in Section 1.2 of the Loan Agreement shall be applicable to this Guaranty.

2.    Guaranty.

2.1    Guaranty of Payment.   The Guarantor hereby unconditionally and irrevocably, jointly and severally, guarantees to Lender: (a) the due and punctual payment in full (and not merely the collectability) of all of the Obligations, including (i) the principal of the Note Loan and the interest thereon (including interest accruing after the commencement of any bankruptcy or insolvency proceeding by or against Borrower, whether or not allowed in such proceeding), and in each case when due and payable, whether on any installment payment date or at the stated or accelerated maturity, all according to the terms of the Note and the Security

EXHIBIT B

Instrument (the "Guaranteed Principal Obligation"), and (ii) all other sums and charges which may at any time be due and payable in accordance with, or secured by, the Loan Agreement, the Note, the Security Instrument or any other document evidencing or securing the Loan (together with the Loan Agreement, the Note and the Security Instrument, the "Loan Documents"), in each case when due and payable in accordance with the Loan Documents, whether on any installment payment date or at the stated or accelerated maturity; and (b) the due and punctual performance of all of the other terms, covenants and conditions contained in the Note and the other Loan Documents required, on the part of Borrower or any subsequent owner of the property made subject to the Security Instrument (the "Property," as more particularly described in the Security Instrument) to be performed. Notwithstanding anything to the contrary contained in this Section 2.1, Guarantor's obligations under this Section 2.1 with respect to the repayment of principal of the Loan shall be subject to the provisions of the Rider attached hereto, which is incorporated herein and made a part hereof.

3.    Guaranty Unconditional. The obligations and liabilities of Guarantor under this Guaranty shall be absolute and unconditional, irrespective of the genuineness, validity, priority, regularity or enforceability of the Loan Agreement, the Note, the Security Instrument or any of the other Loan Documents or any other circumstance which might otherwise constitute a legal or equitable discharge of a surety or guarantor. Guarantor expressly agrees that Lender may, in its sole and absolute discretion, without notice to or further assent of Guarantor and without in any way releasing, affecting or impairing the obligations and liabilities of Guarantor hereunder, do any one or more of the following at any time or from time to time: (a) waive compliance with, or any defaults under, or grant any other indulgences with respect to, the Loan Documents; (b) modify, amend, change or terminate any provisions of the Loan Documents; (c) grant extensions or renewals of or with respect to the Note or the other Loan Documents; (d) effect any release, subordination, compromise or settlement in connection with the Note and the other Loan Documents; (e) agree to the substitution, exchange, release or other disposition of all or any part of the Property, or any other collateral for the Loan; (f) make advances for the purpose of performing any term or covenant contained in any of the Loan Documents with respect to which Borrower or the then owner of the Property shall be in default; (g) assign or otherwise transfer the Loan Documents or this Guaranty or any interest therein or herein; (h) deal in all respects with Borrower or the then owner of the Property as if this Guaranty were not in effect; or (i) effect any release, compromise or settlement with any one or more of Guarantor. The obligations of Guarantor under this Guaranty shall be unconditional, irrespective of the genuineness, validity, regularity or enforceability of the Note or the Security Instrument, or any security given therefor or in connection therewith, or any other circumstances which might otherwise constitute a legal or equitable discharge of a surety or guarantor.

4.    Guaranty Primary. The obligations and liability of Guarantor under this Guaranty shall be primary, direct and immediate; shall not be conditional or contingent upon pursuit by Lender of any remedies it may have against Borrower with respect to the Loan Documents, whether pursuant to the terms thereof or by law; and shall not be subject to any counterclaim, recoupment, set-off, reduction or defense based upon any claim that any Guarantor may have against Borrower, Lender or any other Guarantor. Without limiting the generality of the foregoing, Lender shall not be required to make any demand on Borrower and/or the then owner of the Property, or to sell at foreclosure or otherwise pursue or exhaust its remedies against the Property or any part thereof and/or against Borrower or the then owner of the Property, before,

2

EXHIBIT B

simultaneously with or after enforcing its rights and remedies hereunder against any of Guarantor. Any one or more successive and/or concurrent actions may be brought hereon against Guarantor either in the same action, if any, brought against Borrower and/or the then owner of the Property or in separate actions, as often as Lender may deem advisable.

