**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |  |
|---|---|---|
| BPCP INVESTMENT HOLDINGS, LP, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No. |
| - against - | : | 1:26-cv-03065-MLB |
| | : | |
| SILVERPEAK HOLDINGS, LLC, | : | |
| CHAPMAN DUCOTE, WAR CHEST | : | |
| REAL ESTATE, LLC, AND SPOILS OF | : | Hon. Michael L. Brown |
| WAR, LLC | : | |
| | : | |
| Defendants. | : | |

## <u>ANSWER, AFIRMATIVE DEFENSES, AND COUNTERCLAIMS</u>
### OF
### DEFENDANTS CHAPMAN DUCOTE,
### WAR CHEST REAL ESTATE, LLC,
### AND SPOILS OF WAR, LLC

Defendants Chapman Ducote, War Chest Real Estate, LLC, and Spoils of

War, LLC ("***Defendants***" or "***Counterclaim-Plaintiffs***"), [1] by and through counsel,

hereby answer the "Verified Complaint for Breach of Contract, Declaratory

Judgment, Accounting, Temporary Restraining Order and Interlocutory Injunction"

---

[1] In the "Answer" part, "Defendants" as used does **not** include Silverpeak Holdings, LLC, who is not represented by the undersigned. Otherwise however, for purposes of this pleading, defined terms set forth in the Complaint shall be used consistently as follows unless otherwise stated or further defined: (1) BPCP Investment Holdings, LP, as assignee and successor to Bay Point Capital Partners II LP ("Lender" or "Plaintiff"); (2) Silverpeak Holdings, LLC ("Parent"); (3) Chapman Ducote ("Ducote"); (4) War Chest Real Estate, LLC ("War Chest"); and (4) Spoils of War, LLC ("Spoils"). For the "Counterclaims" part, the parties appearing do not include Parent, and thus Parent is not part of the "Counterclaim-Plaintiffs" pleading herein.

1

dated April 10, 2026 (the "Complaint"), and originally filed in the Superior Court for Fulton County, State of Georgia (Civil Action File No. 26CV005216) [ECF No. 1-2], as follows:

## ANSWER

1.    Defendants admit the allegations of paragraphs 1, 20, 32, 35, 36, 60, 65, 66, of the Complaint.

2.    With regard to the allegations of paragraphs 2-5, Defendants admit that Parent, War Chest, and Spoils are limited liability company in the respective states listed in the Complaint, and that Ducote is a natural person domiciled in Florida. Defendants lack information and belief sufficient to admit or deny the remaining allegation(s) in those paragraphs regarding consent to jurisdiction, and therefore deny those allegations.

3.    With regard to the allegations of paragraphs 6, 8-9, 13, Defendants lack information and belief sufficient to admit or deny the allegations in those paragraphs, and therefore deny those allegations.

4.    With regard to the allegations of paragraph 7, Defendants admit that Ducote sold certain valuable real property interests, and that pledge agreements pertaining to those interests existed, but deny that Lender had or has rights to the proceeds. Defendants further admit that Ducote liquidated a certain certificate of deposit, but deny that the certificate of deposit was required to be maintained under

the "Loan Documents". Defendants admit that the proceeds from the certificate of deposit, and certain membership interests were ultimately transferred to Ducote's ex-wife, but deny the transfer was voluntary, and that Plaintiff was entitled to the proceeds or the interests or that the circumstances of the transfer were otherwise wrongful under the circumstances. Defendants further admit that as of the date of the Complaint, a certain sale of a particular real property was contemplated to occur, but deny the allegations that the foregoing was wrongful, or an attempt to harm Plaintiff in any manner, including willfully. As to the remaining allegations in the paragraph, Defendants lack information and belief sufficient to admit or deny the allegations in those paragraphs, and therefore deny those allegations.

5.      With regard to the allegations of paragraphs 10-12, 14-19, 21, 24, 29, 44, 50, 55, 79, 80, Defendants admit only that the Defendants identified in the Complaint in the foregoing relevant paragraphs entered into agreements, or created or received certain documents, which appear to resemble those annexed to the Complaint at Exhibits A, B, D, and F-I, on or around the date(s) variously set forth in the Complaint, but deny knowledge or information sufficient to form a belief as to whether the documents annexed to the Complaint as Exhibits A, B, D, and F-I are authentic, true, and accurate copies of the exact agreements signed, and therefore deny that Exhibits A, B, D, and F-I are authentic, true, and accurate copies of the agreements which they purport to be. Defendants admit that the Exhibits A, B, D,

and F-I annexed to the Complaint contain provisions discussing the subject matter referenced in the Complaint at the foregoing paragraphs. Defendants further admit the allegations of paragraph 21 pertaining to the ownership via tenancy in common, transfer of interest, and recording of transfer, but deny that the foregoing required Lender (Plaintiff)'s consent or that the forgoing acts were wrongful or disallowed. As to the remaining allegations in the foregoing paragraphs, and as to the authenticity or truth and accuracy of exhibits "C" and "E", Defendants lack information and belief sufficient to admit or deny the remaining allegations in those paragraphs, and therefore deny those allegations, and the authenticity, truth, or accuracy of exhibit "C" and "E".

6.     Defendants admit the first sentence of the allegations set forth in paragraph 22 of the Complaint, discussing the TIC Memorandum and its contents. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 22 of the Complaint, and therefore deny those allegations.

7.     With respect to the allegations in paragraph 23 of the Complaint, Defendants admit that the Provo TIC was sold. Defendants deny that Lender (Plaintiff) was entitled to consent, but in any event, further deny that they did not in truth and in fact consent.

8.      With respect to the allegations in paragraph 26, Defendants admit that Plaintiff engaged in conduct described in the first two sentences of the paragraph, but deny that Plaintiff was entitled to engage in the conduct described, or did so "properly", or that any alleged "acceleration" was permissible or valid as pled. Defendants admit that certain Defendants, through counsel, sent a demand letter on or around December 22, 2025, but deny that any claims or substance set forth in the letter were inaccurate. Defendants admit that Exhibit J appears to be an authentic copy of a certain letter received at that time which was received by Defendants. Defendants admit that Exhibit K is an authentic copy of the letter sent by Defendants through counsel at the time.

9.      With regard to the allegations in paragraph 31 of the Complaint, Defendants admit the interest in the Provo TIC was sold. Defendants further admit only that the proceeds from the sale were not paid to the Lender, because the lender was not entitled to any proceeds. Defendants deny the remainder of the allegations in the paragraph.

10.     With regard to the allegations in paragraph 33 of the Complaint, Defendants admit that the CD was liquidated, and the proceeds were paid to Ducote's Ex-Wife, or other debts which accrued due to the divorce. Defendants deny the allegations that the foregoing was wrongful or in violation of the Loan Agreement identified, or that Plaintiff had any entitlement to the proceeds from the

5

CD. Defendants admit that §6.10 states, *inter alia*, that "Ducote shall maintain the Certificate of Deposit", but deny that the CD was part of the collateral to which Plaintiff would have been entitled, as opposed to merely being a loan covenant to maintain.