5.    Waivers.    Guarantors hereby unconditionally and irrevocably waive: (a) presentment and demand for payment of the principal of or interest on the Note and protest of non-payment; notice of acceptance of this Guaranty and of presentment, demand and protest; (b) notice of any default under this Guaranty or any of the Loan Documents and notice of all indulgences; (c) all errors and omissions in connection with Lender's administration of all indebtedness guaranteed by this Guaranty, except errors and omissions resulting from acts of bad faith; (d) demand for observance, performance, or enforcement of any terms or provisions of this Guaranty or any of the Loan Documents; (e) any right or claim of right to cause a marshalling of the assets of Borrower; (f) any guaranty or suretyship defenses that might otherwise be available to Guarantor in law or equity; (g) any act or omission of Lender (except acts or omissions in bad faith) which changes the scope of Guarantor's risk hereunder; and (h) all other notices and demands otherwise required by law which Guarantor may lawfully waive. The obligations of Guarantor hereunder shall remain in full force and effect without regard to, and shall not be affected or impaired by any release, waiver or discharge of the Guarantor from its liability under any obligation of this Guaranty.

This Guaranty shall be effective as a waiver of, and Guarantor hereby expressly waives, any and all rights to which Guarantor may otherwise have been entitled under any suretyship laws in effect from time to time, and any other right or privilege, whether existing under statute, at law or in equity, to require Lender to take prior recourse or proceedings against any collateral, security or other party whatsoever. Without any limitation of the foregoing, Guarantor hereby expressly waives any defenses to collection of any deficiency from Guarantor.

6.    Reimbursement for Expenses. If Lender shall commence any action or proceeding for the enforcement of this Guaranty, Guarantor shall reimburse Lender promptly upon demand, for all expenses incurred in connection therewith, including, without limitation, reasonable attorneys' fees.

7.    Intentionally Omitted.

8.    Acceleration. Anything in this Guaranty or in any of the Loan Documents to the contrary notwithstanding, Lender, at its option, may, as to Guarantor, accelerate the indebtedness guaranteed by Guarantor hereunder in the event of: (a) the making by any Guarantor of an assignment for the benefit of creditors; (b) the appointment of a custodian for any Guarantor or for any property of any of Guarantor; (c) the commencement of any proceeding by any Guarantor under any bankruptcy, reorganization, arrangement, insolvency, readjustment, receivership or like law or statute; (d) the commencement of any proceeding against any Guarantor under any bankruptcy, reorganization, arrangement, insolvency, readjustment, receivership or like law or statute which is not discharged or dismissed within sixty (60) days after institution thereof; or (e) the death or legal disability of any Guarantor which is a natural person; or (f) as to any Guarantor which is not a natural person, the termination, dissolution, liquidation, consolidation, reorganization or merger of any such Guarantor, without the prior written consent of Lender.

Bay Point – Guaranty Agreement – Silverpeak (13MM) – War Chest
4887-6922-4246.2

EXHIBIT B

9. Subordination of Guarantor Subordinated Debt. If any of Guarantor shall advance any sums to Borrower or if Borrower shall hereafter become indebted to any Guarantor before the last to occur of the termination of all rights of Borrower to obtain advances of Loan proceeds and the full and final payment of the Obligations, such sums and indebtedness ("Guarantor Subordinated Debt") shall be subordinate in all respects to the Obligations. Any payment to Guarantor on account of Guarantor Subordinated Debt shall be collected and received by Lender or Guarantor in trust for Lender and shall be paid over to Lender on account of the Obligations without impairing or releasing the obligations of Guarantor hereunder.