11.     With regard to the allegations in paragraph 34, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth therein pertaining to whether or how the lender was informed, and therefore deny that allegation. Defendants admit that a transfer of the interest occurred, but deny that it was in violation of any operative agreement, or that under the circumstances of the transaction, the transfer either required consideration, or if required, that consideration was inadequate.

12.     With respect to the allegations in paragraph 37-41 of the Complaint, Defendants admit that Martin has communicated with Lender (Plaintiff) in the period prior to the date of the Complaint, but lacks knowledge or information sufficient to form a belief as to the exact content or substance of the communications, and therefore denies the allegations of the paragraph as to the specific content, or lack thereof, of the communications, or whether Plaintiff made requests, or whether specific information was provided in response to those requests, which are similarly thus denied. Defendants admit that in one communication, Martin used the words

"game on" but deny the allegations pertaining to the characterization, indication, or intent of the words as pled.

13.    With regard to the allegations in paragraphs 43, 49, 54, 58, 67, 69, 78, Defendants repeat and reallege each and every particular response to each and every allegation as previously stated, and incorporate same by reference as if restated in full in response to each and every of the foregoing paragraphs.

14.    With regard to the allegations in paragraphs 59, 70-71, and 83, Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny the allegations; and in relevant part to the foregoing allegations, respectfully refers the Court to the respective statutes cited for its full and exact content and terms.

15.    With regard to the allegations of paragraph 81, Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny the allegations.

16.    Defendants deny all of the remaining allegations set forth in Plaintiff's Complaint including without limitation all the allegations in paragraphs 8, 25, 27, 28, 30, 42, 45, 46, 47, 48, 51, 52, 53, 56, 57, 61, 62, 63, 64, 68, 72, 73, 74, 75, 76, 77, and 82.

## AFFIRMATIVE DEFENSES

17.    Defendants assert the following additional defenses to the Complaint. In doing so, Defendants do not assume any burden of proof on any issue that is Plaintiff's burden as a matter of law. Defendants also reserve the right to amend or supplement these defenses as additional facts become known, or as of right as permitted by operative law, statute, or rule.

## First Affirmative Defense: Failure to State a Claim

18.    The Complaint fails to state a claim upon which relief can be granted because Plaintiff cannot plausibly allege breach or damages of the Loan Agreement, or that any alleged breach was material, or satisfaction with conditions precedent which would obligate payment, and otherwise that payment obligations accrued in Plaintiff's favor.

## Second Affirmative Defense: Service

19.    Plaintiff did not, in respect to any attempted acts pled to further a foreclosure upon any business entities or real property identified in the Complaint, properly serve Defendants with materials obliged to be served, or did so in a manner inconsistent with operative law and the operative Pledge Agreement such as in a commercially unreasonable manner or such that Defendants did not receive actual or constructive notice such that Defendants had a reasonable opportunity to interpose and asset rights (such as including but not limited to the right to appear and bid at a foreclosure sale, or, to pay off outstanding balance, or ensure a commercially

reasonable sale price) conferred to  Defendants, and which Defendants were entitled to appear and interpose or assert.

20.     Furthermore, and separately, Plaintiff did not, until on or subsequent to May 15th, 2026, in fact effectuate proper service of any papers upon any Defendants, and to date, on information and belief, Plaintiff has still not in fact served the Georgia State Court "Summons" document on Defendants. Specifically, the "service" purportedly memorialized by the Exhibit "C" document to the Notice of Removal [ECF 1-3, pp. 1-3] does not constitute valid service pursuant to the FRCP, or the operative documents providing contractually-agreed alternative means of service. In addition, Counsel for Defendants were not, prior to May 15th, 2026, and have still not been served with the Georgia State Court "Summons", and as such when filing the materials filed on May 15th, 2026 (which occurred at or around approximately 9:30AM), all such materials filed at that time and on that date were denominated as a "SPECIAL APPEARANCE" and thus Defendant preserved at that time the lack of proper service, which has not since been completed.

### Third Affirmative Defense: Estoppel and Unclean Hands

21.     Plaintiff made affirmative statements to Ducote, inducing him or otherwise assuring him or consenting to his taking actions including but not limited to transferring some or all of the interests alleged to have been, and admitted above

9

to have been transferred, which Plaintiff alleges form some or all of the basis of their alleged claims and/or breaches.

22. Plaintiff did so through both written (email) and verbal means, and communicating directly with Ducote in respect to providing permission for, acknowledging, and assuring Ducote that if taking certain actions, Plaintiff would settle with, release, and discharge any alleged indebtedness on the part of Ducote, including *inter alia* with respect to the transaction involving the swap transaction in which War Chest exchanged its interest in the Oklahoma property for a greater interest in the Muncie Property.

23. Ducote therefore correspondingly understood and undertook those actions in reliance upon those assurances.

24. Thus, to the extent of the actions admitted above, Plaintiff is estopped and has unclean hands, such that Plaintiff cannot assert breach, obligation, or entitlement to recover against Defendants, based upon the allegations set forth above, even if proven by Plaintiff or admitted by Defendant above.

25. Plaintiff has further committed inequitable conduct in various respects, including but not limited to (a) obtaining TRO relief from the Georgia State Court via misrepresentations and omissions, due to utilizing a procedure which ensured that in the first instance, Plaintiff's application would be heard ex parte, and thus Defendants were not able to appear or mount a cognizable defense; and (b)

liquidating approximately $900,000 from Ducote's business account at defendant Silverpeak on or around March 13, when Ducote was still in control of Silverpeak (which is now in receivership), which was both improper as a matter of law based on the operative agreements and Plaintiff's failure to give proper or commercially reasonable notice, and as being in violation of the foregoing inducements and assurances which Plaintiff gave to Ducote.

### Fourth Affirmative Defense: Failure to Satisfy Conditions Precedent

26.     Some or all of Plaintiff's claims are barred based on failure of Plaintiffs to comply with operative provisions of the various governing documents proffered by Plaintiff, to the extent such documents or others are true and accurate authentic copies of the documents containing the agreement(s) of Plaintiff and Defendants.

### Fifth Affirmative Defense: Documentary Evidence

27.     Some or all of Plaintiff's claims are barred based on documentary evidence, as Plaintiff does not plead, and did not comply with the operative governing documents pertaining to some or all of the business entities, including *inter alia* War Chest, via the "Amended and Restated War Chest Agreement" dated and effective April 6, 2026, which distinguishes between membership rights and managerial authority; and assuming *arguendo* Plaintiff does prove Plaintiff obtained membership rights, Plaintiff thus obtained only an "ownership" interest in War Chest, but Plaintiff never obtained managerial authority, which remains with and is

11

specifically vested in Ducote, and Plaintiff does not have, and has never had ability to remove Ducote, permit or direct a sale, approve a sale, or otherwise exercise authority over War Chest's business affairs, all of which are powers reserved to the manager (Ducote) alone.