Without the prior written consent of Lender, Guarantor shall not ask, demand, receive, accept, sue for, set off, collect or enforce Guarantor Subordinated Debt or any collateral and security therefor. The Guarantor represents and warrants to Lender that Guarantor Subordinated Debt is unsecured and agrees not to receive or accept any collateral or security therefor without the prior written permission of Lender. The Guarantor shall not assign, transfer, hypothecate or dispose of Guarantor Subordinated Debt while this Guaranty is in effect. In the event of any sale, receivership, insolvency or bankruptcy proceeding, or assignment for the benefit of creditors, or any proceeding by or against Borrower for any relief under any bankruptcy or insolvency law or other laws relating to the relief of debtors, readjustment of indebtedness, reorganizations, compositions or extensions, then and in any such event any payment or distribution of any kind or character, either in cash, securities or other property, which shall be payable or deliverable upon, or with respect to, all or any part of Guarantor Subordinated Debt or otherwise shall be paid or delivered directly to Lender for application to the obligations and liabilities of Guarantor under this Guaranty (whether due or not due and in such order and manner as Lender may determine in the exercise of its sole discretion) until the obligations of Guarantor hereunder shall have been fully paid and satisfied. The Guarantor hereby irrevocably authorizes and empowers Lender to demand, sue for, collect and receive every such payment or distribution on account of Guarantor Subordinated Debt and give acquittance therefor and to file claims and take such other proceedings in Lender's own name or in the name of Guarantor or otherwise, as Lender may deem necessary or advisable to carry out the provisions of this Guaranty. The Guarantor hereby agrees to execute and deliver to Lender such powers of attorney, assignments, endorsements or other instruments as may be requested by Lender in order to enable Lender to enforce any and all claims upon, or with respect to, Guarantor Subordinated Debt, and to collect and receive any and all payments or distributions which may be payable or deliverable at any time upon or with respect thereto.

So as to secure the performance by Guarantor of the provisions of this Guaranty, Guarantor assigns, pledges and grants to Lender a security interest in, and lien on, Guarantor Subordinated Debt, all proceeds thereof and all and any security and collateral therefor. Upon the request of Lender, Guarantor shall endorse, assign and deliver to Lender all notes, instruments and agreements evidencing, securing, guarantying or made in connection with Guarantor Subordinated Debt.

10. Subrogation. Notwithstanding anything to the contrary contained herein, Guarantor shall not have any right of subrogation in or under any of the Loan Documents or to participate in any way therein, or in any right, title or interest in and to any security or right of recourse for the Obligations or any right to reimbursement, exoneration, contribution, indemnification or any similar rights, until the last to occur of the termination of all rights of Borrower to receive advances of Loan proceeds and the full and final payment of the Obligations.

4

EXHIBIT B

11.    Representations and Warranties.

11.1    Due Organization and Qualification.  Guarantor is a corporation, limited liability company, or limited partnership duly existing under the laws of the jurisdiction of its incorporation or formation and qualified and licensed to do business in any state in which the conduct of its business or its ownership of property requires that it be so qualified except where a failure to be so qualified or licensed could not reasonably be expected to have a material adverse effect.

11.2    Due Authorization; No Conflict.  The execution, delivery, and performance of this Guaranty by Guarantor and the other Loan Documents to which it is a party are within Guarantor's powers, have been duly authorized, and do not and will not (a) conflict with or constitute a breach of any provision contained in Guarantor's certificate of formation or operating agreement or other applicable organizational or governing documents, (b) require any consent or approval of any governmental agency or authority (other than any consent or approval which has been obtained and is in full force and effect), (b) conflict in any material respect with any provision of applicable law or any judgment, order or decree, which is binding upon Guarantor or any of its respective properties, (c) conflict with or constitute an event of default under any agreement to which Guarantor is a party or by which Guarantor is bound, or (d) require, or result in, the creation or imposition of any lien on any asset of Guarantor. Guarantor is not in default under any agreement to which it is a party or by which it is bound.

11.3    Validity and Binding Nature.  This Agreement and each other Loan Document to which Guarantor is a party is the legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, subject to bankruptcy, insolvency and similar laws affecting the enforceability of creditors' rights generally and to general principles of equity.