### Reservation of Rights

28.   Defendants reserve the right to assert additional affirmative defenses as they become known through discovery or otherwise, and to amend this Answer and defenses pursuant to the Federal Rules of Civil Procedure.

## COUNTERCLAIMS

29.   Counterclaim-Plaintiffs Ducote, War Chest, and Spoils assert the following counterclaims against Counterclaim-Defendant BPCP Investment Holdings, LP, as assignee and successor to Bay Point Capital Partners II LP ("Counterclaim-Defendant" or "BPCP").

### Nature of Counterclaims

30.   These Counterclaims are for fraud and misrepresentation, promissory estoppel, intentional infliction of emotional distress, tortious interference, improper foreclosure via deficient notice, and violation of Colorado's consumer protection statute. Counterclaim-Plaintiffs bring this action in response to the outright reversal in position taken by Counterclaim-Defendant BCPC in, essentially, sandbagging one of their longtime borrowers, and his borrowing business entities, at a moment of

acute vulnerability known to BCPC, whereby they first induced him by promise of a different resolution during a long-running, difficult debt workout, allowed him (and encouraged him) to effectuate the steps of that resolution, which he did in good faith, and then at the moment of being forced to stand by their word, simply changed position. Apparently deciding that only they get to decide when to keep their word (and then not keeping it anyway), BCPC's claims, answered above, bizarrely attempt to cast Ducote as somehow the proximate cause of this litigation, rather than their own opportunism, manipulation, and intentional gamesmanship to attempt to procure by coercion and abusive procedural tactics a benefit which, if owed to them at all, they had foresworn. Counterclaim-Plaintiffs seek, by these counterclaims, nothing more or less than to hold BCPC to its promise, which was that for a specific and agreed-upon resolution, they would release and deem satisfied all putative obligations owed to BCPC by the Counterclaim-Plaintiffs, to the extent owed at all, and to the extent proven up. To be sure, Counterclaim-Plaintiffs have been damaged, however, by costs sustained taken in reliance upon BCPC's assurances of settlement, and by the fact of BCPC's reversals and attendant damages sustained by their tactics, all of which are sought hereto.

## Parties

31.    Counterclaim-Defendant BCPC is a limited partnership with its primary offices located in Atlanta Georgia.

a. BCPC's sole-listed "General Partner" is Bay Point Advisors, LLC ("BPA"), with a business and service address at 3050 Peachtree Road, Suite 740, Atlanta, GA, 30305, and that entity is a limited liability company incorporated in Delaware.

b. On information and belief, BPA is owned by Bay Point Venture Corp., a company incorporated under Delaware law, with its principle place of business in Delaware, Andros Holdings, LLC, a limited liability company organized under Georgia law and whose member is Charles Andros (resident and domiciled in Atlanta, Georgia), Canoochee Capital, LLC, a Nevada LLC whose sole managing member, on information and belief, is Charles Andros (see above); and GEJ Investment Corp, a company incorporated under Georgia law, with a principle place of business at 2705 Stillwater Lake Lane, Marietta, Georgia.

32. Ducote is a natural person resident and domiciled in Florida.

33. War Chest is a Florida limited liability company, whose sole member is Ducote (resident and domiciled in Florida).

34. Spoils is a Florida limited liability company, whose sole member is Ducote (resident and domiciled in Florida).

35.    Non-party to the counterclaims part of this pleading, but Defendant in respect to the claims originally brought by BCPC, Silverpeak Holdings, LLC ("*Silverpeak*" or "*Parent*") is a Colorado limited liability company, in which Chapman Ducote (resident and domiciled in Florida) owns an interest.

### Jurisdiction and Venue

36.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and complete diversity exists as between all parties properly opposed, who are citizens of different states.

37.    This court has personal jurisdiction over Counterclaim-Defendant BPCP because BPCP regularly conducts business in Atlanta Georgia by virtue of its primary office location, and Atlanta is within the Northern District of Georgia.

38.    Venue is proper in this Court under 28 U.S.C. §1391(b)(1) because this judicial district is one in which the Counterclaim-Defendants reside.

### Factual Allegations Supporting All Claims

39.    Counterclaim-Plaintiffs repeat and reallege each and every of the foregoing paragraphs as if fully set forth herein.

*Original Agreement And Collateral Package Composition (Late 2022)*

40.    On or around October 18, 2022, Silverpeak, Ducote, War Chest, and Spoils entered into a certain "Loan and Security Agreement" (the "Loan

Agreement") with Bay Point Capital Partners II, LP ("BP II"), who on information and belief later assigned the Loan Agreement to Counterclaim-Plaintiff. A copy of the Loan Agreement is annexed hereto and made a part hereof as **Exhibit 1**.

41.     In respect to the Loan Agreement, Silverpeak was the "Borrower," and Ducote, War Chest, and Spoils were "Guarantor[s]"; BP II was "Lender".

42.     At or around the foregoing time, Silverpeak was substantially owned by and wholly controlled by Ducote.

43.     On or around October 18, 2022, Ducote also executed a "Pledge Agreement" (the "Pledge Agreement") with BP II. A copy of the Pledge Agreement is annexed hereto and made a part hereof as **Exhibit 2**.

44.     Both the Loan Agreement and the Pledge Agreement contain Colorado state law choice of law provisions.

45.     The Loan Agreement and an affiliated "Note" (exhibit "A" to the Loan Agreement itself) created, in 2022, a principal obligation owed to BP II (and later by assignment, BCPC) of $13,000,000 (the "Obligation").

46.     The Loan Agreement also, at exhibit "B", described a certain parcel of real property located in Bernalillo County, New Mexico (the "NM Property"), and upon which pursuant to the Loan Agreement Borrower received a mortgage.

47.     The NM Property was owned by Ducote directly.

16

48.    The Pledge Agreement pledged, in favor of BP II (and later by assignment, BCPC) a number of "Pledged Interests," and also "Pledged Property". The "Pledged Interests" memorialized at exhibit "A" to the Pledge Agreement is Ducote's 100% "Membership Interests" in War Chest, and it is specified that Ducote, at the time of pledging, owned 100% of the ownership interests in War Chest, and pledged 100% of his interest owned (the "War Chest Interest"). However, based on Ducote's divorce, it is not clear that Ducote was able to pledge (or owned) the War Chest Interest.