11.4    Financial Condition.  The financial statements of each Guarantor delivered to Lender prior to the Closing Date or pursuant to the terms hereof were prepared in accordance with GAAP (subject, in the case of interim financial statements, to normal year-end adjustments and the absence of footnotes) and present fairly in all material respects the financial condition of such Guarantor and its subsidiaries (as applicable) as at such dates and the results of its operations for the periods then ended and disclose all Indebtedness and other liabilities (direct or contingent) of such Guarantor and its subsidiaries (as applicable) as of the date thereof.

11.5    No Litigation.  No litigation (including derivative actions), arbitration proceeding or governmental investigation or proceeding is pending or, to Guarantor's knowledge, threatened in writing against Guarantor which could reasonably be expected to have a material adverse effect.

12.    Financial Statements.  Guarantor shall provide to Lender, as and when required, the financial information required to be delivered to Lender with respect to Guarantor pursuant to the terms of the Security Instrument and the other Loan Documents, certified by them to be true and correct and in such form and detail as may be reasonably requested by Lender.  Guarantor also

5

EXHIBIT B

agrees to provide Lender with such other financial information at such other times as may be reasonably requested by Lender.

13.    Governing Law.  The provisions of this Guaranty shall be construed, interpreted and enforced in accordance with the laws of the State of Colorado as the same may be in effect from time to time.

14.    Consent to Jurisdiction.  Guarantor irrevocably submits to the jurisdiction of any state or federal court sitting in the State of Georgia over any suit, action, or proceeding arising out of or relating to this Guaranty.  Guarantor irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding brought in any such court and any claim that any such suit, action, or proceeding brought in any such court has been brought in an inconvenient forum.  Final judgment in any such suit, action, or proceeding brought in any such court shall be conclusive and binding upon Guarantor and may be enforced in any court to whose jurisdiction Guarantor are subject, by a suit upon such judgment provided that service of process is effected upon Guarantor in a manner specified in this Guaranty or as otherwise permitted by applicable law.

15.    Service of Process.  To the fullest extent permitted by applicable law, Guarantor irrevocably consents to the service of process in the manner provided for notices in Section 18.  Nothing in this Guaranty will affect the right of Guarantor or Lender to serve process in any other manner permitted by law.

16.    WAIVER OF TRIAL BY JURY.  TO THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW IN EFFECT FROM TIME TO TIME, GUARANTOR HEREBY WAIVES ANY RIGHT IT MIGHT AT ANY TIME HAVE TO TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR IN ANY WAY PERTAINING OR RELATING TO THIS AGREEMENT OR THE EXERCISE OF ANY RIGHTS AND REMEDIES HEREUNDER, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE.

17.    Avoided Payments.  If at any time any payment, or portion thereof, made by, or for the account of, any of Guarantor on account of any of the obligations and liabilities hereunder is set aside by any court or trustee having jurisdiction as a voidable preference or fraudulent conveyance or must otherwise be restored or returned by Lender under any insolvency, bankruptcy or other federal and/or state laws or as a result of any dissolution, liquidation or reorganization of Borrower or upon, or as a result of, the appointment of any receiver, intervenor or conservator of, or trustee or similar officer for, Borrower or any substantial part of its properties or assets, Guarantor hereby jointly and severally agree that this Guaranty shall continue and remain in full force and effect or be reinstated, as the case may be, all as though such payment(s) had not been made.

18.    Notices.  Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement or any other agreement entered into in connection herewith shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by a