49.    War Chest itself owned, at or around the time of the Pledge Agreement, a number of other real property interests, including a 50% interest in a shopping center located in Provo, Utah through a tenancy-in-common ("TIC") agreement of its own (the "Provo TIC"), and another 38.7% interest in real property located in Bartlesville Oklahoma, also owned through a TIC agreement (the "OK TIC").

50.    War Chest also, eventually, owned a 40.5% interest in a certain "Muncie Marketplace" parcel of real estate (the "Muncie Property"), still through a TIC, in Muncie Indiana (the "Muncie TIC").

51.    Thus, the sole basis of collateral, other than the yacht or the mortgage on the NM Property, was the War Chest Interest. But Ducote was never permitted, by the several TIC agreements, to directly pledge real estate interests themselves in

17

the underlying real properties, and no security interest was ever perfected in the Provo TIC, the OK TIC, or the Muncie TIC, and none was ever offered.

52.    Rather, those TIC agreements each contained various terms and provisions which, in sum and substance, created impairments to the interests held by Silverpeak/Ducote and secured or pledged as part of the Collateral Package.

53.    The foregoing impairments, generally, were transparently discussed and disclosed to BP II in pre-execution discussions occurring prior to the consummation of the Loan Agreement and Pledge Agreement.

54.    Due to the TIC agreements applicable to each and all of the foregoing, it was self-evidently clear both to Ducote, and to BP II (and later to BCPC) that in order to actually execute against much of the Collateral Package, should it wish to, BP II (or later BCPC) would experience difficulty executing and obtaining collateral security due to the provisions of the various TIC agreements, which they were fully aware of, having been put on notice of their existence, and presented with them prior to BP II nevertheless making the decision to enter into the Loan Agreement and the Pledge Agreement, and with the Collateral Package created thereby.

55.    Also around 2022, prior to the consummation of the Loan Agreement or Pledge Agreement, BP II and Ducote discussed the existence of a certain "certificate of deposit" (the "CD") held and maintained by Ducote, which Ducote at the time expressly and specifically communicated to BP II could not be part of the

collateral package for multiple reasons, most saliently, that Ducote had a more senior lender, Hancock Whitney Bank ("Whitney"), who held over $40 million in senior loans, and that the existence and maintenance of the CD was in relationship to Ducote's obligations to Whiteny, and thus could not be part of the collateral package.

56.    As a compromise, it was agreed – and memorialized in the Loan Agreement – that the CD was "established and maintained with by [sic] Hancock Whitney Bank in the name of Ducote" (and not for, by, or through Ducote's relationship with BP II), *see* **Ex. 1** at p. *2, and that Ducote's obligation under the Loan Agreement was only that he "shall maintain" the CD. *See* **Ex. 1** at §6.10, p. *27. The CD was not, however, in fact part of the collateral, and at no time ever did BP II (or later BCPC) have actual rights to execute upon or receive the $10,000,000 reflected by the CD.

### *Counterclaim-Plaintiff's Conduct and Course of Compliance (2022-2026)*

57.    Subsequent to the execution of the Loan Agreement and the Pledge Agreement, Silverpeak (at Ducote's direction) himself made regular payments of approximately $130,000-150,000 approximately monthly, generally not being late or missing payments, and/or transparently disclosing to BP II (and later by assignment BCPC) when circumstances existed whereby Silverpeak would have difficulty making payments exactly on time, and on those occasions reaching ad hoc

or temporary agreements as to exactly when payments would be made, and upon which payments were in fact made as agreed.

58.     However, by 2024, it became necessary for Ducote to begin liquidating assets in order to maintain his obligations to BP II/BCPC; as a result, first, the NM Property was sold, for approximately $7 million, and yielding net proceeds of $1 million after payment first to the senior lender. The sale occurred with knowledge and permission of BP II/BCPC, and all net proceeds from the sale were duly tendered by Ducote to, and received by BP II/BCPC.

59.     Shortly after the sale of the NM Property, Ducote also sold a certain luxury yacht, which was directly owned by Spoils, but which was not directly part of the Collateral Package on the face of the Loan Agreement or the Pledge Agreement, but which BP II/BCPC had placed a junior ship's mortgage, subject to a senior lender. In order to maintain the obligations, Ducote also directed Spoils to sell, again with knowledge and permission of BP II/BCPC, the yacht, satisfy the senior lender, and then, all excess funds from the sale were duly tendered by Ducote to, and received by BP II/BCPC.

60.     Due to the sale of the NM Property, and the ancillary sale of the yacht, Ducote recognized at or around the end of 2025 that Silverpeak/Ducote had exhausted their readily-transferrable collateral, and that although the War Chest

Interest still remained, the interests held by War Chest were non-majority interests in the underlying properties outright, and impaired by the various TIC agreements.

61. Therefore, beginning in late 2025 and running through early 2026, Ducote engaged persons affiliated with BCPC (but also principally employed, on information and belief, by BPA, which is the "General Partner" of BCPC, and thus controls the actual day-to-day business operations of BCPC) including but not limited to Charles Andros ("Andros"), and Mitchell Dagley ("Dagley").

62. In both email correspondence annexed hereto and made a part hereof as **Exhibit 3**, and supplementary verbal communications by phone between Ducote, it was in or around prior to January 2026 that BCPC and Silverpeak/Ducote agreed, in sum and substance, to a modification of the existing and exact payment terms of the Obligations memorialized and secured by the Collateral Package.

63. In sum and substance, the agreement was as follows: that in order to avoid the difficulty of Plaintiff's impaired collateral as to the minority interest TIC properties currently constituting the Collateral Package, Ducote would exchange those properties for additional equity in another property, the Muncie Property, which would then be transferred or sold, but in any event the property or the proceeds tendered to BCPC in full and final settlement of the remaining Obligation outstanding, which was by late 2025 (then approximately 35 months worth of payments made by Silverpeak/Ducote later as of October 2025), only approximately

21

$9 million outstanding. Additionally, the verbal agreements confirming requests made within **Ex. 3** included BCPC confirming a "60 day Payment Holiday" requested by Ducote on or around October 31, 2025.

64.   The nature of the exchange relating to the Muncie Property was offered by Ducote because while previously owning only 40.5% of the Muncie Property and doing so subject to a TIC, if exchanging the War Chest Interest in the OK TIC with Ducote's other partner in the Muncie Property, an entity known as "War Chest Jr." (which owned the remaining share of the Muncie Property), War Chest could obtain a majority share of the Muncie Property, still held through a TIC, but now meaningfully more useful and usable as collateral for BCPC's purposes.

65.   Also in connection with the "swap," BCPC was aware that the Provo TIC, in order to effectuate the Muncie Property acquisition directly for the OK TIC, would need to be sold, and was sold, as well. Thus, when the Provo TIC was sold, it was with BCPC's knowledge, and consistent with the "swap" they had authorized.