6

recognized overnight delivery service, certified mail, postage prepaid, return receipt requested, or electronic mail to Guarantor or to Lender, as the case may be, at its addresses set forth below:

|  |  |
|---|---|
| If to Guarantor: | War Chest Real Estate, LLC<br>7775 NW 128th Street<br>Parkland, FL 33076<br>Attn: Chapman Ducote<br>Email: chapman@chapmanducote.com |
| with a copy to: | Curtis Wolfe Law P.A.<br>3042 Orange Street<br>Miami, FL 33133<br>Attn: Curtis Wolfe, Partner<br>Email: curtiswolfe007@gmail.com |
| If to Lender: | Bay Point Capital Partners II, LP<br>3050 Peachtree Road NW, Suite 740<br>Atlanta, GA 30305<br>Attn: Charles Andros<br>Email: charlesandros@bay-pointadvisors.com |
| with a copy to: | Thompson Hine LLP<br>3560 Lenox Road, Suite 1600<br>Atlanta, GA 30326<br>Attn: Stephen B. Schrock, Esq.<br>Email: stephen.schrock@thompsonhine.com |

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

19.    Remedies Cumulative. All rights and remedies afforded to Lender by reason of this Guaranty, the Loan Documents, or by law are separate and cumulative and the exercise of one shall not in any way limit or prejudice the exercise of any other such rights or remedies. Every right, power and remedy given by this Guaranty to Lender shall be concurrent and may be pursued separately, successively or together against Guarantor or any one or more of them; and each such right, power and remedy may be exercised from time to time as often as Lender may deem expedient. No delay or omission by Lender in exercising any such right or remedy shall operate as a waiver thereof. No waiver of any rights and remedies hereunder, and no modification or amendment hereof, shall be deemed made by Lender unless in writing and duly signed by Lender. Any such written waiver shall apply only to the particular instance specified therein and shall not impair the further exercise of such right or remedy or of any other right or remedy of Lender and no single or partial exercise of any right or remedy hereunder shall preclude any other or further exercise thereof or any other right or remedy.

7

EXHIBIT B

20.    Powers of Attorney. The powers of attorney granted by Guarantor to Lender in this Guaranty shall be unaffected by the disability of the principal so long as any portion of the Loan remains unpaid or unperformed. Lender shall have no obligation to exercise any of the foregoing rights and powers in any event.

21.    Severability. If any provision (or any part of any provision) contained in this Guaranty shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision (or remaining part of the affected provision) of this Guaranty, but this Guaranty shall be construed as if such invalid, illegal or unenforceable provision (or part thereof) had never been contained herein but only to the extent it is invalid, illegal or unenforceable.

22.    Successors and Assigns. This Agreement shall inure to the benefit of, and be enforceable by, Lender and its successors and assigns as holder of the Note, and shall be binding upon, and enforceable against, Guarantor and their respective heirs, personal representatives, successors and assigns.

23.    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic ("pdf", "tif" or "jpeg") format shall be effective as delivery of a manually executed counterpart of this Agreement. Further, each party hereto agrees that any electronic signatures, whether digital or encrypted, of the parties to this Agreement and each other agreement, instrument or document delivered in connection herewith are intended to authenticate this writing and to have the same force and effect as manual signatures. For purposes of this Section, "electronic signature" means any electronic sound, symbol, or process attached to or logically associated with a record and executed and adopted by a party with the intent to sign such record, including facsimile or email electronic signatures.

[SIGNATURES APPEAR ON FOLLOWING PAGES]

8

EXHIBIT B

RIDER

LIMITATION ON GUARANTOR'S LIABILITY

1.    Limitation on Principal Amount.  Notwithstanding the language of Section 2.1 of this Guaranty, Guarantor's obligations under Section 2.1 of this Guaranty with respect to the repayment of principal of the Loan shall not at any time exceed Thirteen Million and No/100 Dollars ($13,000,000.00) as to principal (the "Guaranteed Principal Amount") plus interest on the Guaranteed Principal Amount from the date the same is due by Guarantor hereunder until paid in full at the highest rate of interest charged on any of the Indebtedness as of such due date, together with all costs, expenses and attorneys' fees incurred by Lender.  The limitation of Guarantor's liability as to principal and interest shall not affect the liability of Guarantor for payment of other amounts (other than principal and interest) that shall become due from time to time under the Loan Documents.  In no event shall the Guaranteed Principal Amount or the interest thereon for which Guarantor is liable hereunder be reduced as a result of Lender's receipt of payment of the Obligations from sources other than the Guarantor (such as, but not limited to, the Borrower or the collateral for the Loan) or any acceptance by Lender of a conveyance of collateral for the Obligations in lieu of foreclosure.