66.   Thus, Ducote requested, and BCPC did in fact agree, to permit Ducote to effectuate a "swap" where Ducote coordinated with his partners at "War Chest Jr." to receive the outstanding interest in the Muncie Property not by that time owned by War Chest, and thereby consolidate War Chest's interests by increasing to a majority its interest in a single property, the Muncie Property, in exchange for sale of the less-useable interest in the OK TIC.

22

67.    Ducote thus undertook, as agreed with BCPC, to (a) sell the interest memorialized by the Provo TIC in satisfaction of its Obligations to BCPC, and then (b) effectuated the "swap" of the OK TIC interest for increased stake in the Muncie Property.

68.    However, in doing so, as an accommodation to BCPC, Ducote's partners at "War Chest Jr." declined, in order to make the "swap", to enter into the deal on a cash basis, and insisted that while they would agree to the "swap," it was to be a "no money" swap; at the time, the value and income of the OK TIC property was approximately $4 million greater than that generated and received by the Muncie Property, and so when ultimately effectuating the "swap" for the specific purpose of providing BCPC their increased collateral package, Ducote lost $4 million.

69.    Thus, in effectuating the "swap" in reliance upon BCPC's assurances, Ducote sustained damage by carrying through the deal BCPC had assured him they would accept in satisfaction and settlement of his obligations.

70.    Ducote had no other reason why, and would not have undertaken such a deal on such terms in the absence of a reason such as the assurance of settlement provided by BCPC, which was in truth and in fact the reason why he did so.

71.    In the verbal communications supplementary to the **Exhibit 3** email which occurred at or around the same time between Ducote and Andros and Dagley,

BCPC affirmatively instructed Ducote to complete the "swap" transaction, and assured Ducote that the entire matter, including the Obligation, would be resolved upon transfer of the Muncie Property (and its subsequent sale), and the remainder of the business (i.e., Silverpeak), which would be accepted by BCPC, and after consummation of which, Ducote would be released.

72.    Although more explicitly agreeing to the foregoing verbally by phone, Dagley confirmed that some such agreement was in fact reached with Ducote/Silverpeak via an email dated Monday, January 12, 2026 (*see* **Ex. 3**) where Dagley acknowledged the agreement by asking "Where do we stand with the equity consolidation" and queried Ducote as to the "[l]ast time we spoke" where he acknowledges without raising dispute that Ducote "said the *equity consolidation would be complete before Christmas*", clearly indicating prior knowledge and agreement to the not-disputed or objected "equity consolidation".

73.    Dagley further acknowledged that, in addition to the "equity consolidation," BCPC was on notice of and anticipated that the "shopping center", i.e., the Muncie Property (known as "Muncie Marketplace") was to have been sold.

74.    In response to Dagley's email, on January 12, 2026, Ducote confirmed that "[t]he equity consolidation was completed dec 31th and docs were signed last week. One more thing to do with the bank, but it is basically done."

### *BCPC Repudiates their Agreement With Ducote*

24

75. Upon further communication with Ducote later in January 2026 however, BCPC confirmed the agreement that the Obligations would be settled and deemed satisfied, in exchange for the Muncie Property interest, and the Silverpeak business, which was the full scope of the "swap" agreement.

76. At this time, BCPC still did not, in fact, have a direct interest in the Muncie Property, which they never had, and only had the indirect interest via War Chest, and the inclusion of Ducote's War Chest Interest in the Collateral Package.

77. Between January and February 2026, Ducote proceeded and continued to finalize the necessary transfers and transactions to consummate and conclude the "swap," at times, communicating further with BCPC to confirm or update BCPC on the progress, and each time, BCPC implicitly re-confirming its prior agreement by receiving such updates without objection or suggestion that the activities of Ducote were objectionable or inconsistent with their desires or wishes.

78. At or around a number of weeks subsequent to the **Exhibit 3** email chain, when Ducote had effectively completed the "swap", he engaged in a further phone call with Andros, where he advised Andros in sum and substance that the "swap is complete" and he had "done everything" BCPC instructed him to do, and was ready to effectuate the final step of the "swap", specifically, the transfer of the Muncie Property to BCPC, and also transfer ownership over Silverpeak to BCPC, consistent with the "agreement" previously discussed. In response, Andros stated, in

sum and substance, that "We [BCPC] don't want that deal anymore," and proceeded to state that instead, BCPC would require sale of the Muncie Property, liquidation of the Silverpeak Business *and* payment of all proceeds to BCPC, *but further* that once that happened, BCPC would still proceed against Ducote personally for any and all remaining deficiency contended to still be outstanding, which was contrary to the "agreement" which they had assured Ducote they would accept.

79.    Ducote responded to the effect of reminding Andros of the "agreement" which he had acted under, which was to result in settlement in satisfaction, and not further obligation; and emphasized that the apparent reversal of BCPC was emotionally jarring and horrifying to receive, as Ducote had only recently concluded a protracted and highly stressful divorce proceeding which had lasted four years and largely resulted in unfavorable outcomes for Ducote (stripping him of many assets), and that on top of that, the BCPC Obligation and striving to remain in good standing with BCPC while juggling the divorce proceedings had already been extremely stressful and straining. Andros simply stated that BCPC would not honor that agreement.

80.    Andros then further went on to state, in sum and substance, that "[i]f you think your divorce was bad and put you in a bad mental space, wait until we start crawling up your ass. That will make your divorce seem like a picnic. We are coming for you and we're not messing around."

26

81.     The result and impact of those statements appeared, to Ducote, to be a threat, and were plainly intended by their substance and delivery, and the context under which they were delivered, to create fear, and be inherently coercive, and indeed they were so.

82.     As a result, at or around this time, Ducote retained James Martin, a Managing Partner of ACM Capital Partners, LLC, to become involved with advising Ducote, to intercede on his behalf with the newly aggressive and apparently untrustworthy BCPC, and to otherwise aid in the restructuring of Silverpeak's business's financial affairs.

83.     However, on or around March 13, shortly after the above conversation, BCPC acted to attempt to liquidate approximately $900,000 from Silverpeak's business's account.

84.     When the foregoing liquidation occurred, it became immediately known to Silverpeak employees, who had already received payroll checks which potentially would not clear; to vendors, who contacted Ducote in Ducote's capacity as principal and director of Silverpeak to question its financial viability and ability to satisfy obligations; and elsewhere throughout Silverpeak where management and employees and other ownership were forced, before a weekend with banks soon to close, to resolve the crisis.

85.     As the overall executive then in charge of Silverpeak, the entirety of the foregoing effected Ducote, who then experienced severe and dramatic mental and emotional distress in endeavoring to remedy the situation.