EXHIBIT B

WITNESS the signatures and seals of Guarantor as of the day and year first above written.

GUARANTOR:

WAR CHEST REAL ESTATE, LLC,
a Florida limited liability company

By:_____(SEAL)
　　Name: Chapman Ducote
　　Title: Manager

EXHIBIT B

**EXHIBIT J**

Docusign Envelope ID: 10DE04F6-4D8F-4995-9C4D-031B360B1732 EXHIBIT B

**LAW OFFICES OF JOHN F. ISBELL LLC**
**3050 Peachtree Road NW, Suite 740**
**Atlanta, Georgia 30305**
**(404) 849-6665**
**John@JFI-LAW.com**

December 12, 2025

**VIA FedEx and Email**

Silverpeak Holdings, LLC
Silverpeak Corp.
Chapman Ducote
War Chest Real Estate, LLC
Spoils of War, LLC
7775 NW 128th Avenue
Parkland, Florida 33076
chapman@chapманducote.com

Re:   **NOTICE OF DEFAULT; DEMAND FOR PAYMENT**
      That certain Note ("**Note**") in the original principal amount of $13,000,000.00, dated October 18, 2022, and executed by Silverpeak Corp. ("**Borrower**"), in favor of BPCP Investment Holdings, LP, as successor in interest to Bay Point Capital Partners II, LP ("**Lender**"); that certain Loan and Security Agreement, dated October 18, 2022, and executed by Borrower and Silverpeak Holdings, LLC ("**Parent**") in favor of Lender ("**LSA**"); that certain Preferred Ship Mortgage ("**Ship Mortgage**") dated October 18, 2022, and executed by Spoils of War, LLC ("**Spoils**") in favor of Lender; that certain Deed of Trust, Assignment of Leases and Rents and Security Agreement dated October 18, 2022 ("**NM Mortgage**") and executed by War Chest Real Estate, LLC ("**War Chest**") in favor of Lender; those certain Guaranty Agreements, dated October 18, 2022, and executed by Chapman Ducote ("**Ducote**"), Spoils, and War Chest, respectively (collectively, the "**Guaranties**"); those certain Pledge Agreements dated October 18, 2022, and executed by Parent and Ducote, respectively, in favor of Lender (collectively, "**Pledge Agreements**" and with the Note, LSA, Ship Mortgage, NM Mortgage, Guaranties, and all other related agreements, the "**Loan Documents**")

Dear Mr. Ducote:

This Firm represents Lender with regard to the Loan Documents. Pursuant to Section 2.3 of the LSA, Borrower and Parent were obligated to pay Lender principal and interest on the terms and conditions set forth therein, including that the first payment of principal was due on or before April 30, 2024, with payments thereafter being due on or before the first day of each respective month. Further, Ducote, Spoils, and War Chest (with Borrower and Parent, collectively, the "**Obligors**") are obligated pursuant to the Guaranties, respectively, to satisfy the obligations of Borrower and Parent under the Loan Documents

Obligors have failed to make payments when due under Section 2.3 of the LSA. Accordingly, Obligors are in default of their obligations under the Loan Documents, thereby constituting an "Event of Default" under the Loan Documents, pursuant to Section 8 of the LSA.

Docusign Envelope ID: 10DE04F6-4D8F-4995-9C4D-031B360B1732 EXHIBIT B

Silverpeak Holdings LLC
Silverpeak Corp.
Chapman Ducote
War Chest Real Estate, LLC
Spoils of War LLC
Page 2 of 2

Based upon the foregoing Events of Default, Lender hereby elects to accelerate the entire indebtedness due under the Loan Documents pursuant to Section 9 of the LSA. Further, pursuant to Section 2.8(d) of the LSA, a late fee of 10% of all missed payments is now due and payable, and interest is accruing at the default rate of 30% per annum, as set forth in Section 2.4(b) of the LSA. Finally, an exit fee has accrued pursuant to Section 2.8(c) of the LSA.