86.     Previously, at each and every time which BCPC (due to its holding a "Deposit Account Control Agreement" over Silverpeak's accounts per the Loan Agreement) had ever directed Silverpeak's bank to transfer money from Silverpeak to BCPC, i.e., the monthly interest payments which had for 35+ months always ultimately been made on or around the date due, BCPC had uniformly contacted Silverpeak to confirm the adequacy and convenience of monies on deposit and available, and a mutually agreed time upon which to direct the bank to withdraw them, and done so via comptroller-to-comptroller communication, prior to any withdrawal being in fact effectuated.

87.     On March 13th, however, for the first time ever, BCPC did not do this, and simply directed the bank to withdraw, on information and belief, all available funds.

88.     On information and belief, as informed by the circumstances surrounding the timing and known factors pertaining to effectuating such a liquidation, without notice whatsoever, and at the time it was effectuated, BCPC acted intentionally by effectuating the liquidation at the time and in the manner they

did, specifically to cause the very effects upon Ducote which the liquidation thus caused.

89.    Ducote thus asked Martin to communicate with BCPC in connection with the attempt to liquidate $900,000 from Silverpeak.

90.    This occurred on a Friday, at the close of business, after several hundred thousand dollars of vendor payments and payroll checks were issued---they did this knowingly and maliciously.

91.    Martin contacted, at Ducote's direction, BCPC, and was able to prevail upon BCPC to return the liquidated funds, on information and belief, by suggestion that BCPC's liquidation was legally improper in various ways, which BCPC then did.

92.    As a result, and to further protect Silverpeak, Martin advised Ducote to put Silverpeak into receivership, which Ducote then did, and which thus resulted in Ducote no longer controlling Silverpeak.

93.    Shortly after the attempted (and practically speaking, successful, if later reversed) Silverpeak liquidation, Ducote, in his capacity as manager of War Chest, undertook to amend and restate the War Chest LLC agreement.

94.    The "Amended and Restated War Chest Agreement" dated and effective April 6, 2026 is annexed hereto and made a part hereof as **Exhibit 4** (the "Amended and Restated War Chest Agreement").

95.    In relevant part, the Amended and Restated War Chest Agreement provides as follows:

> 2.14 Manager. "Manager" shall mean Chapman Ducote, and in the event that the Member or Members are other than Chapman Ducote, the initial Member, notwithstanding any provisions of the Act to the contrary, Chapman Ducote shall continue as the Manager and shall not be subject to removal by the Member(s).

> 2.15 Member. "Member" shall mean Chapman Ducote, or his transferee, or any Additional Member. At any time that there is more than one Member, the term "Member" shall mean all Members, and any action that may be taken under this Agreement by the Member may be taken by any Member, provided that any dispute with respect to any action shall be decided by a majority of the Members.

*See* **Ex. 4** at p. 3. It further provides that:

> 7.1 Management Rights. All management of the Company shall be vested in the Manager and all decisions concerning the business affairs of the Company shall be made by the Manager.

*Id.* at p. 5.

96.    As of April 6, 2026, BCPC had not executed or foreclosed upon any interest in War Chest which they held as part of the Collateral Package.

97.    The Amended and Restated War Chest Agreement is and was otherwise fully valid and effective as of April 6th, 2026.

98.    Pursuant to the Amended and Restated War Chest Agreement, while Ducote's ownership and membership interest, on the one hand, were and remained conceptually subject to being executed upon if BCPC acted to foreclose upon the War Chest Interest as part of the Collateral Package, Ducote's *role* as "Manager"

would persist, and not be modified or possible to modify simply by BCPC undertaking to execute or foreclose upon the War Chest Interest.

99. Only the "Manager" of War Chest, by the Amended and Restated War Chest Agreement, and not any "member", has managerial authority over War Chest, such as to direct or block any proposed sale, and otherwise direct the business operations of War Chest.

100. The foregoing includes bringing and/or defending legal proceedings on or on behalf of War Chest.

101. Ducote has never ceased to be "Manager" of War Chest.

### BCPC's Improper Foreclosures

102. Changing tact, BCPC then initiated proceedings in State Court of Georgia, via the "Verified Complaint for Breach of Contract, Declaratory Judgment, Accounting, Temporary Restraining Order and Interlocutory Injunction" dated April 10, 2026 (the "Complaint"), and originally filed in the Superior Court for Fulton County, State of Georgia (Civil Action File No. 26CV005216) [ECF No. 1-2].

103. Filing the Complaint without, as of the date of the Complaint, having served any of the "defendant" parties (who are the parties to this pleading, plus Silverpeak, who by virtue of the receivership, is no longer directed by Ducote, and thus does not answer or counterclaim in this pleading), BCPC then moved for an *ex parte* TRO in Georgia State court, which hearing occurred on or around April 14th,

2026, and resulted in the TRO Order which remains in effect pursuant to 28 U.S.C. §1450, as of the date of this pleading. *See* ECF 2.

104. As of April 14th, and as confirmed by the Complaint which nowhere pleads that any foreclosure or execution has occurred, BCPC had not, then, in fact executed or foreclosed upon *any* interest in the Collateral Package.

105. Indeed, as demonstrated by their "Emergency Motion" and supporting affidavits filed with the Georgia Court prior to the April 14th hearing, BCPC took the position before the Georgia Court that they required the TRO they sought specifically because they needed to freeze and prevent a certain sale which they alleged they had learned Ducote planned to effectuate of the Muncie Property.

106. At the time, Ducote, by virtue of his role as Manager of War Chest, was entirely and rightly authorized to direct War Chest to sell properties held by War Chest, and was in fact doing so in attempting to arrange the sale.

107. In approaching the Georgia Court, BCPC's emergency motion also confirmed that the improperly-noticed "foreclosure" they sought to effectuate upon the War Chest Interest had not happened yet as of April 14th, and indeed would only happen on "April 17, 2026", as stated in their motion papers, and an Affidavit of Greg Jacobs submitted therewith.

108. In their motion, BCPC contended they "properly noticed" a UCC foreclosure sale with respect to the War Chest Interest, but in truth and in fact,

BCPC's "notice" consisted of an April 9th and April 14th posting in the New York Times, and not notice to Pledgor (Ducote) as required by Section 5.2 of the Pledge Agreement.

109.   The Pledge Agreement contains no specific rules on what constitutes proper foreclosure or execution, if attempted, upon the War Chest Interest,  but Section 5.2, "Actions upon Event of Default" provides that "[a]ny notification required by law of any intended disposition by the Lender of any of the Collateral shall be deemed reasonably and properly given if given at least ten (10) days before such disposition."

110.   Neither of the notices provided were commercially reasonable, as posted in the New York Times, and not otherwise provided to Ducote or even advising Ducote of where such notices not provided directly to him would be posted.

111.   Regardless, the earliest notice given, that on April 9th, was fewer than ten (10) days before the foreclosure sale.