As of December 11, 2025, Obligors owe the following amounts to Lender:

- Principal:             $ 11,501,267.11
- Late Fees:             $  1,503,458.33
- Deferred Interest:     $  1,848,979.56
- Interest:              $  3,193,630.69
- Exit Fee:              $    500,000.00
- Legal Fees:            $     45,000.00
- **Total:**             **$ 18,592,335.70**

The foregoing amounts may not include all amounts due and owing to Lender under the terms and conditions of the Loan Documents.

Pursuant to the terms of the Loan Documents and based on the defaults summarized herein, Lender hereby accelerates and declares all amounts due thereunder to be immediately due and payable. Accordingly, the total of all monetary obligations as of November 19, 2025, is **$18,592,335.70** (the "**Monetary Default**").

**Lender hereby demands that Obligors immediately pay the Monetary Default. The exact amount due and owing to Lender on the date of payment may be ascertained by calling Kevin Brawner at 404-963-6031. Time is of the essence in your compliance with these demands and the complete performance of your obligations under the Loan Documents.**

Please be advised that any partial payment or performance of the obligations under the Loan Documents that gave rise to the default(s) identified in this notice shall not (i) constitute an accord, novation, or satisfaction, (ii) cure the subject defaults, (iii) reinstate the Loan Documents, or (iv) waive any rights or remedies of Lender thereunder. Lender continues to reserve and has every intention of pursuing each and every right and remedy available to it. **Pursuant to O.C.G.A. § 13-4-4, you are hereby notified that Lender intends to rely on the exact terms of the Loan Documents notwithstanding any alleged prior departure from the respective terms thereof, including any failures of Lender to pursue its remedies available to it as a result of the previous defaults under the Loan Documents.**

**Lender also reminds you that it has invoked the provisions in the Loan Documents concerning payment of attorneys' fees in addition to any principal and interest and other amounts due thereunder, pursuant to O.C.G.A. §13-1-11.** Notice is hereby given that Lender intends to enforce those provisions of the Loan Documents and Forbearance Agreement.

Docusign Envelope ID: 10DE04F6-4D8F-4995-9C4D-031B360B1732 EXHIBIT B

Silverpeak Holdings LLC
Silverpeak Corp.
Chapman Ducote
War Chest Real Estate, LLC
Spoils of War LLC
Page 3 of 3

This letter does not constitute a waiver of, nor shall it be construed to waive or otherwise prejudice in any respect, Lender's rights to exercise any rights or remedies that may be available to it under the Loan Documents. Further, acceptance by Lender of any payments due under the Loan Documents or reimbursable expenses shall not constitute cure of the defaults or constitute or be construed to waive or otherwise prejudice in any respect any of Lender's rights to exercise any other rights or remedies that may be available to it under the Loan Documents. Future discussions by and among Borrower and/or Guarantors and Lender and/or Lender's forbearance or delay from exercising its rights and remedies under the Loan Documents shall not cause a modification of the Loan Documents, establish a custom or course of dealing, or waive, limit or condition Lender's rights and remedies under the Loan Documents, all of which rights and remedies are expressly reserved by Lender.

Please feel free to contact me if you have any questions regarding this matter.

Sincerely,

*John Isbell*
6D6CC80B776A406...
John F. Isbell

cc:    Charles Andros

Curtis Wolfe Law, PA
3042 Orange Street
Miami, Florida 33133
Attn: Curtis Wolfe, Esq.
Curtiswolfe007@gmail.com

3

EXHIBIT B

**EXHIBIT** K

EXHIBIT B

# Curtis Wolfe Law PA

## Curtis Wolfe

305-812-4500
curtis@curtiswolfelaw.com
Licensed in Delaware and Florida

December 22, 2025

**VIA EMAIL**

Law Offices of John F. Isbell LLC
3050 Peachtree Road NW, Suite 740
Atlanta, GA 30305
Attention: John F. Isbell
John@JFI-Law.com

RE:    RESPONSE TO LETTER OF DECEMBER 12, 2025 NAMELY NOTICE OF DEFAULT;
DEMAND FOR PAYMENT

Mr. Isbell:

We are in receipt of your above-referenced demand letter. We represent Silverpeak Holdings, LLC, Silverpeak Corp., and Mr. Chapman Ducote in restructuring the Note, LSA, and Guarantees (as defined in your letter).