112.   On information and belief, the foreclosure sale did in fact happen within fewer than ten days of either notice, notwithstanding the fact neither notice was otherwise commercially reasonable.

113.   Ducote thus did not receive opportunity to appear at the foreclosure sale and bid.

114. Ducote was affirmatively legally entitled to have opportunity to, upon proper notice, appear and bid at the foreclosure sale, or similarly prior to the sale, tender payment of value commensurate with the value of the asset to be sold or the outstanding Obligation.

115. Neither occurred, because Ducote did not receive proper notice.

116. When the foreclosure sale occurred subsequent to the April 14th hearing and entry of the TRO, Ducote remained, still, the Manager of War Chest.

117. Ducote, as Manager, never authorized the sale of any War Chest assets, or the sale of War Chest itself, per the Amended and Restated War Chest Agreement.

118. The alleged foreclosure sale, improperly conducted and without Ducote having received proper opportunity to appear or bid or tender value equivalent, resulted in a commercially unreasonable putative sale of War Chest, where BCPC accepted a bid for War Chest dramatically below its fair market value, and thus intentionally underselling Ducote in respect to what should have been the actual value procured by the sale of War Chest in satisfaction of the Obligations, even if such sale was otherwise permissible, which it was not.

119. Even so, the putative sale of War Chest still did not result in Ducote ceasing to be Manager of War Chest.

**Count I – Common Law Fraud**

120. Counterclaim-Plaintiffs repeat and reallege each and every of the foregoing paragraphs as if fully set forth herein.

121. The circumstances above, including but not limited to pertaining to the "swap," and the assurance to Ducote given by BCPC, which they then reversed upon after inducing Ducote to undertake the actions and transfers pled herein and above, constituted fraud in that BCPC misrepresented a material fact, knew that their representation given to Ducote was false, Ducote did not know the representation was false, and BCPC intended Ducote to rely upon their representation and assurance, which Ducote then did. Ducote was thus damaged, to the extent of the consequential damages which have arisen from his reliance upon BCPC's representation, which include but are not limited to the loss in value sustained by Ducote on the "swap" of $4 million, out of necessity to effectuate the swap and consolidate the equity, and other damages set forth above.

122. Thus, for the foregoing reasons, the Court should enter judgment in favor of Counterclaim-Plaintiffs and against BCPC on common law fraud under Colorado state law.

## Count II – Promissory Estoppel

123. Counterclaim-Plaintiffs repeat and reallege each and every of the foregoing paragraphs as if fully set forth herein.

124.   The circumstances above additionally state a claim for promissory estoppel, in that BCPC, as promisor, made a promise to Counterclaim-Plaintiffs via Ducote, to the extent of assuring Ducote that they not only permitted and approved his undertaking certain transfers, but which if effectuated, and then tendering the proceeds to BCPC, would be accepted in full satisfaction of all outstanding Obligations, if any. BCPC should have reasonably expected that their promise, which was enthusiastically accepted and confirmed by Ducote, would induce Ducote to act consistent thereto, and as pled above, Ducote in fact did undertake specific actions in reliance upon the promise, to wit, Ducote undertook to effectuate the exact transfers and otherwise relied upon the promise while materially changing his position, and also forbearance to act differently, i.e., to attempt to satisfy his obligations by other means. Now, BCPC brings action against Ducote, contending that the entirety of his actions which form the basis of BCPC's allegations answered in the first part of this pleading are other than the response to an affirmative assurance they gave. Thus, the actual promise and assurance given by BCPC, which Ducote relied upon, must be enforced to prevent injustice.

125.   Thus, for the foregoing reasons, the Court should enter judgment in favor of Counterclaim-Plaintiffs and against BCPC on the claim of promissory estoppel under Colorado state law.

**Count III – Common Law Intentional Infliction of Emotional Distress**

126. Counterclaim-Plaintiffs repeat and reallege each and every of the foregoing paragraphs as if fully set forth herein.

127. The circumstances pled, taken together, but constituting of the entirety of BCPC's tactical approach, coercive conduct, and strategic use of threats in connection with known vulnerability of their counterparties, support that BCPC engaged in extreme and outrageous conduct, and did so with the intent to cause the very emotional distress which was caused by, among other things, the threats made to Ducote verbally by Andros some weeks after the **Ex. 3** email chain and Ducote's finalization of the "swap", and, the sudden action to liquidate the $900,000 from Silverpeak, at the time they did, in the amount they did, and contrary to all prior practice, which BCPC clearly knew would by those circumstances, create a crisis ripe for exploitation. The emotional distress caused to Ducote by the entirety of the foregoing was, for the reasons set forth above, in fact severe, and thus Counterclaim-Plaintiffs state damages in an amount ultimately to be determined.

128. Thus, for the foregoing reasons, the Court should enter judgment in favor of Counterclaim-Plaintiffs and against BCPC on the claim of intentional infliction of emotional distress under Colorado state law.

### Count IV – Common Law Tortious Interference With Contract

129. Counterclaim-Plaintiffs repeat and reallege each and every of the foregoing paragraphs as if fully set forth herein.

130. The circumstances set forth above set forth a basis that BCPC, in inducing Counterclaim-Plaintiffs to effectuate the "swap" based upon the promise, are likewise liable for tortious interference with contract, as BCPC was aware of their several contracts between the two parties, to wit, the Loan Agreement and the Pledge Agreement, and their affirmative statements and directives to Ducote encouraging him to undertake certain actions such as to transfer collateral (with their permission) constituted technical breaches of their own contracts with him, such as including but not limited to the agreement to provide him a "holiday" yet later suing him, *inter alia,* on the basis that he defaulted as to the payment schedule due to the holiday, which they fail to acknowledge when bringing suit against the foregoing lead-caption Defendants for breach. Thus, BCPC's actions establish they intended, by their inducements, to create the very breach sued upon.

131. Thus, for the foregoing reasons, the Court should enter judgment in favor of Counterclaim-Plaintiffs and against BCPC on the claim of intentional infliction of emotional distress under Colorado state law.

## Count V – Deficient Notice Regarding UCC Foreclosure (Colo. Rev. Stat. Ann. §§4-9-611, 4-9-625)

132. Counterclaim-Plaintiffs repeat and reallege each and every of the foregoing paragraphs as if fully set forth herein.

133. Colorado law requires that disposition of collateral secured pursuant to a contract by sale or other disposition must be "commercially reasonable", and which includes the method, manner, time, place, and the terms of ultimate disposition, and such "reasonable notification" of sale or disposition must be provided to the putative debtor, unless debtor in writing and after default explicitly and knowingly releases creditor from such obligation.

134. Here, BCPC did not notify Counterclaim-Plaintiffs entitled to be notified in a commercially reasonable manner, and the manner which they utilized – publication in the New York Times – was not reasonable under the circumstances, nor previously agreed upon, and even then, was still not given by the only metric established in the Pledge Agreement for notice, i.e., a minimum of ten (10) days before the foreclosure sale.