The positions taken in your letter are inconsistent with both the facts and the prior discussions between Mr. Ducote and Mr. Mitchell Dagley, a principal and authorized party of Bay Point Capital Partners II, LP ("Bay Point"), as related to me by Mr. Ducote.

First, Mr. Ducote confirmed that approximately two months ago, Mr. Dagley expressly agreed to a payment holiday while Silverpeak worked through an active sale process. That agreement was not informal or speculative—it was clearly communicated and relied upon by Silverpeak and Mr. Ducote.

Second, during those discussions, Mr. Dagley represented that Bay Point would continue to work cooperatively with Silverpeak and refrain from requiring payments while a sale transaction was being pursued. Silver and Mr. Ducote have acted in good faith and in reliance on those representations. Accordingly, your demand letter is directly contrary to what was agreed and discussed, and its timing—mid-transaction—is particularly problematic.

Third, Mr. Ducote has represented that the monetary figures asserted in the demand are grossly inflated and incorrect. The actual economics of the loan are straightforward:

- Outstanding principal is approximately $11 million and change

- Accrued PIK interest is approximately $1 million

EXHIBIT B

**Curtis Wolfe Law PA**

- Based on the agreements and operations between Silverpeak, Mr. Ducote, and Mr. Dagley, representing Bay Point, there are no legitimate late fees, exit fees, default premiums, or other add-ons of the type referenced in your letter because of the agreement on how Silverpeak would work towards sale and payment/settlement.

Mr. Ducote further represents that the realistic total payoff—including principal and PIK—is approximately $12.0 to $12.5 million, not the draconian and unsupported figures asserted in your demand letter. Inflating the claim in this manner serves no constructive purpose, particularly while a transaction is underway.

Fourth, and most importantly, Silverpeak and Mr. Ducote have been operating as if this is not a default scenario—it is a workout scenario.

As you are aware, the current credit and collateral structure is impaired through no fault of Silverpeak's or Mr. Ducote's good-faith efforts:

- The personal guaranty of Mr. Ducote is effectively compromised due to Mr. Ducote's ongoing divorce, the cratering of the cannabis industry that has significantly devalued Silverpeak and its related collateral, and other related legal matters, rendering the personal guarantee of limited practical value

- Bay Point's existing collateral—namely the TIC interest in War Chest—is not realistically, efficiently collectible, and thereby provides no clear path to repayment in its current form

In recognition of this reality, and as a good-faith effort to materially improve Bay Point's collateral position, Mr. Ducote proposed to Mr. Dagley a restructuring effectively as follows:

- Mr. Ducote would consolidate all TIC interests into a single, owned property

- That property could then be pledged as true real-property collateral, replacing the current non-collectible structure

- This materially enhances Bay Point's security and provides a real, executable path to repayment, which does not realistically exist today

Mr. Ducote confirmed that this proposal was offered as a trade: continued payment forbearance and revised loan terms in exchange for meaningfully better collateral. That overture remains on the table and represents a rational, commercially reasonable workout approach.

Issuing an aggressive demand letter in the middle of this process is counterproductive and inconsistent with both prior representations and agreements and Mr. Ducote's ongoing efforts to protect and enhance Bay Point's position.

We expect Bay Point to stand by the previously agreed payment holiday, withdraw the inflated demand figures, and re-engage constructively in the workout discussions already underway.

EXHIBIT B

**Curtis Wolfe Law PA**

We remain willing to move forward promptly and cooperatively to finalize a solution that benefits all parties.

Sincerely,

*Curtis Wolfe*
Curtis Wolfe (Dec 22, 2025 17:13:20 EST)

Curtis Wolfe