135. As a result, Counterclaim-Plaintiffs did not receive appropriate and proper opportunity to appear at the foreclosure sale, bid, or otherwise tender value to BCPC.

136. The sale itself was commercially unreasonable, to wit, that all interests sold at the foreclosure sale were sold at unreasonable prices, thus damaging Counterclaim-Plaintiffs to the extent of diminishing the value in offset of those sales to any obligation arguably outstanding. Specifically, the value at which the interests

sold was undersold amounted to in in excess of $8-10 million dollars, subject to further proof at trial.

137.   Thus, for the foregoing reasons, the Court should enter judgment in favor of Counterclaim-Plaintiffs and against BCPC on the claim of violation of Colorado state law statutory provisions governing proper foreclosure process, rights of debtors to same, and notice.

**Count VI – Unfair or Deceptive Trade Practices (Colorado Consumer Protection Act; Colo. Rev. Stat. Ann. §§6-1-101 *et seq.*)**

138.   Counterclaim-Plaintiffs repeat and reallege each and every of the foregoing paragraphs as if fully set forth herein.

139.   BCPC is in the business of providing unique financing and lending options to a discrete market demographic with niche financing needs, and lacking clear ability to obtain financing from different or more traditional financial counterparties.

140.   Counterclaim-Plaintiffs are consumers in respect to the foregoing demographic, and who here, utilized BCPC's services.

141.   BCPC's tactics and strategy, demonstrated by the foregoing pleadings, make intentional use of bargaining disparity, lack of transparency, and overt bait-and-switch tactics in furtherance of an overall scheme to maximize (and then sue upon) their recovery of funds from their consumers, through punitive and one-sided

40

provisions embedded in their contractual documents, and, their conduct with their counterparties.

142.  Counterclaim-Plaintiffs engaged BCPC in the course of BCPC's standard business, and entered into agreements similar to all other BCPC clients.

143.  BCPC, per the above, has engaged in the type of conduct set forth above, which is unfair and deceptive in nature, as intentionally calculated and constructed to bring about breach by the clients, which can then be exploited by BCPC.

144.  BCPC's tactics as used on Counterclaim-Plaintiffs are reflective of similar tactics utilized elsewhere on other BCPC counterparties, who constitute members of the public at large, within the demographic likely to utilize BCPC's services for unique financing.

145.  Counterclaim-Plaintiffs have been harmed by BCPC's conduct in the manner pled above.

146.  BCPC's conduct caused the harm suffered by Counterclaim-Plaintiffs.

147.  Thus, for the foregoing reasons, the Court should enter judgment in favor of Counterclaim-Plaintiffs and against BCPC on the claim of violation of the Colorado state Consumer Protection Act.

### Count VII – Declaratory Judgment (28 U.S.C. §§2201, 2202)

148.   Counterclaim-Plaintiffs repeat and reallege each and every of the foregoing paragraphs as if fully set forth herein.

149.   For the reasons set forth herein, an actual controversy exists as to the rights and claims of the Counterclaim-Plaintiffs, on the one hand, and BCPC on the other, in respect to the entitlement to certain particular pieces of collateral, the ability to sell same, and the propriety of foreclosure.

150.   In the absence of declaratory judgment, Counterclaim-Plaintiffs may suffer harm due to the dispute over the proper foreclosure, and their ongoing rights to direct War Chest, which questions hinge upon the other allegations, claims, and defenses asserted by all parties hereto.

151.   There is a concrete and ascertainable legal dispute as to the present rights, and disposition of same, which are disputed by all parties, and which neither party is, at present, capable of relinquishing without either waiver, but at risk of further legal harm to their respective positions by persisting to assert.

152.   Thus, the Court should declare as follows, whether (a) Ducote remains in charge of and directing the business affairs of War Chest; (b) whether the foreclosure sale of same without authorization of War Chest's manager is effective whatsoever; (c) whether the foreclosure sale was properly noticed and effectuated and otherwise "commercially reasonable"; and (d) solely to the extent not duplicative of and/or in the alternative, whether BCPC is estopped, promissorily, or

on equitable grounds, from enforcing the terms of the contract, if proven to have given the promise or assurance substantially consistent with that both asserted as an affirmative defense, and affirmatively alleged by Counterclaim-Plaintiffs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Counterclaim-Plaintiffs respectfully request that the Court enter judgment as follows:

(a) Dismissing the Complaint of BCPC in its entirety;

(b) Entering judgment in favor of Defendants/Counterclaim-Plaintiffs on Defendants' affirmative defenses;

(c) Entering judgment in favor of Defendants/Counterclaim-Plaintiffs on Counterclaim-Plaintiffs claims asserted herewith;

(d) Awarding compensatory, consequential, emotional, and loss of value, diminution of business value, and difference in proper sale price damages, subject to proof at trial, on Counterclaim-Plaintiffs claims, together with costs, and reasonable attorney's fees;

(e) Awarding exemplary, treble, or statutory damages as appropriate under Colorado statute in connection with the claims brought under Colorado Statute;

(f) Awarding pre-judgment and post-judgment interest as permitted by law;

(g) Declaring that Ducote remains Manager of War Chest and empowered to direct and appear on behalf of the company for all purposes;

(h) Declaring that the foreclosure was improperly undertaken and invalid;

(i) Declaring that subject to proof, BCPC's promises and assurances serve to legally or equitably estop BCPC from enforcing the terms of the various contracts and agreements at issue here to the extent inconsistent with their promises and assurances;

(j) Granting such other and further relief as the Court deems just and proper.

## FULL JURY TRIAL DEMAND

Counterclaim-Plaintiffs demand a trial by jury on all issues so triable.

Dated:    Atlanta, Georgia
         June 8, 2026      **RIMÔN, P.C.**

By:   */s/ Jeffrey W. Melcher*
      Jeffrey W. Melcher
      3372 Peachtree Road, Suite 115
      Atlanta, Georgia 30326
      GA Bar No. 501180
      T: (404) 217 – 3750
      jeffrey.melcher@rimonlaw.com

*Attorneys for Defendants Chapman Ducote, War Chest Real Estate LLC, and Spoils of War LLC*

44

## <u>CERTIFICATE OF SERVICE AND COMPLIANCE</u>

I, the undersigned hereby certify that I have this day served a true and correct copy of the foregoing document via the Electronic Case Filing system, which automatically sends notice to counsel of record. I further certify that the foregoing document was prepared using Times New Roman 14-point font, one of the fonts and typeface sizes allowed by the Local Rules of the Northern District of Georgia.

This, the 8th day of June, 2026.

*/s/ Jeffrey W. Melcher*
Jeffrey W. Melcher, Esq.
Georgia State Bar No. 501180